IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHEPARD AND ASSOCIATES, INC. d/b/a LOKRING SOUTHWEST COMPANY 950 South 14th Street, LaPorte, Texas  77571 | ) ) ) ) ) | CASE NO.<br><br>JUDGE |
| And | ) ) | |
| BRAD SHEPARD 3201 Mineral Creek Court League City, Texas  77573 | ) ) ) ) ) ) | **COMPLAINT FOR BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, INTENTIONAL INTERFERENCE WITH CONTRACT,** |
| Plaintiff, | ) ) | **UNJUST ENRICHMENT, AND EQUITABLE ESTOPPEL** |
| v. | ) ) | **(Jury Demand Endorsed Hereon)** |
| LOKRING TECHNOLOGY, LLC 38376 Apollo Parkway Willoughby, Ohio 44094 | ) ) ) ) | |
| Defendant. | ) | |

**PARTIES, JURISDICTION, AND VENUE**

1. Shepard and Associates, Inc., d/b/a Lokring Southwest ("Southwest") is a corporation organized and existing under the laws of the State of Texas having its principal place

of business at 950 South 14th Street, LaPorte, Texas, 77571. Southwest is a resident of the State of Texas.

2. Brad Shepard is an individual domiciled in Texas.

3. Lokring Technology, LLC (Lokring) is an Ohio limited liability company which manufactures industrial couplings. Its headquarters and principal place of business is Willoughby, Ohio. Lokring is a citizen of the State of Ohio.

4. The amount in controversy between the parties is in excess of $75,000, exclusive of interest and costs.

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a), in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue in this Court is proper pursuant to 28 U.S.C. §1391(b). A substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property that is subject of this action is situated in this District. Lokring is also subject to in personam jurisdiction in this District.

## FACTS

7. Commencing in 2003, Southwest was formed by Joe Shepard, Brad Shepard's father, to act as an exclusive distributor for Lokring.

8. Southwest was the first exclusive distributor for Lokring.

9. The model for the distributorship was that the exclusive distributor would develop a customer base for Lokring products within an assigned geographic territory. The distributor would purchase Lokring products at a stated price and would mark up the price for re-sale to customers, keeping the margin as its profit.

10. The exclusive distributor would be responsible to obtain and pay for space, employees, accounting, and all costs incident to operating an independent business.

11. Lokring and Southwest entered into a written agreement for portions of the southwestern United States which provided, inter alia, that either party had the right to terminate the distributorship "for any reason." Upon termination, Lokring had the option, but not the obligation, to re-purchase some or all of distributor's inventory at distributor's cost, less handling.

12. Southwest became a successful distributor due to Joe Shepard's efforts and abilities.

13. After 2003, Lokring established other exclusive distributors around the world using Southwest's agreement as a template.

14. Lokring's distributorship agreement imposes requirements and restrictions on exclusive distributors regarding the promotion and sale of Lokring's product, including but not limited to:

    a. Maintain adequate service and warehouse facilities, adequate personnel, adequate stocks of inventory;
    b. Personally guarantee payment of distributor's purchases of Lokring products;
    c. Enable Lokring to train distributor's employees in the use and installation of Lokring's product;
    d. Create marketing policies and procedures meeting Lokring's standards;
    e. Provide Lokring with sales forecasts;
    f. Travel to the sales and service area and personally call on companies to sell Lokring products, regardless of whether the companies use Lokring products;
    g. Train customers in the use of Lokirng's products;
    h. Service customers through the distributor's personnel;
    i. Maintain liability insurance naming Lokring as additional insured;
    j. Maintain minimum inventory and tooling, subject to audit by Lokring;
    k. Maintain pricing for the sales of product as determined by Lokring;

    l.   Deliver any customers who purchase product for customer's facilities outside of the distributor's geographic area to Lokring to fill orders;

    m.  Participate in trade shows;

    n.   Create a catalogue of Lokring's products;

    o.   Assign an in-house sales manager to act as liaison with Lokring;

    p.   Assist Lokring in assessing customer requirements for product;

    q.   Submit market research for the sales area;

    r.   Provide monthly reports of products sold and inventory levels;

    s.   Maintain a net worth equal to 150% of the distributor's net worth according to distributor's prior year-end financial statement;

    t.   Provide quarterly financial statements;

    u.   Disclose all information pertaining to distributor's customers.

15. Lokring has had a pattern of terminating distributors who had reached the age of 65 and replacing them with younger persons.

16. In each instance of termination, Lokring repurchased a portion of the inventory and tooling from the terminated distributor for re-sale to a replacement distributor.

17. In 2015, Lokring approached Joe Shepard to propose that he establish a new distributorship in the southeastern United States to be located in Northern Florida.

18. Joe Shepard moved to Florida to establish a new exclusive distributorship as Joe Shepard & Associates, Inc., while at the same time operating Southwest, with the assistance of his son, Brad Shepard, a Southwest employee.

19. In late 2015, after Joe Shepard made the southeast distributorship operational, Lokring advised him that he could not hold two distributorships, and proposed that it terminate Southwest and establish another distributor.

20. Joe Shepard advised Lokring that he would be willing to finance the purchase of Southwest by his son Brad.

4

21. The purchase of a Lokring distributorship by a third party required Lokring's approval pursuant to the terms of the distributorship agreement.

22. Lokring engaged the services of business consultants and Lokring personnel to assist in structuring a transaction to sell Southwest to a third party.

23. Lokring agreed to a transaction in which Joe Shepard's Southwest shares would be sold to Brad Shepard at a value which included the going concern goodwill value of Southwest.

24. Lokring insisted that its counsel prepare the transaction documents; however, Lokring's original documents were later revised by separate counsel for Joe Shepard.

25. The structure of the sale finally approved by Lokring involved a promissory note from Brad Shepard to Joe Shepard for the purchase price of the business as a going concern, secured by a pledge of Brad's Southwest shares, with Brad signing an amended distributorship agreement with Lokring as Southwest's owner.

26. Lokring benefitted significantly from this structure, in that it was not required to make any cash outlay to repurchase Southwest's inventory and tooling for re-sale to a new distributor, while at the same time establishing a new southeast distributorship with the assurance that the revenue from Southwest would provide the source of income for Brad Shepard to make the promissory note payments to Joe Shepard, thereby securing Joe Shepard's financial requirements to maintain the southeast Lokring distributorship.

27. During the discussions among Lokring's owner Bill Lennon, Joe Shepard, Brad Shepard, and the consultants regarding the terms of Brad's purchase of Southwest's shares, Brad pushed for Southwest's new distributorship agreement to be for a stated term of seven years.

28. Bill Lennon replied that he could not agree to a definite term because of the other Lokring distributorships, but assured Brad that, so long as Southwest continued to perform, he would be "solid."

29. In reliance upon Bill Lennon's representation, Brad Shepard agreed to proceed with the transaction.

30. Lokring signed the stock purchase agreement as third party beneficiary. A copy of the stock purchase agreement is attached as Exhibit A.

31. By authorizing the transaction, Lokring obtained its benefit by using Southwest as the economic engine to support the transaction for establishing a new distributorship, and transferring the Southwest distributorship from Joe Shepard to Brad Shepard.

32. A copy of the Amended and Restated Distributorship Agreement between Southwest and Lokring is attached at Exhibit B.

33. Under Brad's ownership, Southwest grew from approximately $2,500,000 in sales in 2016 to nearly $6,000,000 in sales in 2018.

34. At Lokring's insistence, Brad invested hundreds of thousands of dollars in Lokring tooling and equipment, established a sales force, leased facilities to accommodate the growing business, and purchased vehicles and equipment to service Southwest's customers.

35. Lokring controlled virtually every aspect of Southwest's operations, making Southwest dependent on Lokring for its economic existence.

36. Brad Shepard performed every requirement in the Amended Distributorship agreement, including but not limited to providing and updating all customer information.

37. The tooling Lokring required Southwest to purchase at a significant cost was defective and had to be returned to Lokring for refurbishing.

38. Lokring imposed restrictions on the persons to whom Southwest could sell products.

39. After 2016, Joe Shepard continued to operate the southeast distributorship and hired a person to be his successor in the business.

40. In May 2020, Joe Shepard turned 65 and announced his retirement as a Lokring distributor.

41. In response to Joe Shepard's announcement, Lokring asked him if the successor could purchase the business from him, duplicating the transaction involving Southwest, namely, Joe Shepard would finance the transition, avoiding Lokring's having to outlay any money to repurchase the inventory and tooling.

42. Joe Shepard declined to participate in such transaction.

43. After Joe Shepard's refusal to finance his successor's purchase of the business, Bill Lennon became angry and sent belligerent and insulting communications to him.

44. Lokring terminated Joe Shepard & Associates, Inc.'s southeast distributorship and was forced to repurchase most of the inventory for resale to Joe Shepard's successor.

45. In July 2020, Bill Lennon told Brad Shepard that he was doing a "great job."

46. As of August 1, 2020, Brad owed approximately $800,000.00 to Joe on the promissory note for his purchase of Southwest.

47. On September 21, 2020, Lokring notified Brad Shepard that it was terminating Southwest's distributorship. A copy of the termination letter is attached as Exhibit C.

48. Despite the provision for termination for "any reason," no reason was given for the termination.

49. Plaintiffs have demanded that that they receive the benefit of the bargain with Joe Shepard, namely, the fair market value of the Southwest distributorship.

50. Lokring has refused to pay the fair market value for Southwest.

51. Lokring has failed and refused to pay for any of Southwest's inventory and tooling, valued at approximately $1,350,000.

52. The fair market value of Southwest is in excess of $4,000,000.00

## FIRST CAUSE OF ACTION
### (Breach of Contract)

53. Plaintiffs incorporate herein all of the foregoing paragraphs as if fully re-written.

54. Southwest and Brad Shepard have complied with all provisions of the distributorship agreement upon termination.

55. Lokring has inspected Southwest's inventory and tooling and has offered to purchase same.

56. Lokring has refused to pay Southwest unless Brad Shepard signs a release of all claims.

57. Lokring's refusal to pay the value of Southwest's inventory and tooling without a release constitutes a breach of the distributorship agreement.

58. Lokring owes Southwest $1,365,756 as and for Southwest's inventory and tooling.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

60. Plaintiffs incorporate herein all of the foregoing paragraphs as if fully re-written.

61. Lokring's requirement that Southwest disclose Southwest's customer information placed Lokring in a confidential relationship with Southwest.

62. Lokring's requirements for Southwest to maintain its distributorship as set forth in Paragraph 14, above, including but not limited to restrictions regarding persons to whom Southwest could sell product, placed Lokring in a position of disproportionate power over Southwest.

63. Lokring's requirements for Southwest to continue its distributorship made Southwest dependent on Lokring for its survival, creating a special trust and confidence in Lokring.

64. By reason of Lokring's distributorship requirements, Lokring occupied a fiduciary relationship with Southwest.

65. As a fiduciary, Lokring owed Southwest the duty of good faith and fair dealing.

66. Lokring's actions as detailed herein and its summary termination of Southwest's distributorship for no reason constitutes a breach of Lokring's fiduciary duty.

67. As a direct and proximate result of Lokring's breaches of fiduciary duty, Southwest has been damaged in an amount greater than $75,000.00, exclusive of interest and costs, the exact amount of which will be determined at the trial of the within matter.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

68. Plaintiffs incorporate herein all of the foregoing paragraphs as if fully rewritten, and in the alternative aver as follows.

9

69. Lokring has been unjustly enriched at Plaintiffs' expense by accepting the benefits of Southwest's purchase of Lokring's products and tooling without having to finance the establishment of a new distributorship for the southwest territory.

70. Lokring has been unjustly enriched by refusing to provide any compensation to Southwest for the defective tooling Lokring forced Southwest to purchase.

71. By reason of Lokring's unjust enrichment, Plaintiffs have been damaged in an amount greater than $75,000, exclusive of interest and costs, the exact amount of which will be determined at the trial of the within matter.

### FOURTH CAUSE OF ACTION
### (Intentional Interference with Contract)

72. Plaintiffs incorporate herein all of the foregoing paragraphs as if fully rewritten.

73. Lokring was aware of the contract between Brad Shepard and Joe Shepard for Brad's purchase of Southwest.

74. Lokring's improper termination of Southwest's distributorship cut off the income stream which enabled Brad Shepard to perform his contract with Joe Shepard.

75. Brad Shepard's inability to make the payments due pursuant to the contract with Joe Shepard has created a breach of that contract

76. Lokring's intentional interference with the contract has resulted in damage to Brad Shepard in the amount of $800,000.

### FIFTH CAUSE OF ACTION
### (Equitable Estoppel)

77. Plaintiffs incorporate herein all of the foregoing paragraphs as if fully rewritten.

78. Bill Lennon's statement to Brad Shepard that Southwest would remain as a distributor so long as it performed under the distributorship agreement was intended to induce

reliance by Brad Shepard to complete the purchase of Southwest and enter into the Distributorship Agreement with Lokring.

79. Brad Shepard relied upon the fact that Southwest would remain as a Lokring distributor so long as it performed under the Distributorship Agreement.

80. Brad has performed all the conditions of the Distributorship Agreement.

81. Bill Lennon's statement to Brad Shepard was false and misleading.

82. By relying on Bill Lennon's false and misleading statement, Brad Shepard has been damaged in an amount exceeding $75,000 exclusive of interest and costs, the exact amount of which will be determined at the trial of the within matter.

WHEREFORE, Plaintiffs Shepard and Associates, Inc., dba Lokring Southwest Company and Brad Shepard demand judgment against Lokring Technology, LLC, as follows:

I. As to the First Cause of Action, the amount of $1,365,756;

II. As to the Second Cause of Action, an amount in excess of $75,000.00;

III. As to the Third Cause of Action, an amount in excess of $75,000.00;

IV. AS to Fourth Cause of Action, the amount of $800,000;

V. As to the Fifth Cause of Action, an amount in excess of $75,000.00

together with interest and costs, and for such other and further relief to which plaintiffs are entitled in law and in equity.

    Respectfully submitted,

    NICOLA, GUDBRANSON & COOPER, LLC


    __/s/ John D. Sayre_____
    John D. Sayre (0015191)
    James H. Grove (0040815)
    Landmark Office Towers

1400 Republic Building
25 West Prospect Avenue
Cleveland, Ohio 44115-1048
Ph:  216-621-7227
Fx:  216-621-3999
Email:  sayre@nicola.com
          grove@nicola.com
Attorney for Plaintiffs

## JURY DEMAND

A trial by jury of the maximum number of jurors allowed by law is demanded by plaintiffs.

NICOLA, GUDBRANSON & COOPER, LLC

__/s/ John D. Sayre_____
John D. Sayre (0015191)
James H. Grove (0040815)
Landmark Office Towers
1400 Republic Building
25 West Prospect Avenue
Cleveland, Ohio 44115-1048
Ph:  216-621-7227
Fx:  216-621-3999
Email:  sayre@nicola.com
          grove@nicola.com
Attorney for Plaintiffs