# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **SHEPARD AND ASSOCIATES, INC.,** et al., | **CASE NO. 1:20-CV-02488** |
| **Plaintiffs,** | **JUDGE PAMELA A. BARKER** |
| -vs- | |
| **LOKRING TECHNOLOGY, LLC,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendant.** | |

This matter comes before the Court upon the Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion to Dismiss") of Defendant Lokring Technology, LLC ("Lokring").  (Doc. No. 6.)  Plaintiffs Shepard and Associates, Inc., doing business as Lokring Southwest Company ("Southwest"), and Brad Shepard (collectively, "Plaintiffs") filed a brief in opposition to Lokring's Motion to Dismiss on December 8, 2020, to which Lokring replied on December 18, 2020.  (Doc. Nos. 7, 8.)

Also, currently pending is Lokring's Emergency Motion to Enforce the Contracts.  (Doc. No. 9.)  Plaintiffs filed a brief in opposition to Plaintiffs' Emergency Motion to Enforce the Contracts on March 1, 2021, to which Lokring replied on March 8, 2021.  (Doc. Nos. 10, 11.)

For the following reasons, Lokring's Motion to Dismiss (Doc. No. 6) is GRANTED IN PART and DENIED IN PART, and Lokring's Emergency Motion to Enforce the Contracts (Doc. No. 9) is DENIED.

## I.    Background

### a.  Factual Allegations

In 2003, Joe Shepard, Brad Shepard's father, formed Southwest to act as an exclusive distributor for Lokring. (Doc. No. 5 at ¶ 7.)[1] Lokring and Southwest entered into a written agreement for Southwest to act as an exclusive distributor for portions of the southwestern United States. (*Id.* at ¶ 11.) As a Lokring distributor, Southwest would purchase Lokring products at a stated price and mark up the price for resale to customers, keeping the margin as its profit. (*Id.* at ¶ 9.) Either party had the right to terminate the distributorship "for any reason." (*Id.* at ¶11.) Upon termination, Lokring had the option, but not the obligation, to repurchase some or all of Southwest's inventory. (*Id.*)

Southwest was the first exclusive distributor for Lokring, after which, Lokring established other exclusive distributors around the world using Southwest's agreement as a template. (*Id.* at ¶¶ 8, 13.) Lokring's distributorship agreement imposes requirements and restrictions on exclusive distributors regarding the promotion and sale of Lokring's products, including requiring distributors to maintain adequate stocks of inventory, to allow Lokring to train their employees in the use and installation of Lokring's products, to create marketing policies and procedures meeting Lokring's standards, to provide Lokring with sales forecasts, to maintain pricing for the sale of products as determined by Lokring, to submit market research for their sales areas, to provide monthly reports of products sold and inventory levels, to provide quarterly financial statements, and to provide information pertaining to their customers. (*Id.* at ¶ 14.)

---

[1] The allegations contained in Plaintiffs' Amended Complaint are assumed to be true solely for purposes of ruling on Lokring's Motion to Dismiss.

In 2015, Lokring approached Joe Shepard to propose that he establish a new distributorship in the southeastern United States.  (*Id.* at ¶ 17.)  Joe Shepard then moved to Florida to establish a new exclusive distributorship as Joe Shepard & Associates, Inc., while at the same time operating Southwest, with the assistance of his son, Brad Shepard, who was a Southwest employee.  (*Id.* at ¶ 18.)  After Joe Shepard made the southeast distributorship operational, Lokring advised him that he could not hold two distributorships.  (*Id.* at ¶ 19.)

Subsequently, Joe Shepard advised Lokring that he would be willing to finance the purchase of Southwest by his son.  (*Id.* at ¶ 20.)  Pursuant to the terms of the distributorship agreement, such a purchase of a Lokring distributorship by a third party required Lokring's approval.  (*Id.* at ¶ 21.)  Lokring insisted that it prepare the documents for the transaction and engaged the services of business consultants and Lokring personnel to assist in structuring a transaction to sell Southwest to Brad Shepard.  (*Id.* at ¶ 22.)

Initially, Lokring structured the sale as a stock purchase agreement between Brad and Joe Shepard for the value of the distributorship to be paid by a promissory note, with Lokring as a third-party beneficiary.  (*Id.* at ¶ 23; Doc. No. 5-1.)[2]  Brad Shepard would then sign a new distributorship agreement with Lokring.  (Doc. No. 5 at ¶ 23.)  Lokring benefitted significantly from this structure, as it was not required to make any cash outlay to repurchase Southwest's inventory and tooling for resale to a new distributor.  (*Id.* at ¶ 24.)  At the same time, Lokring was able to establish a new

---

[2] In ruling on Lokring's Motion to Dismiss, the Court may consider exhibits attached to Plaintiffs' Amended Complaint. *See, e.g.*, *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011) ("[A] court may consider 'exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein,' without converting the motion to one for summary judgment.") (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

southeast distributorship with the assurance that the revenue from Southwest would provide the source of income for Brad Shepard to make the promissory note payments to Joe Shepard, thereby securing Joe Shepard's financial requirements to maintain the southeast Lokring distributorship. (*Id.*)

Lokring later proposed a different structure for the purchase.  Instead of a promissory note, Lokring proposed that the consideration for Brad Shepard's purchase of Joe Shepard's shares be paid through a consulting agreement between Southwest and Joe Shepard.  (*Id.* at ¶ 25.)  Lokring established the price for the purchase as $1,875,000.  (*Id.*; Doc. No. 5-2.)  However, Joe Shepard believed the consulting agreement exposed him to the possibility that a termination of the Southwest distributorship agreement by Lokring would leave him with no recourse for the purchase price.  (Doc. No. 5 at ¶ 26.)  As a result, he revised the documents to provide for the purchase of his shares in Southwest by Brad Shepard by promissory note, as it had been structured originally.  (*Id.*)

During discussions among Lokring's owner, Bill Lennon ("Lennon"), Lokring's consultants, Joe Shepard, and Brad Shepard regarding the purchase, Brad Shepard pushed for Southwest's new distributorship agreement to be for a stated term of seven years to match the term of the promissory note to Joe Shepard.  (*Id.* at ¶ 27.)  Lennon told Brad Shepard that he could not agree to a definite term because other Lokring distributorships were not for a definite term, but assured Brad Shepard that, so long as Southwest continued to perform, he would be "solid."  (*Id.* at ¶ 28.)  In reliance upon Lennon's representation, Brad Shepard agreed to proceed with the agreement.  (*Id.* at ¶ 29.)  Lokring subsequently approved the sale of Southwest's shares to Brad Shepard, although it did not sign as a third-party beneficiary.  (*Id.* at ¶ 30; Doc. No. 5-3.)

Southwest and Lokring also entered into an Amended & Restated Lokring Exclusive Distributor Agreement ("Distributor Agreement").  (Doc. No. 5 at ¶ 32; Doc. No. 5-4.)  The

4

Distributor Agreement provides that the agreement "may be terminated by either party for any reason by giving the other party written notice thirty (30) days in advance."  (Doc. No. 5-4 at Section 12.2.) With respect to the repurchase of inventory and tooling upon termination, the Distributor Agreement provides:

> (c)  Distributor shall make available for inspection, on terms reasonably agreed to by Company and Distributor, within fifteen (15) days of the termination of this Agreement for any reason, all Inventory then in Distributor's possession.  The Inventory will be inspected by Company for re-saleability.  If, in Company's sole discretion, the inventory is deemed to be in condition not suitable for resale ("Ineligible Inventory"), payment is not warranted and Company will not buy back the Ineligible Inventory.  If, in the Company's sole discretion, the inventory is deemed suitable for resale and it is in original factory packaging ("Eligible Inventory"), Company will repurchase all Eligible Inventory at one-hundred percent (100%[]) of Distributor's initial purchase price, and Distributor will return inventory within fifteen (15) days of the inspection described herein.  Company will deliver payment for the Eligible Inventory upon Company's receipt of the Eligible Inventory.
>
> (d)  Distributor shall make available for inspection, at the time of the inspection set forth above concerning the Inventory, all tooling previously used by Distributor for demonstration, rental, or loan.  Company will determine what, if any, reconditioning is required to restore these tools to their proper working condition.  If Company decides in its own discretion that reconditioning is required, payment to Distributor of the returned tooling's initial purchase price will be net of reconditioning fee unless the tooling has been deemed Ineligible Inventory as described above, in which case, Company will not buy back the same.

(*Id.* at Sections 12.5(c), (d).)  The Distributor Agreement also contains the same types of requirements and restrictions regarding the promotion and sale of Lokring's products noted above.  (*See id.* at Sections 5, 6.)

After Brad Shepard became the owner of Southwest in 2016, he continued to grow the business and, at Lokring's insistence, invested hundreds of thousands of dollars in Lokring tooling and equipment (some which was defective and had to be returned to Lokring for refurbishing), established a sales force, leased facilities to accommodate the growing business, and purchased

5

vehicles and equipment to service Southwest's customers.  (Doc. No. 5 at ¶¶ 33-34, 37.)  During this time, Lokring controlled virtually every aspect of Southwest's operations, and Brad Shepard abided by the requirements of the Distributor Agreement, including the requirement to provide customer information to Lokring.  (*Id.* at ¶¶ 35-36.)

In May 2020, Joe Shepard announced his retirement as a Lokring distributor.  (*Id.* at ¶ 40.)  In response, Lokring asked him if the successor to his distributorship could purchase the business from him in order to duplicate the structure of Brad Shepard's purchase of Southwest where Joe Shepard financed the transition, which would prevent Lokring from having to outlay any money to repurchase inventory and tooling.  (*Id.* at ¶ 41.)  Although it upset Lennon, Joe Shepard declined to participate in such a transaction.  (*Id.* at ¶¶ 42-43.)  As a result, after Lokring terminated Joe Shepard & Associates, Inc.'s southeast distributorship, it was forced to repurchase most of the inventory for resale to Joe Shepard's successor.  (*Id.* at ¶ 44.)

On September 21, 2020, although Lennon had informed Brad Shepard that he was doing a "great job" only months before, Lokring notified Brad Shepard that it was terminating Southwest's distributorship.  (*Id.* at ¶¶ 45, 47; Doc. No. 5-5.)  At that time, Brad Shepard still owed hundreds of thousands of dollars to Joe Shepard on the promissory note for his purchase of Southwest.  (*See* Doc. No. 5 at ¶ 46.)  Lokring did not provide a reason for its decision.  (*Id.* at ¶ 48.)  Lokring also refused to pay for any of Southwest's inventory and tooling, valued at approximately $1,350,000.  (*Id.* at ¶ 51.)

### b.  Procedural History

On November 3, 2020, Plaintiffs filed a Complaint in this Court against Lokring.  (Doc. No. 1.)  Shortly thereafter, on November 12, 2020, Plaintiffs filed an Amended Complaint, setting forth

the following causes of action:  (1) breach of contract, (2) breach of fiduciary duty, (3) unjust enrichment, (4) intentional interference with contract, and (5) equitable estoppel.  (Doc. No. 5.)

In response, on December 1, 2020, Lokring filed a Motion to Dismiss, seeking the dismissal of all claims in Plaintiffs' Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. No. 6.)  Plaintiffs filed a brief in opposition to Lokring's Motion to Dismiss on December 8, 2020, to which Loking replied on December 18, 2020.  (Doc. Nos. 7, 8.)

While Lokring's Motion to Dismiss was still pending, it filed an Emergency Motion to Enforce the Contracts in which it asserts that Plaintiffs have failed to return Southwest's inventory as required under the Distributor Agreement and should be ordered to do so by the Court.  (Doc. No. 9.) Plaintiffs filed a brief in opposition to Defendant's request on March 1, 2021, to which Lokring replied on March 8, 2021.  (Doc. Nos. 10, 11.)

As such, both Motions are ripe for consideration and will be addressed in turn.

## II.    Lokring's Emergency Motion to Enforce the Contracts

In its Emergency Motion to Enforce the Contracts, Lokring asserts that Plaintiffs have refused to release Southwest's inventory to Lokring as required under the Distributor Agreement.  (Doc. No. 9 at 2.)  Lokring also contends that Plaintiffs are violating confidentiality and non-competition agreements by soliciting Lokring's customers and representing that Lokring products are no longer available, but Lokring has not requested relief with respect to this conduct at this time.  (*Id.* at 2-3.) Instead, Lokring only requests that the Court order Plaintiffs to immediately return all inventory in their possession to Lokring.  (*Id.* at 4.)[3]  In response, Plaintiffs assert that Lokring's Motion is

---

[3] Lokring acknowledges that if the Court grants this relief, it would moot Lokring's Motion to Dismiss with respect to Plaintiffs' breach of contract claim because the basis for its Motion in that regard was Plaintiffs' own failure to perform by refusing to return the inventory as required by the Distributor Agreement.  (Doc. No. 9 at 1, 4.)

procedurally invalid and should be denied.  (Doc. No. 10 at 1-2.)  They also deny Lokring's allegations regarding their misconduct.  (*Id.*)  The Court agrees with Plaintiffs that Lokring's Motion is procedurally invalid and will deny Lokring's Emergency Motion to Enforce the Contracts, as the Court concludes that it has no authority to grant the requested relief in these circumstances.

Lokring does not identify the procedural basis for its request to enforce the Distributor Agreement on an emergency basis prior to a full adjudication of the merits of any claims, although it appears that such a request would be the equivalent of a motion for preliminary injunctive relief pursuant to Fed. R. Civ. P. 65.  Lokring cannot establish, however, that a preliminary injunction is warranted.

Generally, the Supreme Court has indicated that "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945).  In other words, "[a] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)).  "This is because '[t]he purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends [he] was or will be harmed through the illegality alleged in the complaint.'" *Id.* (quoting *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)).

Pursuant to this principle, a defendant that has not filed any counterclaims cannot obtain a preliminary injunction, as it has not sought any relief in the underlying action.  *Westbank Yellow Pages v. BRI, Inc.*, No. 96-1128, 1996 WL 255912, at *2 (E.D. La. May 13, 1996) ("If defendants

8

wish to file a counterclaim in this suit seeking a permanent injunction or other relief against plaintiff, they are free do to so . . . . Unless and until such a counterclaim is filed, the granting of the preliminary injunction sought by defendants would be inappropriate."); *see also Cabotage v. Ohio Hosp. for Psychiatry, LLC*, No. 2:11–cv–50, 2012 WL 3064116, at *3 n.1 (S.D. Ohio July 27, 2012) ("OHP did not advance *any* counterclaims against Plaintiff, let alone claims upon which this Court could ultimately award injunctive relief.").

In this case, Lokring has not filed any counterclaims against Plaintiffs regarding their alleged breach of the Distributor Agreement based on their failure to return Southwest's inventory.  Without such a claim upon which the relief sought ultimately may be granted, the Court cannot issue the requested preliminary injunction.  Thus, while there is no doubt that courts have the authority to enforce contracts, the grant of a preliminary injunction requiring Plaintiffs to return the inventory in their possession would be inappropriate under these circumstances.

The Court also notes that even if Lokring's Motion is considered a request to enforce the Distributor Agreement pursuant to the Court's inherent power, relief is still not warranted.  The Supreme Court has recognized that "[f]ederal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).  For example, district courts have the inherent power to sanction parties for misconduct and to rule on motions *in limine*.  *See id.*; *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  Although the Supreme Court has never precisely delineated the outer boundaries of these powers, it has recognized certain limits.  *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016).  Specifically, (1) "the exercise of an inherent power must be a 'reasonable response to the

9

problems and needs' confronting the court's fair administration of justice," and (2) "the exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute." *Id.* at 1892 (citations omitted).

Here, Lokring had the option of filing a counterclaim for breach of contract and moving for a preliminary injunction to enforce the contract, but did not do so. The Court sees no reason to exercise its inherent powers when there is an appropriate procedural avenue that was not followed that would have directly presented the issue.

Accordingly, Lokring's Emergency Motion to Enforce the Contracts is denied.

## III. Lokring's Motion to Dismiss

### a. Standard of Review

Under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

10

inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.""'"  *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

### b.  Analysis

#### i.  Breach of Contract

In Count One of Plaintiffs' Amended Complaint, they allege that Lokring has offered to purchase Southwest's inventory and tooling, but that Lokring has refused to pay Southwest for such inventory and tooling unless Brad Shepard signs a release of all claims, which Plaintiffs contend constitutes a breach of the Distributor Agreement.  (Doc. No. 5 at ¶¶ 53-58.)[4]  Lokring argues that Plaintiffs' breach of contract claims fail for two reasons.  First, Lokring argues that Plaintiffs have no

---

[4] Lokring denies requiring Brad Shepard to sign a release of claims.  (Doc. No. 6 at 6 n.8.)  However, for purposes of ruling on Lokring's Motion to Dismiss, the Court must accept Plaintiffs' factual allegations as true.  *Gunasekara*, 551 F.3d at 466.  Both parties also attached emails as exhibits to their respective briefs related to the issue of whether Lokring demanded a release.  (*See* Doc. Nos. 7-1, 8-1.)  However, the Court finds these emails were not part of the pleadings, and they will be excluded from the Court's consideration in ruling on Lokring's Motion to Dismiss.

right to the repurchase of Southwest's inventory because whether to do so is up to Lokring's sole discretion.  (Doc. No. 6 at 7.)  Second, Lokring asserts that Plaintiffs have not adequately alleged that they fulfilled their obligations under the Distributor Agreement because they have not alleged that they returned any of Southwest's inventory or tooling to Lokring, which is required before payment is due.  (*Id.*)[5]  Plaintiffs respond that they have adequately alleged that Lokring conditioned payment for Southwest's inventory on a release agreement, which precludes dismissing their breach of contract claims.  (Doc. No. 7 at 3.)  In its reply brief, Lokring once again points out that Plaintiffs have failed to allege that they fulfilled their obligation to return the inventory, and that, if anything, Plaintiffs have attempted to plead an anticipatory breach of contract claim, but have failed to adequately do so. (Doc. No. 8 at 1-3.)  Upon review of the parties' arguments, the Court finds that dismissal is not appropriate.

Under Ohio law, "[t]he party alleging breach of contract must show: (1) the existence of a binding contract or agreement; (2) the non-breaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the non-breaching party suffered damages as a result of the breach."  *Sobh v. Am. Family Ins. Co.*, 755 F. Supp. 2d 852, 855 (N.D. Ohio 2010).

However, "[w]hen a party to a contract declares that he or she will not perform the terms of the contract, an anticipatory repudiation occurs and the injured party can immediately maintain an action for breach*."  Cambridge Co., Ltd. v. Telsat, Inc.*, No. 23935, 2008 WL 649582, at *3 (Ohio Ct. App. 9th Dist. Mar. 12, 2008).  "To prevail on a claim of anticipatory breach of contract, a plaintiff

---

[5] Relatedly, because Lokring contends that payment is not due yet, Lokring also asserts Plaintiffs have failed to allege that they have suffered any damages yet.  (Doc. No. 6 at 7.)

12

must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff." *Haman Enterprises, Inc. v. Sharper Impressions Painting Co.*, 50 N.E.3d 924, 930 (Ohio Ct. App. 10th Dist. 2015). "[T]he repudiation must be expressed in clear and unequivocal terms." *Id.* (quoting *Metz v. Am. Elec. Power Co., Inc.*, 877 N.E.2d 316, 323 (Ohio Ct. App. 10th Dist. 2007)). For example, an "anticipatory repudiation occurs when a party declares that he or she will not perform the terms of the contract unless the contract price is increased." *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Commrs.*, 786 N.E.2d 921, 929 (Ohio Ct. App. 7th Dist. 2003). On the other hand, "[a] mere request for a change in terms or for cancellation does not constitute a repudiation." *Haman Enterprises*, 50 N.E.3d at 930.

Here, upon termination of the Distributor Agreement, the agreement provides, in relevant part, the following:

> If, in the Company's sole discretion, the inventory is deemed suitable for resale and it is in original factory packaging ("Eligible Inventory"), Company will repurchase all Eligible Inventory at one-hundred percent (100%[)] of Distributor's initial purchase price, and Distributor will return inventory within fifteen (15) days of the inspection described herein. Company will deliver payment for the Eligible Inventory upon Company's receipt of the Eligible Inventory.

(Doc. No. 5-4 at Section 12.5(c).) Plaintiffs allege that "Lokring has inspected Southwest's inventory and tooling and has offered to purchase same." (Doc. No. 5 at ¶ 55.) Thus, while Lokring does have discretion as to whether to repurchase inventory that is not suitable for resale, Plaintiffs have alleged that Lokring has chosen to repurchase Southwest's inventory. Plaintiffs also allege that "Lokring has refused to pay Southwest unless Brad Shepard signs a release of all claims." (*Id.* at ¶ 56.) Thus, Plaintiffs have adequately alleged that Lokring indicated its intent not to perform under the contract unless Plaintiffs consent to a release to which Lokring has no right under the Distributor Agreement.

13

While Plaintiffs' allegations are not detailed, accepting Plaintiffs' factual allegations as true and drawing all inferences in their favor, the Court finds that Plaintiffs have alleged a plausible claim for anticipatory breach of the Distributor Agreement. Because of the alleged repudiation, Plaintiffs also need not plead that they have fulfilled their obligation to return the inventory. Thus, Lokring's Motion to Dismiss is denied with respect to Count One.

### ii. Breach of Fiduciary Duty

In Count Two of their Amended Complaint, Plaintiffs allege that Lokring breached its fiduciary duty by terminating Southwest's distributorship for no reason. (Doc. No. 5 at ¶¶ 59-66.) Lokring asserts that dismissal of this claim is warranted because no fiduciary relationship existed, as Lokring and Southwest are merely parties to the Distributor Agreement, which explicitly sets forth their relationship as independent contractors. (Doc. No. 6 at 7-10; Doc. No. 8 at 3-6.) In response, Plaintiffs contend that based on Lokring's involvement in Brad Shepard's purchase of Southwest, its assurances to Brad Shepard that it would honor the distributorship as long as he performed, and Lokring's total control of Plaintiffs under the Distributor Agreement make this the rare instance where the distributorship did give rise to a fiduciary relationship. (Doc. No. 7 at 3-7.) The Court finds that Plaintiffs have adequately alleged the existence of a fiduciary relationship, and, as a result, dismissal is not appropriate.

"Under Ohio law, the following elements must be met to prove a breach of fiduciary duty: '(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately there from.'" *Bedford Nissan, Inc. v. Nissan N. Am., Inc.*, No. 1:16 CV 423, 2016 WL 6395799, at *11 (N.D. Ohio Oct. 28, 2016) (quoting *Pasqualetti v. Kia Motors Am., Inc.*, 663 F. Supp. 2d 586, 597 (N.D. Ohio 2009)).

14

Lokring challenges the adequacy of Plaintiffs' allegations solely with respect to the first element—the existence of a fiduciary relationship.  "A fiduciary relationship is defined as a relationship 'in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" *Id.* (quoting *Scotts Co. v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 738 (S.D. Ohio 2009)).  A fiduciary duty "can arise by law or informally through the operation of the relationship between the parties."  *Id.*  "A party cannot, however, *unilaterally* elevate a relationship to a fiduciary level." *Pasqualetti*, 663 F. Supp. 2d at 598.  Instead, "[b]oth parties must understand that a special trust or confidence has been reposed."  *Id.* (quoting *Cedar View, Ltd. v. Colpetzer*, No. 5:05-CV-00782, 2006 WL 456482, *2-3 (N.D. Ohio Feb. 24, 2006)).

In general, "[t]he vast majority of business relationships . . . do not give rise to a fiduciary relationship."  *Id.*  Indeed, there is no fiduciary relationship "where the parties interact at 'arms length, each protecting his own interest.'"  *Id.* (quoting *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St.2d 282, 287 (1979)).  "Under such circumstances, it would be unreasonable for either party to expect the other to act as their fiduciary."  *Id.*  Thus, courts have held that independent contractor relationships do not result in a fiduciary relationship.  *See Iams Co. v. L.A. Pet Foods*, No. C-3-93-307, 1998 U.S. Dist. LEXIS 6584, at *43 (S.D. Ohio Mar. 26, 1998) ("[T]he parties' relationship was governed by Distributorship Agreements, which provided that Defendants were independent contractors, a status which, objectively, contravenes the Defendants' assertion that Plaintiff owed them a *de facto* fiduciary duty."); *Tool Steel Products Sales Corp. v. XTEK, Inc.*, No. C-910533, 1993 WL 19476, at *4 (Ohio Ct. App. 1st Dist. Jan. 29, 1993) (holding no fiduciary relationship existed when "[u]nder

15

the specific terms of the agreement, as well as in the parties' actual course of dealing, TSP's status in relation to XTEK was that of an independent contractor").

This general principle regarding business relationships also has been applied to franchisor-franchisee relationships, which both parties appear to agree are similar to the distributorship relationship in this case.  (*See* Doc. No. 6 at 9; Doc. No. 7 at 8.)  "[A]s a general rule, 'franchise agreements do not give rise to fiduciary or confidential relationships between the parties.'" *Pasqualetti*, 663 F. Supp. 2d at 598 (quoting *Costello v. Lungaro*, Nos. 93-3755, 93-3806, 1995 WL 290249, *4 (6th Cir. May 11, 1995)); *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 530 F. App'x 542, 546 (6th Cir. 2013).

However, in a case involving New York law, which largely mirrors Ohio law regarding breach of fiduciary duty, a court held that "a distributorship agreement may, in some rare instances, create a confidential relationship out of which a duty of fiduciary care arises."  *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y. 2007) (citation omitted).  In that case, a Lamborghini dealer, Manhattan, argued that a fiduciary relationship existed between it and Lamborghini because "the Dealer Agreements effectively grant[ed] Lamborghini 'the authority to exercise near life and death economic power over [Manhattan]," including "requiring [Manhattan] to provide reports to [Lamborghini] concerning sales, inventories, customer data, and all information concerning [Manhattan]'s business."  *Id.* at 219.  After considering these allegations, the court denied Lamborghini's motion to dismiss, concluding that Manhattan had "pled circumstances sufficiently extraordinary to allow its claims for breach of fiduciary duty to proceed."  *Id.* at 220.

In *Franklin Park*, the Sixth Circuit declined to explicitly adopt *Manhattan Motorcars*' reasoning.  530 F. App'x at 547 ("Were we to adopt the *Manhattan Motorcars* rationale, we would

determine whether the circumstances of this case represent a 'rare instance' where a fiduciary relationship exists between the franchisor and franchisee."). However, the Sixth Circuit noted the similarities between New York and Ohio law and went on to analyze the breach of fiduciary duty claim at issue using essentially the same rationale that was applied in *Manhattan Motorcars*. *Id.* at 546-49. In the case, the plaintiff franchisee asserted a fiduciary relationship with Ford arose because it was required "to report sensitive information to Ford, such as the dealership's balance sheet, profitability, and other operations information." *Id.* at 548. However, Ford pointed out that the plaintiff "retained exclusive control over its human resources decisions and advertising; and the dealership was not obliged to share confidential information regarding prospective customers with Ford." *Id.* Ultimately, the Sixth Circuit held that no fiduciary relationship existed:

> While we recognize that the automobile market is a highly competitive one and that the existence of a second Toledo dealership may have had a negative impact on [the plaintiff's] bottom line, those considerations do not take this case out of the realm of a typical franchisor-franchisee relationship. The [sales and service agreements] established a number of duties on the part of [the plaintiff], but, as the district court recognized, they also granted the dealership a fair amount of autonomy in advertising, staffing, the purchase and sale of used cars, [and] the ability to sell cars outside of its market area. In short, we see nothing that makes this a "rare instance" where a confidential relationship gave rise to a fiduciary duty.

*Id.* at 548-49.

Relying on *Franklin Park*, other courts applying Ohio law have likewise found that a fiduciary relationship did not exist between a franchisee and franchisor because the relevant agreement did not provide the franchisor with a sufficient level of control over the franchisee. *See Bedford Nissan*, 2016 WL 6395799, at *12 ("As in *Franklin Park*, it appears that Plaintiffs have much autonomy in the purchase and sale of cars."); *Enterprises v. Volvo Cars of N. Am., LLC*, No. 2:14–CV–360, 2016 WL 4480343, at *12 (S.D. Ohio Aug. 25, 2016) ("Although Brentlinger contends Volvo's control goes

17

beyond the circumstances in *Manhattan*, the facts in this case do not go beyond what the Sixth Circuit and the Ohio Revised Code have already consider common levels of control in franchise agreements.").

In this case, Plaintiffs have alleged that "Lokring controlled virtually every aspect of Southwest's operations, making Southwest dependent on Lokring for its economic existence." (Doc. No. 5 at ¶ 35.)  In their Amended Complaint, Plaintiffs also identified many of the restrictions and obligations imposed on them by the Distributor Agreement.  (*See id.* at ¶ 14.)  For example, the Distributor Agreement required Plaintiffs to (1) "maintain adequate service and warehouse facilities, adequate sales and service representatives, and adequate stocks of inventory so as to service customers;" (2) not sell competitive products; (3) not sell products outside their designated areas; (4) carry liability insurance in amounts satisfactory to Lokring; (5) maintain pricing for the sales of products as determined by Lokring; (6) assign an in-house sales manager to act as a liaison with Lokring; (7) "submit market research information, as reasonably requested by [Lokring], regarding competition and changes in the market within the Primary Sales and Service Area;" (8) "provide to [Lokring] a written monthly report, showing for the month immediately preceding the request: (a) Distributor's shipment of Products by part number and customer showing location, quantity, unit prices, and total prices, and (b) monthly average and current inventory levels of Products in the aggregate and by each Product;" (9) "provide [Lokring] with a forecast for the calendar quarter, to which the request relates, showing prospective orders by customer specifying the Product;" (10) maintain marketing policies and procedures meeting Lokring's standards; and (11) "provide [Lokring] with copies of its financial statements, including detailed line item information on payroll and business expenses."  (Doc. No. 5-4 at Sections 5, 6.)  These provisions, which grant Lokring

immense control over many aspects of Plaintiffs' business and require numerous disclosures by Plaintiffs, including the disclosure of detailed customer and financial information, make the alleged relationship between Plaintiffs and Lokring more akin to the relationship that was present in *Manhattan Motorcars* than the relationships in *Franklin Park* and other cases where no fiduciary relationship was found. And while the Distributor Agreement does expressly set forth the parties' relationship as independent contractors, the cases relied on by Lokring do not indicate that such a provision by itself is dispositive. *See Iams Co.*, 1998 U.S. Dist. LEXIS 6584, at *43-45; *Tool Steel*, 1993 WL 19476, at *4. As such, the Court finds that Plaintiffs' allegations are sufficient to state a claim for breach of fiduciary duty, and Lokring's Motion to Dismiss is denied in this respect.[6]

### iii. Unjust Enrichment

In Count Three of their Amended Complaint, Plaintiffs allege that Lokring has been unjustly enriched at Plaintiffs' expense in two ways. (Doc. No. 5 at ¶¶ 67-70.) First, Plaintiffs allege that Lokring has been unjustly enriched by its acceptance of the benefits of Southwest's purchase of Lokring's products and tooling without having to finance the establishment of a new distributorship for the southwest territory. (*Id.* at ¶ 68.) Second, Plaintiffs allege Lokring has been unjustly enriched because it has refused to provide any compensation to Southwest for the defective tooling Lokring forced it to purchase. (*Id.* at ¶ 69.) Lokring asserts Plaintiffs' unjust enrichment claims should be dismissed because an express contract—the Distributor Agreement—covers the subject matter of both of Plaintiffs' theories. (Doc. No. 6 at 10-12.) Plaintiffs do not dispute that an express contract

---

[6] Lokring also briefly argues that Plaintiffs' breach of fiduciary duty claim should be dismissed as an improper attempt to add a tort claim to a breach of contract claim, but the authority relied on by Lokring to support this argument only precluded a claim for negligence based on the contract—not breach of fiduciary duty, which was also alleged in the case. *See Nichols v. Chicago Title Ins. Co.*, 669 N.E.2d 323, 332-34 (Ohio Ct. App. 8th Dist. 1995). Thus, the Court finds this argument unpersuasive.

governs the same subject matter, but assert that their unjust enrichment claims should be allowed to proceed in the alternative because there is a question as to whether the Distributor Agreement is illusory and unenforceable. (Doc. No. 7 at 7-8.) In addition, they assert their claims may proceed despite the presence of an express contract because Lokring acted in bad faith when entering into the Distributor Agreement based on its false representations that Southwest would remain a distributor as long as it performed under the agreement. (*Id.* at 8-9.) The Court concludes that the dismissal of Plaintiffs' unjust enrichment claims is warranted.

A claim for unjust enrichment "arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain." *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984) (quoting *Hummel v. Hummel*, 133 Ohio St. 520, 525 (1938)). To establish a claim for unjust enrichment, a party "must demonstrate that (1) he conferred a benefit upon a defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *RG Long & Assocs., Inc. v. Kiley*, No. CA2014–10–129, 2015 WL 3824365, at *2 (Ohio Ct. App. 12th Dist. June 22, 2015).

"However, in the absence of fraud or bad faith, Ohio law prohibits recovery under a theory of unjust enrichment where an express contract covers the same subject." *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996); *accord Champion Contracting Const. Co. Inc. v. Valley City Post*, No. 03CA0092–M, 2004 WL 1459298, at *6 (Ohio Ct. App. 9th Dist. June 30, 2004) ("The doctrine of unjust enrichment, however, is 'inapplicable if an express agreement existed concerning the services for which compensation is sought; the parameters of the agreement limit the parties' recovery in the absence of bad faith, fraud or illegality.'") (quoting *Pawlus v. Bartrug*, 673 N.E.2d 188, 191 (Ohio Ct. App. 9th Dist. 1996)).

20

Although the existence of an express contract that governs the same subject matter bars an unjust enrichment claim, "where the existence of a contract is in dispute, [an] unjust enrichment claim may be pled in the alternative to a breach of contract claim." *Right-Now Recycling, Inc. v. Ford Motor Credit Co.*, No. 1:11-cv-364, 2014 U.S. Dist. LEXIS 182828, at *61 (S.D. Ohio Oct. 1, 2014). However, even at the motion to dismiss stage, if the existence of the contract is not in dispute, courts routinely dismiss unjust enrichment claims as precluded by the contract. *See, e.g.*, *Pinkerton v. Gov't Employees Ins. Co.*, No. 5:18-CV-1371, 2019 WL 1026227, at *7 (N.D. Ohio Mar. 4, 2019) ("In this case, no party disputes the existence of the underlying insurance contract governing the issues in this case. Because there is no question that an express written contract exists between Pinkerton and defendants covering the disputed UIM coverage, Ohio law precludes a claim for unjust enrichment."); *N. Cent. Elec. Coop., Inc. v. Linde, LLC*, No. 3:16-CV-1890, 2019 WL 460485, at *4 (N.D. Ohio Feb. 6, 2019) ("Because the parties do not dispute the existence of a contract, but only whether that contract was breached, North Central's unjust enrichment claim may not proceed."); *Amarado Oil Co. v. Davis*, No. 5:12CV627, 2013 WL 5234440, at *12 (N.D. Ohio Sept. 17, 2013) ("In sum, because Amarado agrees that a contract exists and has not pleaded a viable fraud in the inducement claim, Count 3 is dismissed.").

In this case, although they do not challenge the fact that the Distributor Agreement covers the subject matter of their claims, Plaintiffs argue that their unjust enrichment claims may be plead in the alternative because the existence of the contract is in dispute in that the contract may be illusory. (Doc. No. 7 at 7-8.) Under Ohio law, "a contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." *Century 21 Am. Landmark, Inc. v.*

21

*McIntyre*, 427 N.E.2d 534, 536-37 (Ohio Ct. App. 1st Dist. 1980).  "However, when a contract as a whole is supported by consideration, 'a reservation of the right to cancel the contract on notice does not make the contract unenforceable because the party reserving the right to cancel is bound to perform unless and until such notice is given.'"  *Helton v. U.S. Restoration & Remodeling, Inc.*, 61 N.E.3d 808, 822 (Ohio Ct. App. 10th Dist. 2016) (quoting *Driscoll v. Norprop, Inc.*, 719 N.E.2d 48, 52 (Ohio Ct. App. 8th Dist. 1998)).

Here, Plaintiffs assert that there is a question as to whether the Distributor Agreement is illusory because Lokring could walk away from the distributorship at any time without any obligation to repurchase inventory or tooling.  (Doc. No. 7 at 7.))  However, even if true, Lokring's right to terminate the contract upon notice does not render the contract illusory, as Lokring would still be bound by the Distributor Agreement until it provided such notice.  Plaintiffs also argue that the Distributor Agreement imposes no restrictions or obligations on Lokring and that Lokring's performance was entirely within its discretion.  (*Id.*)  Plaintiffs do not cite to any allegations in their Amended Complaint or provisions of the Distributor Agreement in support of these assertions.  And while it certainly appears that many of Lokring's obligations were up to its discretion, Plaintiffs have failed to address other provisions of the Distributor Agreement that appear to set forth mandatory actions by Lokring.  (*See* Doc. No. 5-4 at Section 7.)  Thus, Plaintiffs have not adequately alleged a dispute over the existence or validity of the Distributor Agreement.

Next, Plaintiffs assert their unjust enrichment claims should be allowed to proceed despite the Distributor Agreement because there is a question as to whether Lokring entered into the agreement in bad faith.  (Doc. No. 7 at 8-9.)  In support of this argument, Plaintiffs point out that Lokring was involved in Brad Shepard's purchase of Southwest, that Lokring refused to provide a definite term

22

for the distributorship despite knowing that it would take Brad Shepard eight years to pay off his promissory note, that Lennon assured Brad Shepard he would be "solid" as long as he performed, and that Lokring terminated the Distributor Agreement for no apparent reason just three months after Joe Shepard resigned from his southeast distributorship. (*Id.* at 8.) However, Plaintiffs do not cite any authority in support of their contention that this is the type of conduct that could support an unjust enrichment claim despite the presence of an express contract, especially when the contract explicitly states that it could be terminated for any reason upon thirty days' notice. The only case cited by Plaintiffs is easily distinguishable, as it does not involve a finding of bad faith or an unjust enrichment claim, but instead involved the analysis of the reasonable time for the performance of a distributor agreement that was not terminable at the will of the manufacturer. *See Bach v. Friden Calculating Mach. Co.*, 155 F.2d 361, 365 (6th Cir. 1946).

Accordingly, the Court concludes that Plaintiffs have not adequately alleged that the existence of the Distributor Agreement is in dispute or otherwise established a basis for their unjust enrichment claims to proceed despite the presence of an express contract. Therefore, Lokring's Motion to Dismiss is granted with respect to Plaintiffs' unjust enrichment claims.

### iv. Intentional Interference with Contract

In Count Four of their Amended Complaint, Plaintiffs allege that Lokring intentionally interfered with Brad Shepard's contract for the purchase of Southwest from Joe Shepard by improperly terminating Southwest's distributorship, which cut off Brad Shepard's source of income to make payments on the promissory note and caused his breach of the contract. (Doc. No. 5 at ¶¶ 71-75.) Lokring asserts that this claim should be dismissed because the Distributor Agreement expressly allowed it to terminate Southwest's distributorship for any reason, and its actions were

23

therefore privileged and cannot serve as the basis for a tortious interference with contract claim.  (Doc. No. 6 at 12-14.)  In opposition, Plaintiffs argue that while termination of the distributorship was permitted for any reason, Lokring has failed to identify a reason, Brad Shepard and Southwest fully performed under the agreement, and no grounds for termination existed.  (Doc. No. 7 at 9.)  Therefore, Plaintiffs argue Lokring's conduct was improper, not done in good faith, and not privileged.  (*Id.*)  The Court finds Plaintiffs' arguments unpersuasive and concludes that dismissal is warranted.

"Ohio law recognizes causes of action for both tortious interference with a business relationship and tortious interference with contract rights."  *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).  "They differ only in that the former tort does not require proof of a contractual relationship."  *Id.*  To recover on a claim of tortious interference with contract, a plaintiff must establish: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification or privilege; and (5) resulting damages."  *Franklin Tractor Sales v. New Holland N. Am., Inc.*, 106 F. App'x 342, 344 n.1 (6th Cir. 2004); *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995).

With respect to the fourth element, "Ohio law imposes the burden of proving 'lack of privilege' or 'improper interference' on the plaintiff."  *Super Sulky*, 174 F.3d at 742.  Courts generally consider seven factors to decide whether the alleged conduct was privileged:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the party with whom the actor has interfered, (4) the interests sought to be advanced by the actor, (5) the social interests of protecting the freedom of contracting and the interference with such, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

*Id.*  Ordinarily, "[t]he nature of the actor's conduct is the chief factor that the court should consider." *Id.*

24

However, when the defendant's conduct that is the basis for a tortious interference claim is expressly permitted under a contract, courts have found that fact dispositive and fatal to the plaintiff's claim.  For example, in *Franklin Tractor Sales*, the plaintiff was a dealer of construction equipment manufactured by the defendant.  106 F. App'x at 343.  The plaintiff sued the defendant for tortious interference with a business relationship after the defendant started selling its construction equipment directly to one of the plaintiff's customers, which eliminated the plaintiff's commissions.  *Id.* at 343-44.  The Sixth Circuit affirmed the district court's grant of summary judgment in favor of the defendant, holding that because the dealership agreements between the plaintiff and the defendant unquestionably allowed the defendant to bypass the plaintiff and sell directly to customers, the defendant's conduct was privileged.  *Id.* at 346-47; *see also Vitek v. AIG Life Brokerage*, No. 06–cv–615, 2008 WL 4372670, at *10 (S.D. Ohio Sept. 22, 2008) ("[N]o reasonable juror could find that Defendants' exercise of their unlimited contractual right to terminate Cotterman and Peace constituted improper interference.").

In the instant matter, the Distributor Agreement between Lokring and Southwest provides that the agreement "may be terminated by either party for any reason by giving the other party written notice thirty (30) days in advance."  (Doc. No. 5-4 at Section 12.2.)  Thus, Lokring's termination of the Distributor Agreement was expressly permitted under the contract.  Plaintiffs argue that the termination was improper because Lokring did not provide a reason for the termination and that no grounds for termination existed, but the Distributor Agreement did not require Lokring to notify Plaintiffs of the reason for the termination.  Because Lokring had the right to terminate the contract for any reason, Plaintiffs have not identified any way in which Lokring's termination violated the Distributor Agreement.  Nor have Plaintiffs adequately alleged that Lokring's termination of the

contract was in bad faith given that it was merely exercising a contractual right.  *See Oak Rubber Co. v. Bank One, N.A.*, 214 F. Supp. 2d 820, 833 (N.D. Ohio 2002) ("Ohio law is crystal clear that an actor does not act in 'bad faith' when it decides to enforce its contractual rights.").  Therefore, the Court finds that Lokring's conduct as alleged in the Amended Complaint was privileged, and Plaintiffs have failed to state a claim for tortious interference with contract.  Lokring's Motion to Dismiss is granted with respect to Count Four.

### v.  Equitable Estoppel

In Count Five of their Amended Complaint, Plaintiffs set forth a claim of equitable estoppel based on Plaintiffs' alleged reliance on Lennon's statement to Brad Shepard that Southwest would remain a distributor so long as it performed under the Distributor Agreement.  (Doc. No. 5 at ¶¶ 76-81.)  Lokring moves for the dismissal of this claim on the basis that equitable estoppel is a defense, not an independent cause of action, under Ohio law.  (Doc. No. 6 at 14-15.)  Plaintiffs do not respond to this argument or address their equitable estoppel claim in any way in their opposition brief.

"[U]nder Ohio law, equitable estoppel is a defense and not an independent cause of action." *Nachar v. PNC Bank, Nat. Ass'n*, 901 F. Supp. 2d 1012, 1021 (N.D. Ohio 2012); *accord Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 468 (N.D. Ohio 2008) ("[T]he great majority of Ohio courts, including the Ohio Supreme Court, have recognized that equitable estoppel is a defense and not an independent cause of action.").  Accordingly, the Court finds that dismissal of Plaintiffs' equitable estoppel claims is warranted and will grant Lokring's Motion to Dismiss in that regard.

### IV.  Conclusion

For the reasons set forth above, Lokring's Motion to Dismiss (Doc. No. 6) is GRANTED IN PART and DENIED IN PART.  Specifically, Lokring's Motion to Dismiss is GRANTED with

respect to Counts Three, Four, and Five of Plaintiffs' Amended Complaint and DENIED with respect to Counts One and Two of Plaintiffs' Amended Complaint.

Lokring's Emergency Motion to Enforce the Contracts (Doc. No. 9) is DENIED.

**IT IS SO ORDERED.**


  *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  March 19, 2021                                    U. S. DISTRICT JUDGE

27