# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **SHEPARD AND ASSOCIATES, INC.,** **et al.** | **CASE NO. 1:20-CV-02488-PAB** |
| **Plaintiffs,** | **JUDGE PAMELA A. BARKER** |
| **-vs-** | |
| **LOKRING TECHNOLOGY, LLC,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendant/Third-Party Plaintiff,** | |
| **-vs-** | |
| **JARED GUIDRY and TUBE-MAC INDUSTRIES, INC.,** | |
| **Third-Party Defendants.** | |

Currently pending are the following motions: (1) Defendant/Third-Party Plaintiff Lokring Technology, LLC's ("Lokring") Motion for Temporary Restraining Order ("TRO") and Preliminary and Permanent Injunctive Relief (Doc. Nos. 98, 99);[1] (2) Third-Party Defendant Jared Guidry's ("Guidry") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6) (Doc. No. 111); and (3) Guidry's Motion to Quash Subpoena (Doc. No. 90.)

For the following reasons, Lokring's Motion for Preliminary Injunctive Relief (Doc. Nos. 98, 99) is GRANTED IN PART and DENIED IN PART, as set forth below.  Guidry's Motion to Dismiss

---

[1] Lokring filed both a Sealed Motion for Temporary Restraining Order (Doc. No. 98), as well as a Redacted Motion for the public docket. (Doc. No. 99.)

(Doc. No.111) is GRANTED. Guidry's Motion to Quash Subpoena (Doc. No. 90) is DENIED AS MOOT.

## I. Relevant Factual Background[2]

Lokring designs, develops, manufactures, and markets mechanically attached fittings for use in pressure piping systems.  (Doc No. 152 at PageID#s 3107, 3108; Doc. No. 148 at PageID#s 2308.) Lokring is headquartered in Willoughby, Ohio.  (*Id*.)  William Lennon in Lokring's CEO.  (Doc. No. 148 at PageID# 2308.)

In April 2016, Plaintiffs Shepard & Associates, Inc. and Brad Shepard entered into a written agreement to act as an exclusive distributor for Lokring products for portions of the southwestern United States (hereinafter "the 2016 Distributor Agreement").[3] (Doc. No. 41 at ¶ 32; Doc. No. 41-4.) Plaintiffs' exclusive distributorship operated under the name "Lokring Southwest Company" (hereinafter "Southwest") and was located in Texas.

Among other things, the 2016 Distributor Agreement contains provisions relating to the protection of Lokring's intellectual property and confidential information, including the return of said intellectual property and confidential information upon termination of the distributorship.  (*See* Doc. No. 41-4 at Sections 10.1 & 12.5 (Ex. I); Doc. No. 148 at PageID#s 2320-21; 2326-31.) Moreover, the 2016 Distributor Agreement provides that "Distributor shall enter into and cause each employee

---

[2] The Court presumes familiarity with its previous opinions in this case and sets forth only the background relevant to the instant Motion.

[3] As discussed in a previous Opinion, Southwest was first formed in 2003 by Joe Shepard, Brad Shepard's father, to act as an exclusive distributor for Lokring.  *See* Doc. No. 13.  In 2015, Lokring approached Joe Shepard to propose that he establish a new distributorship in the southeastern United States. (*Id*.) Joe Shepard then moved to Florida to establish a new exclusive distributorship as Joe Shepard & Associates, Inc., while at the same time operating Southwest, with the assistance of his son, Brad Shepard, who was a Southwest employee. (*Id*.) After Joe Shepard made the southeast distributorship operational, Lokring advised him that he could not hold two distributorships. (*Id*.) After extensive negotiations, Lokring approved the sale of Southwest's shares to Brad Shepard.  (*Id*.)

of Distributor to enter into" the Distributor Confidentiality and Non-Competition Agreement ("NDA") and Distributor Employee Confidentiality and Non-Competition Agreement ("ENDA"). (Doc. No. 41-4 at Sections 5.1(q) & 13.1; Doc. No. 148 at PageID# 2327.)  In April 2016, Plaintiffs executed the NDA, which contains detailed Confidentiality and Non-Competition provisions. (Doc. No. 9-1, PageID#s 282-88 (Ex. H).)

In February 2019, Plaintiffs hired Jared Guidry as a Technical Sales Consultant for Southwest, with a start date of March 1, 2019.[4]  (Doc. No. 61 at ¶ 19.)  At all times relevant herein, Guidry has resided in Texas.  (Doc. No. 151 at PageID# 2873.)  On February 24, 2019, Southwest presented Guidry with an offer letter that provides, among other things, that his employment is conditioned on his agreement to Confidentiality and Non-Competition Agreements. (Doc. No. 98-2 at PageID#s 1378-79 (Ex. SSS).) Guidry testified that he signed the offer letter but insists that he was never presented with copies of the Confidentiality or Non-Competition Agreements and never signed those Agreements. (Doc. No. 151 at PageID#s 2874-76, 2896-2897, 2899.)

In May 2019, shortly after beginning his employment at Southwest, Guidry visited Lokring's facility in Willoughby, Ohio for a tour and training.  (Doc. No. 115 at PageID# 1969, Doc. No. 151 at PageID# 2877.)  While employed at Southwest, Guidry used a work email account that was housed on Lokring's email server in Ohio.  (Doc. No. 147 at PageID#s 2202, 2208, 2219; Doc. No. 149 at PageID# 2440; Doc. No. 151 at PageID#s 2933-2934.)  Using both this email system and an internal Lokring messaging system called "Flowan," Guidry occasionally contacted Lokring for technical

---

[4] Plaintiffs also hired Zach Maywald as a sales consultant in January 2019.

assistance on certain sales and for certain requests, while he was employed at Southwest.  (Doc. No. 115 at PageID# 1969.)

On or about, June 29, 2020, Southwest employee Zach Maywald, acting pursuant to instructions from Brad Shepard, extracted and downloaded to an Excel spreadsheet Lokring's customer list contained on the Big Contacts customer relationship management ("CRM") system (hereinafter "Big Contacts List.")  (Doc. No. 147 at PageID#s 2238-39.)  According to Mr. Lennon, the Big Contacts List is a Confidential Customer Database containing over 26,000 rows of specific customer information, including names, job titles, addresses, email addresses and other information pertaining to buyers and potential buyers of Lokring's specialized products. (Affidavit of William Lennon, Doc. No. 98-1 at PageID#s 1313-15.)  At Shepard's instruction, Mr. Maywald forwarded the Big Contacts List to both Shepard and Guidry at their respective Lokring email accounts.  (Doc. No.  147 at PageID# 2238.)

In July 2020, Lokring became aware that Shepard and Guidry had obtained access to the Big Contacts List and Lokring's counsel emailed Shepard to cease and desist accessing Big Contacts. (*See* Doc. No. 98-2 at PageID# 1383 (Ex. O).)  On September 7, 2020, Guidry forwarded the Big Contacts List from his Lokring email account to his personal Yahoo email account. (Doc. No. 98-1 at PageID# 1314 (Ex. S); Doc. No. 151 at PageID# 2919.)

On September 21, 2020, Lokring notified Shepard that it was terminating Southwest's distributorship.  (Doc. No. 41 at ¶ 48; Doc. No. 150 at PageID# 2797.)  The April 2016 Distributorship Agreement thereafter terminated on October 21, 2020, and Guidry's employment with Plaintiffs ended on the same date.  (Doc. No. 61 at ¶ 76, 95; Doc. No. 150 at PageID#s 2792-93.)  However,

Shepard kept Guidry and another employee on for another month or so in a 1099 capacity as the distributorship wrapped up.  (Doc. No. 150 at PageID# 2793.)

After his employment with Southwest ended, Guidry commenced employment with Tube-Mac Industries, Inc. (hereinafter "Tube-Mac"), a Lokring competitor.  (Doc. No. 151 at PageID# 2905 & Ex. IIII; Doc. No. 148 at PageID# 2316.)  Beginning at least as early as February 2021, Guidry began emailing specific employees of Dow Chemical, one of Lokring's biggest customers, in an attempt to solicit business for Tube-Mac.  (*See* Doc. No. 98-2 at PageID#s 1391-1442; Doc. No. 151 at PageID#s 2928-29.) These individuals worked in Lokring's specific industry and were familiar with and used Lokring's products. (*Id*.) Further, according to Lokring, these individuals' contact information was not public information and Guidry "could not have identified these particular individuals with[in] a corporation as massive as Dow, without the [Big Contacts List]." (Doc. No. 98 at PageID# 1295.)  Guidry testified that he used the Big Contacts List and often supplemented information thereon by consulting other sources such as LinkedIn or ZoomInfo. (Doc. No. 151 at PageID#s 2942-47.)

Guidry sent emails to numerous Dow Chemical employees in June 2021.  In these messages, Guidry repeatedly represented that he previously worked for Shepard at Southwest but "Lokring Technology closed that office late last year without cause."  (*See, e.g*., Doc. No. 98-2 at PageID#s 1391-1421.)  Guidry then attempted to solicit sales for Tube-Mac's Pyplok product by (among other things) representing that "Lokring released another sizeable price increase" whereas "Pyplok couplings are significantly more cost effective and in most cases can save over 60% over Lokring." (*Id*.)  He also criticized Lokring for "major delays" associated with its products, stating that "[t]he Lokring factory in Ohio does not keep inventory and most lead times are now at 8 weeks or more for

5

basic fittings. Tube-Mac keeps a sizeable inventory on hand and will have a large local stock in Texas by [the] end of the year." (*Id*.)

In addition, Guidry identified what he described as a "major flaw in the Lokring design," and attached a document containing "questions from [a Lokring customer] when discussing 1/8" corrosion allowance" (hereinafter "Corrosion Allowance Document"). (Doc. No. 98-2 at PageID# 1421; Doc. No. 152 at PageID#s 3110-15; Ex. JJ.) Created by one of Lokring's customers in 2016, this document outlines an issue that that customer was having with the corrosion allowance for a particular Lokring product. Dow Chemical asked Guidry to "refrain from contacting the various Dow personnel, as you have been, as it is creating significant confusion with the Lokring technology that we are currently using." (Doc. No. 98-2 at PageID# 1425.) In addition to Dow Chemical, Guidry also solicited other Lokring customers, including TPC Group and Lyondell Bassell. (*See, e.g*., Doc. No. 98-1 at PageID# 1374; Affidavit of Zach Maywald (Doc. No. 9-3) at ¶¶ 9-17.)

Lokring maintains that Shepard and Guidry have been preparing to compete against Lokring upon the expiration of Shepard's noncompetition agreement by establishing a distributorship for Tube-Mac products. (Doc. No. 98 at PageID# 1297; Affidavit of Michael Fadalla (Doc. No. 98-4 at ¶¶ 23-32 (Ex. W); Doc. No. 152 at PageID#s 3028-30.)

## II.    Relevant Procedural History

On July 13, 2021, Lokring filed its First Amended Counterclaims and Third-Party Complaint, setting forth 10 claims for relief against Plaintiffs, Guidry, and Tube-Mac. (Doc. No. 61 at PageID#s 905-16.) Therein, Lokring asserts the following claims: (1) Breach of Contract (Exclusive Distributor Agreement), as against Plaintiffs (Count I); (2) Breach of Contract (Confidentiality and Non-Competition Agreement), as against Plaintiffs and Guidry (Count II); (3) Spoliation of Evidence, as

6

against Plaintiffs and Guidry (Count III): (4) Tortious Interference with Business Relationship, as against Plaintiffs, Guidry, and Tube-Mac (Count IV); (5) Tortious Interference with Contracts, as against Plaintiffs, Guidry, and Tube-Mac (Count V); (6) Civil Conspiracy, as against Plaintiffs, Guidry, and Tube-Mac (Count VI); (7) Misappropriation of Trade Secrets under state and federal law, as against Plaintiffs, Guidry and Tube-Mac (Counts VII and VIII); (8) Unfair Competition and Deceptive Trade Practices under state and federal law, as against Plaintiffs, Guidry, and Tube-Mac (Count IX); and (9) Unjust Enrichment, as against Plaintiffs, Guidry, and Tube-Mac (Count X).[5] (Doc. No. 61.)

On September 28, 2021, Lokring filed the instant Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief against Plaintiffs and Guidry.[6] (Doc. Nos. 98, 99.) Therein, Lokring argues that there is a strong likelihood of success on the merits of its misappropriation of trade secrets, breach of contract, and unfair competition and deceptive trade practices claims. (Doc. No. 98 at PageID# 1298.) Lokring argues that it will suffer irreparable injury without injunctive relief and that the other factors for evaluating a preliminary injunction weigh in favor of granting its Motion. (*Id.* at PageID#s 1304-07.) Lokring seeks the following injunctive relief:

(1) Plaintiffs and Guidry should be enjoined from further unauthorized use and disclosure of Lokring's trade secrets and confidential information;

(2) Plaintiffs and Guidry should be ordered to provide a complete inventory of Lokring's trade secret and confidential information currently in their possession or to which they have access;

(3) Plaintiffs and Guidry should be ordered to return all such trade secret and confidential information to Lokring;

---

[5] This Count is misnumbered in the Third-Party Complaint as Count IX.

[6] Third-Party Defendant Tube-Mac Industries, Inc. is not a subject of the instant Motion for Preliminary Injunction.

7

> (4) Plaintiffs and Guidry should be enjoined from engaging in any business activities competitive with Lokring, consistent with the non-competition provisions of the NDA and ENDA and subject to the tolling provisions set forth therein, and, until such time that violations of the NDA and ENDA, misappropriations of trade secrets, and unfairly competitive activities have ceased and all trade secret and confidential information has been returned to Lokring, the period of non-competition should be deemed tolled.

(*Id.* at PageID# 1298.)

The Court held a conference call with the parties' counsel on September 30, 2021 regarding Lokring's Motion for TRO. (*See* Minutes of Proceedings dated September 30, 2021.) During the call, Guidry's counsel expressed that he did not believe this Court had personal jurisdiction over Guidry and indicated his intent to file a Motion to Dismiss based upon a lack of personal jurisdiction. (*See id.*)

Shortly thereafter, on October 13, 2021, Guidry filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6) for lack of personal jurisdiction and failure to state a claim upon which relief may be granted. (Doc. No. 111.) Guidry also filed a Motion to Quash a subpoena that had been previously issued by Lokring, arguing that Lokring "has issued a subpoena to a party in this case who is located in Pasadena, Texas and has no minimum contacts to be subject to jurisdiction" in this District. (Doc. No. 90.) Lokring opposed both Motions, to which Guidry replied. (Doc. Nos. 102, 139, 142.)

Meanwhile, on October 4, 2021, the Court granted in part and denied in part Lokring's Motion for TRO. (Doc. No. 103.) Therein, the Court ordered Plaintiffs to (1) "return the Big Contacts List and Corrosion Allowance Document to Lokring and delete any and all electronic and hard copies of the same," and (2) "refrain from retaining, using, or disclosing confidential proprietary, and trade secret information belonging to Lokring." (*Id.* at PageID# 1551.) As to Guidry, the Court indicated

8

that it was only able to make a preliminary finding of personal jurisdiction over Guidry in light of the limited evidence and argument before it at that time.  (*Id*. at PageID#s 1534, 1537, 1539-40.) The Court indicated that it would "reevaluate this issue as necessary based on the parties' anticipated briefing and presentation of evidence" at the hearing. (*Id*. at PageID# 1540.)  In light of the preliminary determination of personal jurisdiction, the Court imposed a narrower TRO as to Guidry, ordering that he "refrain from accessing, using, or disclosing the Big Contacts List and Corrosion Allowance Document pending the outcome of the preliminary injunction hearing." (*Id.* at PageID# 1551.)

The Court subsequently held an in-person hearing over the course of six separate days from October 14 through October 29, 2021. (Doc. Nos. 147-52.)  At the conclusion of the hearing, the Court indicated that it would permit the parties to file Proposed Findings of Fact and Conclusions of Law.  (Doc. No. 150 at PageID# 2806; Doc. No. 151 at PageID# 2975.) On December 20, 2021, subsequent to the hearing transcript's availability on the docket, Lokring, Plaintiffs, and Guidry each filed Proposed Findings of Fact and Conclusions of Law.  (Doc. Nos. 155-57.)

## III.  Personal Jurisdiction as to Third-Party Defendant Jared Guidry

### A.  Legal Standard

The Court begins with the threshold issue of personal jurisdiction as to Guidry.[7]  "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v.*

---

[7] The parties introduced testimony and evidence regarding personal jurisdiction throughout the preliminary injunction hearing.  (Doc. Nos. 147-52) In addition, the parties addressed this jurisdictional issue at length in their respective Proposed Findings of Fact and Conclusions of Law.  (Doc. Nos. 155-57.)  The Court will consider all such testimony, evidence, and briefing in evaluating the issue of personal jurisdiction over Guidry.

9

*Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (citation omitted). *See also Bird v. Parsons*, 289 F.3d 865, 872 (6th Cir. 2002) (explaining that courts must first decide whether personal jurisdiction exists over defendants before proceeding to the merits of the case).

"The plaintiff bears the burden of establishing that jurisdiction exists."[8] *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). "The weight of the plaintiff's burden, however, depends on whether the trial court chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue (either pretrial or during trial)." *Serras v. First Tenn. Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). "When the district court holds an evidentiary hearing to determine jurisdiction, Plaintiffs must make more than just a '*prima facie* showing.' . . . Plaintiff must establish jurisdiction by a preponderance of the evidence." *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (citing *Serras*, 875 F.2d at 1214).

Here, although the Court did not specifically hold a hearing on Guidry's Motion, the six-day preliminary injunction hearing on Lokring's Motion for Preliminary Injunction included testimony and evidence addressing the issue of personal jurisdiction.  Lokring also submits in its Opposition to Guidry's Motion to Dismiss that the "preliminary injunction hearing, and all evidence presented thereat, should be considered by this Court when considering the merits of Guidry's Motion." (Doc.

---

[8] In the Sixth Circuit's split decision in *SunCoke Energy, Inc. v. Man Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 219 (6th Cir. 2009), a majority of judges determined that "personal jurisdiction . . . must be proper as to each claim." *Id.* at 219 (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266 (5th Cir. 2006); *Remick v. Manfredy*, 238 F.3d 248 (3rd Cir. 2001); *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284 (1st Cir. 1999)). *See, e.g., Knowledge Based Sols., Inc. v. Dijk*, No. 16-cv-13041, at *3 (E.D. Mich. Sept. 7, 2017) ("[P]ersonal jurisdiction must be analyzed on a claim-by-claim basis."). *See also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 1351, at 299 n.30 (2004) ("[I]f separate claims are pled, specific personal jurisdiction must independently exist for each claim and the existence of personal jurisdiction for one claim will not provide the basis for another claim."). The parties have not briefed the personal jurisdiction issue on a claim-by-claim basis. Therefore, the Court will address personal jurisdiction in one section.

10

No. 139 at PageID# 2117.) Therefore, the Court concludes that Lokring must establish jurisdiction by a preponderance of the evidence.

A federal court can exercise personal jurisdiction over a defendant if jurisdiction is (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment. *Tharo Sys., Inc. v. Cab Produckttechnik GMBH & Co., KG*, 196 F. App'x 366 (6th Cir. 2006). Because it is unclear whether Ohio's long-arm statute is coterminous with federal constitutional limits,[9] the Court presumes that, to establish a *prima facie* case of personal jurisdiction, a plaintiff must demonstrate that (1) Ohio's long-arm statute has been satisfied and (2) exercising jurisdiction would comport with Due Process. *Schneider v. Hardesty*, 669 F.3d 693, 699 (6th Cir. 2012) (quoting *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008)).

### B.    Analysis

#### 1.    Ohio's Long-Arm Statute

---

[9] Ohio recently amended the state long-arm statute, effective in April 2021, with subsection (C) now providing: "In addition to a court's exercise of personal jurisdiction under division (A) of this section, a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." R.C. § 2307.382(C). District courts have expressed uncertainty as to whether the amended long-arm statute now extends personal jurisdiction to the fullest extent that the U.S. Constitution permits, such that the traditional two-part analysis of the Ohio long-arm statute plus the Due Process factors would merge into a single Due Process analysis. *See, e.g., Amatech Group Ltd. v. Fed. Card Servs., LLC*, No. 1:21-cv-406, 2022 WL 44674, at *4-5 (S.D. Ohio Jan. 5, 2022). "Neither the Supreme Court of Ohio nor any Ohio appellate courts have yet had occasion to interpret this new language," but at least two other courts in the Northern District of Ohio have interpreted the amended statute as being coextensive with the Constitution. *Id.* at *4. *See, e.g., Smith v. Swaffer*, No. 1:20-CV-1848, 2021 WL 4596922, at *10 (N.D. Ohio Oct. 7, 2021); *NOCO Co. v. Shenzhen Valuelink E-Commerce Co., Ltd.*, --- F. Supp. 3d ---, 2021 WL 4699088, at *2 (N.D. Ohio July 22, 2021).

The Court first finds, based upon the briefing and evidence presented at the hearing, that the exercise of jurisdiction is authorized under Ohio's Long-Arm Statute. The relevant provision of Ohio's Long Arm Statute provides as follows:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

***

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state . . .

Ohio Rev. Code § 2307.382(A)(6). The above section has been interpreted broadly. *See Schneider*, 669 F.3d at 700; *Pay(q)r, LLC v. Sibble*, No. 5:15-cv-1038, 2015 WL 9583034 at *5 (N.D. Ohio Dec. 31, 2015).

Here, the Court finds that Guidry committed tortious acts outside Ohio that caused injury within this State.   The evidence supports Lokring's argument that Guidry used his Lokring email address on September 7, 2020 to forward the Big Contacts List to his personal Yahoo account.  (Doc. No. 155 at PageID# 3239, ¶ 91; Ex. S (Doc. No. 98-1 at PageID# 1314)). That is, that based upon the "hand-in-hand" configuration of the cloud-based email server and Lokring's Ohio-based server, the Court finds that Guidry's transmission of the Big Contacts List to his personal email was a tortious contact with the State of Ohio that constituted a misappropriation of trade secrets. (Doc. No. 155 at PageID# 3239, ¶ 91; Doc. No. 147 at PageID#s 2219-20.)

The Big Contacts List Excel spreadsheet was originally created by Southwest employee Zach Maywald in June 2020, as a download of data from the Big Contacts online database. (*See* Ex. S.) Subsequently, counsel for Lokring emailed Shepard on July 28, 2020 that he "and various of [his] employees have been accessing Big Contacts" and that "such access is strictly prohibited and not

12

authorized" and must "cease and desist." (Doc. No. 98-2 at PageID# 1383; Ex. O.)  Bill Lennon testified that the access relating to the cease-and-desist message was after Lokring had paid Joe Shepard for the rights to the Big Contacts license and Brad Shepard and his distributorship employees were still accessing Big Contacts.  (Doc. No. 149 at PageID# 2530-34.) Shepard and his employees were accessing Big Contacts during a time when Lokring Technology sought to have all distributors migrate data into and use another Customer Relationship Management ("CRM") system called Pipeliner. (*Id.*) Nonetheless, Maywald emailed Shepard and Guidry on June 29, 2020 with instructions on how to download contents from Big Contacts and attached two spreadsheets, which Guidry forwarded to his personal email on September 7, 2020. (Ex. S; Doc. No. 147 at PageID#s 2236-39; Doc. No. 151 at PageID# 2919.) Guidry then used the Big Contacts List and Corrosion Allowance Document in preparing his sales pitch emails to Lokring customers like Dow Chemical, TPC Group, and Lyondell Bassell, of which there were approximately 150 messages. (Doc. No. 98 at PageID#s 1295-97; Doc. No. 151 at PageID# 2929; Doc. No. 155 at PageID# 3241, ¶ 97.)

The Court further finds that Guidry not only possessed and used the Big Contacts List to attempt to sell Pyplok products to Lokring customer Dow Chemical, but that he "misrepresented the competing products as a 'LOKRING equivalent'" and "falsely suggested Lokring was no longer servicing Dow's territory." (Doc. No. 115 at PageID# 1975; Doc. No. 155 at PageID# 3220, ¶ 84; Doc. No. 98-2 at PageID# 1428.)  In his sales emails to Dow personnel, Guidry stated that Lokring closed Plaintiffs' distributorship without cause, and falsely suggested that Lokring was no longer servicing the area or had gone out of business.  (*Id*.)  Guidry also distributed the Corrosion Allowance Document to nine different Dow employees on behalf of Tube-Mac, referencing an allegedly "major flaw in the Lokring design." (Doc. No. 98 at PageID# 1296; *See, e.g.*, Doc. No. 98-2 at 1391.) Further,

13

Guidry used his personal email address on October 22, 2020 to send a disparaging email to Bill Lennon and numerous Lokring employees, all located in Ohio, a distributor located in Ohio, and other Lokring distributors around the country and the world. (Doc. No. 155 at PageID# 3240, ¶ 93; Ex. UU; Doc. No. 149 at PageID#s 2490-91.) Also in October 2020, Guidry used his LinkedIn account to create a disparaging post regarding Bill Lennon and Lokring in which Guidry declared "Bill Lennon at Lokring Technology" to be a "fucking psycho." (Doc. No. 155 at PageID#s 3240-41, ¶ 94; Ex. NNN; Doc. No. 151 at PageID#s 2937-38.)

At the hearing, Guidry confirmed that, prior to the Court's TRO enjoining his use of the Big Contacts List, he utilized information contained on it when sending emails to Dow personnel as part of his Tube Mac sales efforts. (Doc. No. 151 at PageID#s 2945-47.) He also acknowledged that he forwarded the Big Contacts list from his Lokring email account to his personal Yahoo account on September 7, 2020 (Ex. S; Doc. No. 151 at PageID#s 2918-19); that he sent the disparaging email on October 22, 2020 to various recipients at Lokring (Ex. UU; Doc. No. 151 at PageID# 2937); and that he posted a negative reference to Bill Lennon on his LinkedIn account in October 2020, but removed it the next day "because it is obviously distasteful." (Ex. NNN; Doc. No. 151 at PageID#s 2937-38.)

The Court preliminarily found when evaluating Lokring's Motion for TRO that Subsection (A)(6) of Ohio's long-arm statute was satisfied. (*See* Doc. No. 103 at PageID#s 1536-37). That conclusion remains the same with the introduction of evidence and testimony elicited at the hearing discussed above. Although Guidry was an employee of Texas-based distributorship Shepard and Associates, Inc. and not directly employed by Lokring Technology, courts within this Circuit faced with similar facts have found the requirements of § 2307.382(A)(6) to be met. Guidry could reasonably have expected that injury would occur in Ohio by taking and using Lokring's customer

14

information to attempt to sell a competing product through his forwarding the Big Contacts List to his personal email and sending sales emails to Lokring customers from Texas.  *See, e.g.*, *Alloy Bellows & Precision Welding, Inc. v. Cole*, No. 1:15-cv-494, 2015 WL 6964579, at *4 (N.D. Ohio Nov. 10, 2015) (finding § 2307.382(A)(6) met where non-resident former employee removed employer's confidential trade secrets from its Ohio computer system); *Dayton Superior Corp. v. Yan*, 288 F.R.D. 151, 167 (S.D. Ohio 2012) (finding § 2307.382(A)(6) met where non-resident former employee misappropriated employers' trade secrets outside of Ohio); *Coast to Coast Health Care Servs., Inc. v. Meyerhoffer*, No. 2:10-cv-734, 2012 WL 169963, at *3 (S.D. Ohio Jan. 19, 2012) (finding § 2307.382(A)(6) met where non-resident former employee misappropriated trade secrets and noting "if Meyerhoffer secretly conspired to start a competitor company and utilized Coast to Coast's national client lists, prospective client lists, and independent contractor physician provider lists and also began contacting clients of Coast to Coast, she should have reasonably expected that Dr. Bolton's Ohio business would be damaged."); *Safety Today, Inc. v. Roy*, No. 2:12-cv-510, 2012 WL 2374984, at *2 (S.D. Ohio June 22, 2012) (finding § 2307.382(A)(6) met where non-resident former employee took the customer lists and confidential information of their Ohio-based employer).

Accordingly, the Court finds that Lokring has established by a preponderance of the evidence that the requirements of § 2307.382(A)(6) are met with respect to Guidry.

### 2.  Due Process

As the Sixth Circuit has explained, "[p]ersonal jurisdiction comes in two flavors: [1] 'general' jurisdiction, which depends on a showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant, and [2] 'specific' jurisdiction, which exposes

15

the defendant to suit in the forum state only on claims that 'arise out of or relate to' a defendant's contacts with the forum." *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & nn. 8-10 (1984) and *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)). Here, Lokring does not argue that this Court has general jurisdiction over Guidry.  Therefore, the Court considers this argument waived and considers only whether Lokring has demonstrated that this Court has specific jurisdiction over Guidry.

The Sixth Circuit has established the following three-part test for determining whether specific personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996). *See also Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000); *S. Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968).

### a.     Purposeful Availment

The question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is "the *sine qua non* for *in personam* jurisdiction." *Mohasco Indus.*, 401 F.2d at 381-82. *See also Calphalon Corp.*, 228 F.3d at 721 ("The purposeful availment prong . . . is essential to a finding of personal jurisdiction.")  The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State," and when the defendant's conduct

16

and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985) (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)); *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994).

Courts require purposeful availment to insure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King Corp.*, 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).  In this regard, the Supreme Court has explained that, in examining a defendant's contacts, courts "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  In other words, "[d]ue process requires that a defendant be haled into court in a forum State based on his *own* affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with persons affiliated with the State." *Id.* at 286.

Lokring argues that purposeful availment is demonstrated by the fact that Guidry had a Lokring email account and used Lokring's servers to improperly access and misappropriate Lokring's Confidential Information.  In support of this argument, Lokring cites evidence that Guidry's work email account was housed on Lokring's servers. Specifically, Lokring notes that Sean O'Brien ("O'Brien"), a contractor hired by Lokring to provide IT services, testified that the Microsoft servers that host Lokring emails are in the cloud, but that Lokring also has servers physically located in the State of Ohio. These physical servers provide various functions, such as "housing files," "transporting data to machinery on the shelf floor," and "cataloging users and controlling the domain that exist at Lokring." (Doc. No. 147 at PageID# 2219.) Lokring also asserts that Guidry had knowledge of the

17

Lokring email accounts being connected to Ohio, citing an email in which Guidry explains to a customer that "[o]ur emails run through a central server at corporate in Ohio."[10] (Ex. A at p. 1; Doc. No. 151 at PageID#s 2933-34.)  Lokring argues that Guidry then used his Lokring email address on September 7, 2020 to forward the Big Contacts List to his personal Yahoo account.  (Doc. No. 155 at PageID# 3239, ¶ 91; Ex. S; Doc. No. 151 at PageID# 2919.)  According to Lokring, this List "includes numerous customers of Lokring who are based in the [S]tate of Ohio, and which have an Ohio address or telephone number as the contact information." (Doc. No. 115 at PageID# 1970.)

Lokring also notes that Guidry visited Lokring's facility in Willoughby, Ohio in May 2019 for a tour and training.  (Doc. No. 115 at PageID# 1969; Doc. No. 151 at PageID# 2877.) Moreover, during his employment with Southwest, Guidry "contacted Lokring for technical assistance on certain sales and he utilized Lokring's Flowan system for certain requests." (Doc. No. 115 at PageID# 1969.) Mark Sindelar testified that Lokring distributors such as Plaintiffs were able to contact Lokring through various methods such as email, phone, and a system called Flowan, "which is kind of a tag in/tag out kind of project management system." (Doc. No. 152 at PageID# 3133.) Sindelar testified that he interacted with Guidry via email relative to a request for technical guidance on an application in which to use Lokring products. (*Id.* at PageID#s 3132-33.) Sindelar stated that Guidry contacted him less than 10 times. (*Id.*)

Lokring also points to a text message that Guidry sent in September 2020 to Chris Brickner (a Lokring distributor in Ohio doing business as Lokring Great Lakes), who received the text message in Ohio.   (Doc. No. 115 at PageID# 1970.)  Lokring alleges that Guidry "sent these texts to Mr.

---

[10] Guidry later testified that he was speculating in this email, "trying to appease the customer on the delay of response" and that he did not have personal knowledge of where Lokring's servers were located. (Doc. No. 151 at PageID#s 2968-69.)

Brickner . . . because Guidry mistakenly believed that Brickner was taking over Shepard and Associates' southwest territory." (*Id.*)  In addition, Lokring points to an October 22, 2020 email that Guidry sent to Bill Lennon and other Lokring employees located in Ohio, to a distributor located in Ohio, and other Lokring distributors around the country and the world. (Doc. No. 155 at PageID# 3240, ¶ 93; Ex. UU; Doc. No. 151 at PageID# 2886; Doc. No. 152 at PageID#s 3035-38, 3135.) This email contained highly disparaging remarks about both Lokring and Mr. Lennon, personally. Lokring likewise highlights Guidry's LinkedIn post in October 2020 where he made a disparaging remark about Bill Lennon.  (Doc. No. 155 at PageID#s 3240-41, ¶ 94; Ex. NNN; Doc. No. 151 at PageID# 2938.)  Finally, Lokring points to numerous calls that Guidry had with Joe Shepard (who resides in Novelty, Ohio) following the termination of the Southwest distributorship.  Lokring asserts that "Guidry's calls to Joe Shepard were part and parcel of Jared Guidry's campaign to misappropriate, unfairly compete, and disparage Bill Lennon and Lokring's good name." (Doc. No. 115 at PageID#s 1971-72; Ex. BBB at pp. 15, 18; Doc. No. 150 at PageID#s 2636, 2717-21; Doc. No. 151 at PageID# 2915.)

Lokring goes on to argue that "Guidry consented to the jurisdiction of this Court by agreeing to the Employee Confidentiality and Non-Compete Agreement . . . either by signing the agreement or by initiating and continuing his employment with Shepard and Associates, thus assenting to the forum selection clause." (Doc. No. 115 at PageID# 1980-81.) To date, Lokring has been unable to produce a signed copy of an Employee Confidentiality and Non-Compete Agreement signed by Guidry, but points to circumstantial evidence that he signed an offer letter which was produced by Meador Staffing, the agency through which Guidry was hired by Southwest. This offer letter Guidry

19

signed references, "You will agree to a Confidentiality Agreement" and "You will agree to a Non-Compete Agreement." (Ex. SSS at ¶¶ 12-13; Doc. No. 151 at PageID#s 2896-99.)

Lokring also argues that it has satisfied the "effects test" regarding personal jurisdiction, enunciated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). Lokring maintains that the effects test is "satisfied by virtue of Guidry's 150 email messages [whereby he] not only possessed and used Lokring's Confidential Customer Database to attempt to sell a competing product to a significant customer of Lokring, Dow Chemical, he misrepresented the competing product as a 'LOKRING equivalent.'" (Doc. No. 155 at PageID# 3241, ¶ 97.)

Lastly, Lokring argues that personal jurisdiction over Guidry exists because he is part of a conspiracy with Plaintiffs and Tube-Mac to harm Lokring's business. Lokring asserts that, under the "conspiracy theory of personal jurisdiction," if one co-conspirator commits an overt act in furtherance of the conspiracy in the forum state, personal jurisdiction extends to all members of the conspiracy. (Doc. No. 155 at PageID#s 3243-44, ¶¶ 103-12.)

In response, Guidry maintains that Lokring has failed to demonstrate purposeful availment. Guidry notes that, at all times relevant herein, he has resided in Pasadena, Texas. (Doc. No. 156 at ¶ 3; Doc. No. 111-1 at PageID# 1718; Doc. No. 151 at PageID# 2873.) He states that he has never lived in the State of Ohio and was never an employee of Lokring. (Doc. No. 151 at PageID# 2873; Doc. No. 111-1 at PageID#1719; Doc. No. 156 at PageID# 3248.) Guidry did not maintain an office in Ohio and only visited Ohio once in May 2019 for a Lokring Technology factory tour. (Doc. No. 111-1 at PageID# 1719; Doc. No. 151 at PageID# 2877.) Guidry testified that while he was employed by Shepard and Associates in Texas, he never sold anything in Ohio and further, that no matter the company with which he was employed, he never sold anything in Ohio or contacted anybody for

business purposes in Ohio. (Doc. No. 151 at PageID# 2877.) Guidry also argues that the Corrosion Allowance Document is actually the property of Exxon Mobil and that under Section 12.1 of a Master Goods and Services Agreement between Exxon Mobil and Lokring Technology, materials produced under the agreement between those parties would be Exxon's sole property, and therefore, not a Lokring trade secret. (Doc. No. 156 at PageID#s 3253-54.)

Guidry further asserts that he was never presented with the Confidentiality and Non-Competition Agreements referenced in paragraphs 12 and 13 of his offer letter from Shepard and Associates, Inc., nor were they spoken of after he signed the offer letter.[11] (Doc. No. 151 at PageID#s 2876; 2897-99.) Overall, Guidry is adamant that he never entered into a Confidentiality or Non-Competition Agreement. Finally, as to allegations of a potential conspiracy, Guidry testified that "Brad [Shepard] and I are not and were not working on a plan to work for Tube-Mac together in some greater scheme." (Doc. No. 151 at PageID# 2918.)

The Court finds that Lokring has failed to establish purposeful availment. First, the Court rejects Lokring's argument that Guidry consented to the jurisdiction of this Court by signing the Employee Confidentiality and Non-Compete Agreement, and/or or by initiating and continuing his employment with Shepard and Associates, thus assenting to the forum selection clause contained in that Agreement. (Doc. No. 115 at PageID# 1980.)

The facts relevant to this issue are as follows. Guidry signed an offer letter drafted by Shepard and Associates on February 25, 2019. (Ex. SSS; Doc. No. 151 at PageID#s 2843, 2896.) The offer letter indicates that "You will agree to a Confidentiality Agreement" and "You will agree to a Non-

---

[11] Guidry also testified that "Lokring Technology, LLC" is never mentioned in the offer letter. (*Id.*; see also Ex. SSS.)

21

Compete Agreement." (Ex. SSS.4.) Lokring argues that as part of Plaintiffs' agreements with Lokring Technology, Plaintiffs were obligated to secure signed non-competition and confidentiality agreements from their employees.[12]  (*See, e.g.*, Ex. H at § A.1.c.; Doc. No. 148 at PageID#s 2331-37.)  Lokring argues that the Confidentiality Agreement contains a forum selection clause for any state or federal court sitting in Lake County or Cuyahoga County. (Doc. No. 115 at PageID# 1981.) Zach Maywald (a former employee of Southwest who is currently employed by Southwest's successor distributor Alba Pipework) testified that he signed an ENDA when he began his employment with Southwest. (Doc. No. 147 at PageID# 2226; Doc. No. 9-3 at PageID# 291 (Ex. X); Doc. No. 11-2 at PageID# 319 (Ex. Z).) Maywald further testified that Guidry signed an ENDA as well yet admits that he had never seen a copy of Guidry's signed ENDA. (Doc. No. 147 at PageID#s 2286, 2299.)

Shepard later testified that he never presented Guidry with either a Confidentiality or Non-Compete Agreement and never told Guidry that a non-compete agreement would be required for which Lokring Technology, LLC would be a beneficiary. (Doc. No. 151 at PageID#s 2843-44.) Guidry also testified that he never had an ENDA or non-compete agreement from his employment with Southwest and no such confidentiality and non-competition agreements referenced in Paragraphs 13 and 14 of his offer letter were ever presented to him.  (Doc. No. 151 at PageID# 2876.) Lokring's position is that "Guidry signed the employee NDA, but the signed document has either been spoliated or is being withheld by Guidry, Shepard, or both." (Doc. No. 115 at PageID# 1981.)

---

[12] For example, Lokring points to the 2016 Distributor Agreement between Southwest and Lokring and its provision that "Distributor shall enter into and cause each employee of Distributor to enter into the Lokring Confidentiality Agreements as more specifically defined in Section 13.1," which denotes a Distributor Employee Confidentiality and Non-Competition Agreement. (Ex. I at § 5.1(q); Doc. No. 148 at PageID# 2326.)

The Court recognizes that there is conflicting testimony between Maywald, Shepard, and Guidry as to whether Guidry signed a confidentiality or non-compete agreement.  The Court also recognizes that the 2016 Distributor Agreement between Plaintiffs and Lokring indicates that a distributor was obligated to cause its employees to enter into a confidentiality agreement. (*See, e.g.*, Ex. I at § 5.1(q)).  Nonetheless, Lokring has thus far been unable to produce a copy of a confidentiality or non-competition agreement allegedly signed by Guidry.  In the absence of a signed agreement, and in light of the conflicting testimony elicited at the hearing, the Court finds that Lokring has failed to establish by a preponderance of evidence that Guidry entered into an employment agreement with Lokring, an Ohio company. Rather, the Court finds that Guidry's employment was with the Texas-based distributor Southwest.  Moreover, the Court finds that Lokring's argument that Guidry is bound to a forum selection clause through continued employment with Southwest lacks merit.  As discussed above, Guidry maintains that he was never presented with the Confidentiality or Non-Compete Agreements at any point during his employment with Southwest.

Second, the Court finds that Lokring has not established purposeful availment using the "effects test" first enunciated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783.  Under this test,  "a plaintiff must show that the defendant: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *O'Brien Construction, Inc. v. Miller*, No. 1:19-cv-1451, 2020 WL 1187259, at *10 n.7 (N.D. Ohio Mar. 12, 2020) (quoting *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 2011 WL 6293323, at *8 (S.D. Ohio Dec. 15, 2011). *See also Thompson v. Moore*, 2009 WL 3378242 at *2 (N.D. Ohio Oct. 15, 2009).  As explained recently by another Court in this District:

> The Supreme Court and Sixth Circuit have applied the *Calder*-effects test narrowly. Mere allegations that intentional tortious conduct injured a forum resident does not,

alone, suffice to prove a defendant possessed the constitutionally required minimum contacts with that forum to satisfy personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 290, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) ("*Calder* made clear that the mere injury to a forum resident is not always a sufficient connection to the forum, rather [t]he proper question is ... whether the defendant's conduct connects him to the forum in a meaningful way"). In short, injury to a forum resident is not enough, on its own, to establish personal jurisdiction, and the *Calder*-effects test has not been read to authorize personal jurisdiction in a plaintiff's home forum in the absence of additional evidence to demonstrate that the defendant "specifically directed" his actions toward the forum state. *See Parker v. Winwood*, 938 F.3d 833, 841 (6th Cir. 2019).

*LeafFilter N. LLC v. Home Craft Builders, Inc.*, 487 F. Supp. 3d 643, 648-49 (N.D. Ohio 2020).

Lokring argues that the effects test is satisfied by Guidry's 150 email messages in which he used the Big Contacts List to attempt to sell the Tube-Mac product, Pyplok, to Lokring customers including Dow Chemical. (Doc. No. 155 at PageID# 3241, ¶ 97.) Lokring emphasizes that Guidry sent the Big Contacts List from his Lokring email to his personal email; that the email indicated the information being transmitted was confidential proprietary information owned by Lokring; that he deleted the email from the sent box of his Lokring email account; and then used the customer list to solicit Lokring's customers for Tube-Mac's benefit. (Doc. No. 139 at PageID#s 2119-20.) Lokring also argues that the customer list contains specific customer and vendor information of no less than 40 companies located within Ohio, including some of Lokring's biggest customers, such as Exxon, BP, and Dow. (*Id.* at PageID# 2120 n.3.) Guidry also distributed Lokring's Corrosion Allowance Document to nine Dow employees. (Doc. No. 98 at PageID# 1300; *see, e.g.*, Ex. N.) Based on the above, Lokring argues that the effects test is satisfied because Guidry knew his conduct was intended to cause harm in Ohio. In response, Guidry argues that although the customer lists identified customer information from Ohio customers, "there is no allegation that Guidry has ever used such information or called on such customers. All the pleaded facts and evidence presented at the preliminary injunction hearing shows Guidry only works in the Texas area." (Doc. No. 142 at PageID# 2159.)

24

The Court finds that, although Guidry was sending these sales emails from outside the State of Ohio and it could be foreseeable that misrepresenting Lokring's product could have a negative consequence to Lokring in Ohio, Guidry's activities were not specifically directed toward the forum state, as in other cases where the effects test was met.  For example, in *Neal v. Janssen*, 270 F.3d 328 (6th Cir. 2001), the Sixth Circuit found personal jurisdiction existed where the nonresident defendant was found to have directed false information to the plaintiffs in the forum state of Tennessee regarding the commission for the sale of a dressage horse named Aristocrat, which was boarded in the Netherlands.  Specifically, the defendant (who was plaintiffs' agent in selling the horse) represented to the plaintiffs that he had found a buyer that would pay $312,000 for Aristocrat.  *Neal*, 270 F.3d at 330.  Based on this representation, plaintiffs accepted the offer.  *Id.*  Plaintiffs subsequently learned, however, that the buyer had actually paid defendant $480,000.  *Id.*  Although the defendant never visited the forum state, the Sixth Circuit found that representations made to the forum state residents were pivotal, noting that "the [defendant's] actions of sending false information into [the forum state] by phone and fax had foreseeable effects in [the forum state] and were directed at individuals in [the forum state]."  *Id.* at 332.

Similarly, in *Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914 (6th Cir. 2019), the Sixth Circuit expressly relied on *Neal* to find specific jurisdiction.  *Power Investments, LLC*, 927 F.3d at 918-919.  In that case, Michael Becker, a Missouri citizen, secured financing from Power Investments to purchase a power plant.  *Id.* at 916.  Power Investments was incorporated in Nevada, and had one member, Mason Miller, who lived in Kentucky.  *Id.*  "Becker called, texted, and emailed Miller many times, seeking funds and making many allegedly false assurances." *Id.*  Eventually, Miller came to believe that Becker had been "less than honest" about his use of the loaned funds as well as the power

plant's liabilities and operating costs. *Id.* Power Investments sued Becker in Kentucky for fraudulent

misrepresentation and unjust enrichment. The Court found that

> Becker initiated the ill-starred relationship with Miller, a Kentucky resident. He communicated with him extensively for well over a year, wheedling several advances, gathering third-party financing, and eventually obtaining a bailout of the power-plant purchase. These fraudulent communications far exceed the handful of phone calls at issue in *Neal*. Becker called Miller's central-Kentucky cell phone number, as well as his landline at a Lexington law firm, "on hundreds of occasions." R. 8-1 at 2. Becker texted Miller "hundreds, if not thousands," of times. *Id.* He sent about 300 emails to Miller's law firm address. And Becker's alleged misrepresentations in these communications constitute the core of Miller's fraud claims—just as in *Neal*.

*Id.* at 918-19.

Here, the Court finds that Guidry's emails to Lokring customers are too attenuated to satisfy

the effects test, because the contacts were not directed to the forum state. Although Guidry may have

forwarded the Big Contacts List from his Lokring email and utilized the Corrosion Allowance

Document that Lokring maintains may have been stored on an Ohio-based server, on the basis of the

evidence before it, the Court is unable to definitively conclude that Guidry's access to the Corrosion

Allowance Document involved reaching into an Ohio-based server.[13] Moreover, the sales emails

---

[13] Lokring also argues that purposeful availment is demonstrated by Guidry's acquisition of the Corrosion Allowance Document, "which originated in a series of emails sent from Jerard Smith of ExxonMobil to Mark Sindelar" the Director of Innovation and Technology at Lokring. (Doc. No. 155 at PageID# 3240, ¶ 92; Ex. JJ-1; Doc. No. 152 at PageID# 3114.) The Corrosion Allowance Document was stored on the Southwest shared drive so all employees could access it and Shepard testified that he had "asked Lokring to do some kind of shared file within the company." (Doc. No. 150 at PageID#s 2761, 2788.) O'Brien testified that Shepard and Associates would have had access to certain documents at Lokring "and could get that access either through their Office 365 account or through web access or through virtual private networking." (Doc. No. 147 at PageID# 2189.) Lokring asserts that Guidry's obtaining the Corrosion Allowance Document from the shared drive was a contact with the State of Ohio. (Doc. No. 155 PageID#s 3239-40, at ¶ 92.) That is, that based on Lokring's networking, someone in Lokring's office would be able "to place a document in this virtual place and then that document could be accessed by the distributor as well." (Doc. No. 147 at PageID# 2189.) However, O'Brien also testified that he did not know whether the Corrosion Allowance Document was located on a physical server in the State of Ohio. (Doc. No. 147 at PageID# 2208.) Shepard testified that "within Lokring Southwest" they "had a shared drive that all employees can access" and that he placed the Corrosion Allowance Document "on the Southwest share drive so all personnel could access the matter for use in the sales." (Doc. No. 150 at PageID#s 2762, 2788; Doc. No. 108-2 at ¶ 20; see also Doc. No. 151 at PageID# 2849 ("something like the corrosion allowance document was on our S-drive that everyone had access to.").

forming the basis of many of Lokring's claims were directed to customers in Texas. A review of the Dow emails attaching the Corrosion Allowance Document likewise indicates that Guidry was directing these communications to individual residents in Texas branches of Dow Chemical. (*See, e.g.*, Doc. No. 98 at PageID#s 1391-1422.) Thus, the instant case is distinguishable from *Neal* and *Power Investments*, where the defendants were specifically directing the communications forming the basis of the claims to the forum state. "[T]he *Calder*-effects test has not been read to authorize personal jurisdiction in a plaintiff's home forum in the absence of additional evidence to demonstrate that the defendant "specifically directed" his actions toward the forum state." *LeafFilter*, 487 F. Supp. 3d at 649 (citing *Parker*, 938 F.3d at 841).

The Court further finds that many of the other alleged contacts that Guidry had with the State of Ohio are the kind of "random," "fortuitous" contacts that courts have found to be insufficient to demonstrate purposeful availment. As the Supreme Court has noted, "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Walden*, 571 U.S. at 285.  *See also Power Investments LLC*, 927 F.3d at 918 ("A foreign defendant's relationship with an in-forum plaintiff does not suffice 'standing alone' to confer jurisdiction. The defendant needs it 'own affiliation' with the State.") (internal citations omitted).

Lokring argues that the "hand-in-hand" configuration of the cloud-based server and Lokring's Ohio-based server coupled with Guidry's use of his Lokring email address to send the Big Contacts List to his personal Yahoo email account necessarily created a contact with the State of Ohio. (Doc. No. 155 at ¶ 91.)  However, the Sixth Circuit has indicated that a plaintiff's "decision to store its emails on servers located in [the forum state], without more, does not support the exercise of personal

27

jurisdiction over [the defendant]." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548 n.1 (6th Cir. 2016). *See also NMS, Inc. v. Brey & Co.*, No. 16-cv-545, 2016 WL 3406279, at *4, n.42 (N.D. Ohio June 21, 2016) ("While remotely accessing Ohio servers may be insufficient on its own to give jurisdiction, it is one contact that this Court can consider for due process purposes."). Moreover, although some cases have found purposeful availment when a defendant removed files allegedly containing trade secrets from an Ohio-based database, such cases often involved defendants with other, more meaningful contacts with Ohio, such as an employment relationship with an Ohio company. *See, e.g.*, *The RightThing, LLC*, 2009 WL 249694, at *5; *OnX USA LLC v. Sciacchetano*, 913 F. Supp. 2d 473, 479 (N.D. Ohio 2012) ("In addition to reaching Ohio through his computer wires, he engaged in an ongoing relationship with an Ohio corporation during which he personally supervised Ohio-based employees.").

Here, the Court finds that Guidry's emailing the Big Contacts List from his Lokring email account to his personal account to be a fortuitous contact with Ohio that is insufficient, standing alone, to establish purposeful availment. The Court likewise rejects Lokring's argument that purposeful availment is demonstrated by the communications that Guidry had with Mark Sindelar on ten or fewer occasions for the purpose of technical assistance with sales, and Guidry's lone visit to Lokring's Willoughby location in May 2019.

Lokring also argues that its claim of unfair competition arises directly from Guidry's contacts with Ohio because of Guidry's October 22, 2020 email to Lokring's employees and distributors in the State of Ohio, wherein Guidry made disparaging remarks about Bill Lennon. (Doc. No. 155 at PageID#s 3242-43, ¶ 102; Doc. No. 152 at PageID#s 3092-93; Ex. UU.) There is no evidence, however, that this email caused any effect on Lokring's business. The Court notes that this email only

28

included "@lokring.com" email addresses and appears to include only internal Lokring personnel. Indeed, Mike Fadalla (a former employee of the Lokring Gulf Coast distributorship and a recipient of the October 22 email) acknowledged in his testimony that although the email disparaged Lennon, he could not see anything in the email that specifically disparaged Lokring Technology, LLC. (Doc. No. 152 at PageID# 3097.) In fact, the email addressed to Lokring individuals, some of whom were resident in Ohio, includes statements by Guidry that Lokring is a wonderful product.  (*See* Ex. UU: "This is an incredible product and will no doubt have continued success. I will actually encourage Lokring use in my next ventures.")  The Court finds that the October 22, 2020 email does not establish purposeful availment.  *See Walden*, 571 U.S. at 285 (noting that the minimum contacts analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.")

For similar reasons, the Court rejects Lokring's argument that the text message Guidry sent to Lokring distributor Chris Brickner in Ohio demonstrates purposeful availment. (Doc. No. 115 at PageID# 1970.)  Guidry sent this text message after Southwest received notice that the distributorship was to be terminated, thinking that Brickner was to become the new distributor. Though Brickner was in Ohio, this is a fortuitous contact and even the contents of the text message were focused on the Texas market for Lokring products.  (*Id.*; "Welcome to Houston! Good Luck.") Guidry's LinkedIn post disparaging Bill Lennon and Lokring Technology also does not provide sufficient contact with Ohio. This post on a professional social networking website had a global audience. In a case addressing social media posts and personal jurisdiction, the Sixth Circuit recently noted that "[t]he tweets 'did not create sufficient contacts' with Kentucky 'simply because' the plaintiffs have Kentucky connections." *Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021); *see also*

*Binion v. O'Neal*, 95 F. Supp. 3d 1055, 1060 (E.D. Mich. 2015) ("Plaintiff cannot establish that O'Neal's posts were 'expressly aimed for dissemination' in Michigan. Nor is there any allegation that O'Neal took affirmative steps to direct the posts to a Michigan audience. Instead, O'Neal's posts were meant for a national or even international audience.").

Lastly, the Court rejects Lokring's argument that this Court has jurisdiction over Guidry under a conspiracy theory of personal jurisdiction.[14] Under this theory, a defendant's contacts may be imputed to another defendant for jurisdictional purposes, if they are involved in a conspiracy. *See, e.g., Ashcor v. Bryant*, 2020 WL 12812012 (E.D. Tenn. Jan. 7, 2020). Several courts have held that, to prevail on a conspiracy theory of personal jurisdiction, a plaintiff must allege, "'(1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries.'" *Stolle Machinery Co. LLC v. RAM Precision Industries,* No. 3:10-cv-155, 2011 WL 6293323, at * (S.D. Ohio Dec. 15, 2011) (quoting *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*, 410 F. Supp. 2d 592, 599 (E.D. Ky. 2006)). *See also DayCab v. Prairie Tech.*, 2021 WL 6275629 (E.D. Tenn. Aug. 2021); *Ashcor v. Bryant*, 2020 WL 12812012 (E.D. Tenn. Jan. 7, 2020).

Lokring argues that even prior to Plaintiffs' commencement of this lawsuit, Guidry and Plaintiffs had discussions about contacting Mike Fadalla to discuss working with them as Tube-Mac distributors. (Doc. No. 155 at PageID# 3243, ¶ 105.) Lokring argues that after the distributorship's

---

[14] In his Motion to Dismiss, Guidry also raises an argument regarding the fiduciary shield doctrine. (*See* Doc. No. 111 at PageID#s 1705-07.) Lokring's Opposition contains no response to the fiduciary shield doctrine raised in Guidry's Motion and Guidry's Reply also does not mention it. (*See* Doc. Nos. 139, 142.) In general, this doctrine "prevents individual officers of a corporation from being subject to personal jurisdiction in the forum state merely because the corporation is subject to such jurisdiction." *Commodigy OG Vegas Holdings LLC v. ADM Labs*, 417 F. Supp. 3d 912, 924 (N.D. Ohio 2019). Because the Court finds that Lokring has failed to establish personal jurisdiction, the Court declines to reach the merits of the fiduciary shield doctrine argument raised by Guidry.

termination, Plaintiffs failed to return Lokring's inventory, "creat[ing] a supply chain crisis that Guidry had knowledge of and exploited when soliciting sales from Lokring's customers for the benefit of Tube-Mac." (*Id.* at PageID#s 3243-44, ¶¶ 106-07.)  In addition, Lokring argues that Guidry and Shepard remained in close communication, "with AT&T records reflecting over 703 phone calls between the two of them" and that communications increased during the periods when Lokring filed pleadings to obtain the return of its inventory. (*Id.* at PageID# 3244, ¶ 111.)

The Court rejects Lokring's argument based on the "conspiracy theory" of personal jurisdiction.  In *Stolle Machinery Co.*, the Southern District of Ohio noted that "[t]he Sixth Circuit has neither expressly adopted nor rejected the 'conspiracy theory' of personal jurisdiction, but has noted that conclusory allegations of a nonresident's part in a conspiracy are insufficient." 2011 WL 6293323, at *7, n.2 (citing *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237 (6th Cir. 1981)). *See also C.T. v. Red Roof Inns, Inc.*, No. 2:19-cv-5384, 2021 WL 602578, at *5 (S.D. Ohio Feb. 16, 2021) (noting that "the Sixth Circuit has yet to settle the issue of conspiracy jurisdiction.")  Several courts within this District have refrained from applying a conspiracy theory of personal jurisdiction. *See, e.g.*, *Spivak v. Law Firm of Tripp Scott, P.A.*, No. 1:13-cv-1342, 2015 WL 1084856, at *5 (N.D. Ohio Mar. 10, 2015) ("[O]n the question of whether, for the purpose of determining personal jurisdiction, the contacts of one alleged member of a civil conspiracy with the forum state may be attributed to other members of that conspiracy who have no such personal contacts, this theory has been directly considered and rejected [at least] twice in this District in cases applying Ohio law."); *Hollar v. Philip Morris Inc.*, 43 F. Supp. 2d 794, 802 n.7 (N.D. Ohio 1998) ("Since personal jurisdiction must be based on the actions and contacts of the specific defendant at issue, . . . the Court declines to apply the so called 'conspiracy theory of jurisdiction' in which the contacts of a

31

defendant's co-conspirators with the forum state are attributed to the defendant in order to supply the minimum contacts necessary for personal jurisdiction."); *Prakash v. Altadis U.S.A. Inc.*, No. 5:10-cv-0033, 2012 WL 1109918, at *18 (N.D. Ohio Mar. 30, 2012) ("Moreover, the 'absent co-conspirator' doctrine . . . is not recognized as a means for establishing personal jurisdiction in this district."); *Moro Aircraft Leasing, Inc. v. Keith*, 789 F. Supp. 2d 841, 847 n.1 (N.D. Ohio 2011) ("The Court notes that the Sixth Circuit does not recognize the 'conspiracy theory of jurisdiction.'"). Absent clear adoption of the conspiracy theory of personal jurisdiction by the Sixth Circuit, this Court will follow other courts within the Northern District of Ohio and decline to apply that theory.

In sum, the Court finds that Lokring has failed to meet its burden to establish by a preponderance of the evidence that Guidry has purposely availed himself of the privilege of acting in the State of Ohio. Analysis of the second and third prongs of the *Mohasco* test is, therefore, unnecessary.  *See LAK, Inc. v. Deer Creek Enter.*, 885 F.2d 1293, 1303 (6th Cir. 1989) ("The plaintiff having failed to pass the 'purposeful availment' test, we need not dwell on the other criteria of *Mohasco Industries*; each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked."). *See also Filtrexx Int'l, LLC*, 2013 WL 587582, at *12.

### C.    Conclusion

For all the reasons set forth above, the Court finds that Lokring has failed to establish that this Court has personal jurisdiction over Guidry under the Due Process Clause.  Accordingly, the Court GRANTS Guidry's Motion to Dismiss (Doc. No. 111).  Third-Party Defendant Jared Guidry is dismissed.  In light of the Court's dismissal of Guidry, the Court denies Guidry's Motion to Quash Subpoena (Doc. No. 90) as MOOT.

## IV.     Motion for Preliminary Injunction

Having dismissed Third-Party Defendant Jared Guidry from the case due to a lack of personal jurisdiction, the Court will evaluate Lokring's Motion for Preliminary Injunction as to Plaintiffs/Counter-Defendants Shepard and Associates, Inc. and Brad Shepard, only.

### A.     Standard of Review

When considering a motion for preliminary injunction, the Court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *See Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). *See also Palmer v. Harris*, 2018 WL 6062305 at *6 (N.D. Ohio Nov. 20, 2018). These factors should be balanced against each other but are "not prerequisites that must be met." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). *See also Avery Dennison Corp. v. Juhasz*, 924 F. Supp. 2d 893, 899 (N.D. Ohio 2013).

A party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). In addition, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. "The party seeking

33

the injunction must establish its case by clear and convincing evidence." *Draudt v. Wooster City Sch. Dist. Bd. of Educ.*, 246 F. Supp. 2d 820, 825 (N.D. Ohio 2003).

### B.   Preliminary Injunction Factors

#### 1.   Likelihood of Success on the Merits

First, the Court considers whether Lokring "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 543 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc*., 119 F.3d 393, 402 (6th Cir. 1997). Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

In its Motion, Lokring argues that the evidence "establishes likely success on Lokring's claims for breach of contract, misappropriation of trade secrets, and unfair competition and deceptive trade practices." (Doc. No. 98 at PageID# 1298.) The Court will proceed with analyzing the likelihood of success on the merits as to these claims.

#### a.   Misappropriation of Trade Secrets

Lokring claims that Plaintiffs misappropriated Lokring's trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.* (*see* Doc. No. 61 at Count 7) and Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code. §§ 1333.61, *et seq.* (*see id.* at Count 8).  The definition of a trade secret and requirements for establishing misappropriation of trade secrets are substantially the same under the DTSA and OUTSA. *See, e.g.*, *PUI Audio, Inc. v. Van Den Broek*,

2021 WL 4905461, at *5 n.5 (S.D. Ohio Oct. 21, 2021); *Just Funky, LLC*, 2021 WL 2635377, at *6 (same). In order to prevail on a misappropriation of trade secrets claim under the OUTSA, a plaintiff must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *See Tomaydo-Tomahdo, LLC v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio Ct. App. 8th Dist. 2017). *See also Goken Am., LLC v. Bandepalya*, 2014 WL 6673830 at *5 (S.D. Ohio Nov. 24, 2014).

### i.     Existence of a Trade Secret

The term "trade secret" is defined in the OUTSA as follows:

(D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C. § 1333.61(D). *See also MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 965 (N.D. Ohio 2009).[15] Courts consider six factors to determine whether an item constitutes a trade secret:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the

---

[15] Similarly, the DTSA defines the term "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . , whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.,* 89 Ohio St.3d 396, 732 N.E.2d 373, 378 (2000). *See also Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 414, 49 N.E.2d 1296, 1302 (2016).

Lokring argues that the Big Contacts List and the Corrosion Allowance Document meet the definition of trade secret under the OUTSA. (Doc. No. 98 at PageID# 1299.)  The Court will address each of these documents separately, below.

### a.    The Big Contacts List

Lokring argues that the Big Contacts List is subject to protection under the DTSA and OUTSA.  (Doc. No. 98 at PageID#s 1299-1300.) Lokring maintains that the information contained in this database is not publicly available or known outside of Lokring and the amount of time and expense that it would take for others to develop it is considerable.  (*Id*.) Further, Lokring asserts that it takes reasonable steps to protect this information, including requiring (1) all distributors and their employees to sign NDAs and ENDAs, and (2) the return of all confidential and trade secret information upon termination of a distributorship.  (*Id*. at 1300-01; Lennon Aff. (Doc. No. 98-1) at ¶ 12; Ex. I at § 5.1(q); Ex. H at § B.3.) Lokring prohibited Plaintiffs from "disclosing any and all confidential information and intellectual property pursuant to the EDA and NDA, even with respect to employees." (Doc. No. 155 at PageID# 3225, ¶ 23; Ex. H at § A.1.c.)

Plaintiffs argue that the Big Contacts List is not a trade secret.  Plaintiffs maintain that Joe Shepard developed and paid for Big Contacts starting in 2010 and that when he started Lokring Southwest in 2003 as an exclusive Lokring distributor, he brought over his already established CRM system. (Doc. No. 108 at PageID# 1640.) Plaintiffs also argue that when Brad Shepard first began

working at Southwest in 2009, "he assisted in gathering customer data to add to the CRM from sources such as LinkedIn Sales Navigator, Industrial Info PEC Reports, ZoomInfo, and Spokeo, all of which was paid for by Shepard and Associates." (*Id.*) Plaintiffs maintain that when Joe Shepard started his Southeast distributorship in 2015, Lokring acknowledged his ownership of Big Contacts. (*Id.*; J. Shepard Aff. (Doc. No. 108-1) at ¶ 18.) Plaintiffs further assert that when Joe Shepard sold Shepard and Associates, Inc. to Brad Shepard in 2016, he allowed Southwest to retain access to Big Contacts and Lokring made no effort to restrict Brad's rights to Big Contacts. (*Id.*)

Plaintiffs also argue that "[d]uring the time Brad owned Southwest, all Southwest sales people had access to and would input data into Big Contacts." (Doc. No. 108 at PageID# 1640; B. Shepard Aff. (Doc. No. 108-2 at ¶ 8).) Plaintiffs assert that, in 2018, Lokring initiated its own CRM system called Pipeliner, and directed that the Big Contacts data be transferred to Pipeliner. (*Id.* at PageID# 1641; Doc. No. 148 at PageID# 2413.) This merging of the two systems proved difficult and by 2020 the consolidation of the Big Contacts data into Pipeliner was not complete. (*Id.*; B. Shepard Aff. (Doc. No. 108-2) at ¶ 10.) In June 2020, Mr. Maywald downloaded the Big Contacts data to an Excel spreadsheet and forwarded it to Shepard and Guidry. (*Id.*) Plaintiffs argue that, "Lokring, which monitored the email, did not advise Brad that the information on the spreadsheet was confidential." (*Id.*; B. Shepard Aff. at ¶ 12.) Lastly, Plaintiffs point to the fact that when Lokring terminated Joe Shepard's Southeast distributorship in June 2020, Lokring purchased Joe Shepard's Big Contacts license for $1,000. (*Id.*; J. Shepard Aff. at ¶ 11; Doc. No. 108-1 at PageID# 1652.)

For the following reasons, the Court finds that there is a substantial likelihood that Lokring will be able to establish that the Big Contacts List constitutes a trade secret. As an initial matter, both the OUTSA and DTSA specifically define a "trade secret" as including business and financial

37

information. *See* Ohio Rev. Code § 1333.61(D); 18 U.S.C. § 1839(3).  Courts have expressly found

that customer lists, pricing information, and other business information can constitute "trade secrets"

under the OUTSA provided the other requirements of that statute are met.  *See Corporate Lodging*

*Consultants, Inc. v. Szafarski,* 2021 WL 3709914, at *6-7 (N.D. Ohio Aug. 20, 2021); *Kuvedina, LLC*

*v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 756 (S.D. Ohio 2013); *Avery Dennison Corp v.*

*Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000). Federal courts have reached the same

conclusion under the DTSA.  *See, e.g.*, *Corporate Lodging Consultants,* 2021 WL 3709914, at *6-7;

*Vendavo, Inc. v. Long, et al.,* 2019 WL 4139000, at *6-11 (N.D. Ill. Aug. 30, 2019); *API Am. Inc. v.*

*Miller*, 380 F. Supp. 3d 1141, 1148 (D. Kan. Apr. 5, 2019); *Select Energy Servs., Inc. v. Mammoth*

*Energy Servs., Inc.*, 2019 WL 1434586 at *5-6 (W.D. Okla. March 20, 2019).

  The Court evaluates the six factors as follows. As to the first three factors, (1) the extent to

which the information is known outside the business, (2) the extent to which it is known to those

inside the business, and (3) the precautions taken by the holder of the trade secret to guard the secrecy

of the information, the Court finds that these factors weigh in favor of the Big Contacts List's trade

secret status.  Lokring maintains that it required all distributors, including Plaintiffs, to enter into an

Exclusive Distributor Agreement as well as an NDA. (Doc. No. 155 at PageID# 3225, ¶ 22.) Shepard

signed a Confidentiality and Non-Competition Agreement which provides that the recipient agrees

"not to use the Information otherwise than for the purpose of providing outsourced manufacturing

and sales services to Lokring."  (Ex. H.1 at § A.1.a.; Doc. No. 155 at PageID# 3221, ¶ 6.) Section

A.2 of the Confidentiality and Non-Competition Agreement defines the term "Information" to include

"all technical and non-technical information disclosed to the Recipient by or on behalf of Lokring,

including but not limited to . . . *customer lists* . . . ." (Ex. H.2.) (emphasis added.)  The agreement

38

also defines "Information" to include "all information concerning suppliers and customers, whether or not such suppliers and customers were developed, identified, or maintained by Lokring or Recipient." (Ex. H.3 at § A.2.d.)  Shepard's NDA further required that:

> All employees and third parties to whom the Recipient discloses Information as permitted under this Agreement shall: (i) have a need to know the Information; (ii) be bound to the Recipient by written confidentiality agreements or otherwise to maintain the Information in confidence on terms at least as restrictive as this Agreement; and (iii) be informed of the confidential nature of the Information to be disclosed to them and their obligations with respect to its use and disclosure . . .

(Ex. H.1 at § A.1.c.)

Lokring also required Plaintiffs to cause its employees to enter into an ENDA.  (Doc. No. 155 at PageID# 3225, ¶ 26; *See* Ex. I, §§ 5.1(q) and 13.1.)  Lokring contractually imposed liability on the distributor for any breach of the NDA by one of the distributor's employees. (Doc. No. 155 at PageID# 3225, ¶ 24; Doc. No. 149 at PageID#s 2543-44; Ex. H at § A.1.h.) Lokring also maintained a secure IT network, including various levels of encryption and email systems with usernames and passwords.  (Doc. No. 155 at PageID# 3226, ¶¶ 27-28; Doc. No. 147 at PageID#s 2186-89.)

The Court rejects Plaintiffs' argument that Lokring's purchase of Joe Shepard's Big Contacts license upon the termination of the Southeast distributorship belies the Big Contacts List's trade secret status.  As Lokring notes, "the license to Big Contacts is not equivalent to the ownership of the [Big Contacts List] which resided on Big Contacts." (Doc. No. 110 at PageID# 1683.)  Indeed, the Settlement Agreement between Joe Shepard and Lokring provides that "[p]ursuant to the EDA and a Confidentiality and Non-Competition Agreement, entered into concurrent with the EDA, SHEPARD is required to return all such Confidential Information to LOKRING," to include "customer lists . . . on a CRM system known as Big Contacts." (Doc. No. 108-1 at PageID# 1652 (Ex. FF.2.)  Although Lokring granted Joe Shepard the right to retain one copy of the Big Contacts List, the agreement

made clear that "such customer list constitutes LOKRING's property, and SHEPARD's restrictions on use and dissemination of such customer list shall survive the termination of the EDA." (*Id.*; *see also* Ex. GG.19 at § 14.13 (providing that at no time shall Distributor and its Majority Shareholder "disclose the customer list to anyone or otherwise use the customer list in a manner that is competitive to Company.") Notably, Lokring has also presented evidence that, after learning in July 2020 that Plaintiffs and Guidry accessed Big Contacts, counsel for Lokring specifically advised Plaintiffs that access to the Big Contacts Database was "strictly prohibited and not authorized." (Ex. O; Doc. No. 98-2 at PageID# 1383.) Moreover, upon termination of the distributorship, Plaintiffs were required to "return all Intellectual Property . . . and all Information." (Ex. I.15 at § 12.5(a); Doc. No. 148 at PageID# 2329-30.)

Based on the above, the Court finds that Lokring has demonstrated a substantial likelihood of success in demonstrating that it took "reasonable measures to protect [its] confidential information." *Dayton Superior*, 2013 WL 1694838 at *13. *See, e.g., Fred Siegel Co., LPA v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853, 862 (1999) (finding trade secret status justified where defendant kept client list on a password-protected computer, kept hard copies in office cabinets which were sometimes locked, and "probably" told its employees that its customer list were confidential); *Valco Cincinnati, Inc. v. N & D Mach. Serv., Inc.*, 24 Ohio St.3d 41, 492 N.E.2d 814, 818 (1986) (finding trade secret status justified where employer kept plant locked, screened all visitors, and restricted access to drawings contended to be trade secrets).

The Court further finds that there is a substantial likelihood that Lokring will succeed in demonstrating that it satisfied the other three factors noted above, i.e., (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or

40

money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.  Lokring argues that in June 2020, when Lokring was acquiring the sole administrator rights to Big Contacts, Joe and Brad Shepard were concerned that Lokring would cut off their rights to the CRM. (Doc. No. 155 at PageID# 3230.) During this time, Lokring asserts that Joe Shepard was communicating with Big Contacts "to migrate all of the customer information to a 'secret' database controlled by him and Brad," but Plaintiffs represent that Brad Shepard "did not approve the idea" of "creating another license for Big Contacts."  (*Id.*; Doc. No. 157 at PageID# 3264, ¶ 47; Ex. TTT, UUU, VVV.)  Lokring asserts that Plaintiffs' and Joe Shepard's actions during this time demonstrate the value of the Big Contacts List to a competitor.

In support of its argument, Lokring points to Bill Lennon's testimony that it took "substantial resources and time" for Lokring to develop both the customer relationships reflected in the Big Contacts List, and the List itself. (Lennon Aff. (Doc. No. 98-1) at ¶ 11.) Lokring argues that "after a potential customer is identified by the distributor, Lokring expends substantial time, resources and money to have its product vetted, tested and approved for use by the customer" and that the information contained in the Big Contacts List "contains the parties' role and function at the customer, and it includes multiple levels of engineers that are necessary to approve a product for use, and procurement people that would purchase the products once approved." (Doc. No. 155 at PageID#s 3227-28, ¶¶ 35-36.)  Mike Fadalla testified that identifying the right persons at large industrial sites is a complex process "to try to get into the facility or to make contact with someone within the facility that may allow representatives such as [himself] to come in and do a presentation." (Doc. No. 152 at PageID# 3013.) Guidry also acknowledged the value of the Big Contacts List when asked how it

compared to his LinkedIn contacts, stating, "There's a lot more contacts on that customer list. I'll be honest." (Doc. No. 151 at PageID#2881.) Guidry also utilized the Big Contacts List and supplemented his copy with additional research he conducted. (*Id.* at PageID#s 2946-47.)

Plaintiffs argue that Lokring did not provide customer leads or information to distributors. (Doc. No. 157 at PageID# 3264, ¶ 40.) For example, Steve Burke, a former Lokring distributor, testified that he generated his information on the Pipeliner CRM and paid for it in its entirety. (Doc. No. 150 at PageID# 2611.) Plaintiffs also argue that "the problem in obtaining customers for distributors was in overcoming engineering habits and technical habits, not identifying customers." (Doc. No. 157 at PageID# 3264, ¶ 41.) Guidry testified that he used "several web-based tools that are out there for anybody to obtain that information, whether it's phone numbers, where the person works, who they are, what they do," such as LinkedIn, ZoomInfo, etc. (Doc. No. 151 at PageID# 2880.)

The Court finds that these factors also weigh in favor of holding the Big Contacts List to be a Lokring trade secret. There is value in this voluminous list of over 26,000 rows of specific customer information and such information was not generally available. Although the Southwest distributorship may have contributed much of the material to the Big Contacts List, the 2016 Distributorship Agreement and NDA make clear that customer lists are the property of Lokring Technology and the facts discussed above demonstrate the amount of time and expense it would take for others to acquire and duplicate the information. Accordingly, the Court finds, for purposes of the instant Motion, that there is a substantial likelihood that Lokring will succeed in demonstrating that the Big Contacts List constitutes a trade secret for purposes of its federal and state misappropriation of trade secrets claims.

### b.      The Corrosion Allowance Document

With regard to the Corrosion Allowance Document, the Court finds that Lokring has not established a likelihood of success on the merits on its claim that the Corrosion Allowance Document constitutes a trade secret.   For the reasons explained below, the Court finds that the Corrosion Allowance Document is the property of Exxon Mobil under a Master Goods and Services Agreement between Lokring and Exxon.  (Ex. HH).

Lokring maintains that the Corrosion Allowance Document is a trade secret that was misappropriated by Guidry when he sent it to various Dow personnel as an attachment to his Tube-Mac sales emails. (Doc. No. 98 at PageID#s 1300-01.)  Lokring identifies a Test Report 14-016 (Ex. DD) marked confidential that considers the effects of 1/8" corrosion allowance. Mark Sindelar testified that he drafted this test report document and that it was the result of initial discussions with Exxon to get "clarity on what they were looking for relative to their questions to Lokring to prove fitness for service of use  . . . for compliance with 1/8 inch corrosion allowance." (Doc. No. 152 at PageID# 3116.)

However, the Court notes that the actual Corrosion Allowance Document PowerPoint slide that Guidry sent to various Dow personnel with the file name, "Lokring corrosion testing comments" appears to have originated from Jerard Smith of Exxon. In a September 17, 2021 email from Sindelar to Lennon, Sindelar writes, "I located the originations of the slide on 1/8" corrosion allowance of Lokring, which came from Jerard Smith of Exxon." (Ex. DD.2.1.) Directly below this email is an October 25, 2016 email from Jerard Smith to Sindelar, Brad Shepard, and various Exxon personnel, in which Smith writes, "I put together the attached PowerPoint to highlight our concerns. Please look this over and comment." (*Id.*)

43

Pursuant to Section 12.1 of a Multi-Country Master Goods and Services Agreement between Lokring and ExxonMobil (hereinafter "MSA"), titled "Ownership of Documents" (Ex. HH.23) the Contractor (Lokring) "agrees that all tracings, drawings, field notes, requisitions, purchase orders, specifications, computer programs (data files and other software in whatever form), and other documents, records, and materials, whether written, audio, or video, developed by Contractor in connection with any Order ('Documents') shall be the sole property of Buyer." (*Id.*)

The Court rejects Lokring's suggestion during the hearing that it was not clear whether the Master Goods and Services Agreement applied to the Corrosion Allowance Document. (Doc. No. 149 at PageID#s 2472-73; Doc. No. 152 at PageID# 3158). Article 1 of the MSA, titled "Agreement Scope" sets forth that the "purpose of this Agreement is to define the terms and conditions for the provision of Goods and Services specifically set out in Exhibit C of this Agreement" and "[t]he Goods and Services are generally described as compression fittings, *and the services associated with supporting the applications of these products*." (Ex. HH.2-3, emphasis added.) Exhibit C of the MSA also sets forth in part that: "Services such as onsite technical support and consultancy, auditing, validation of LokRing [sic] Product Installation, and initial Certified Training for installers will be offered by Contractor." (Ex. HH.39.) Lennon also appeared to acknowledge that Exxon would have interest in this document, testifying that "if you're saying, is the slide property of Exxon or property of ours, I think it was authored -- if it was authored by Exxon by Gerard [sic], and it used our slides as a -- kind of a piece of paper to write his comments on, it's still coming from an Exxon employee back to us. So I would think there's protection to Exxon in the transfer of that information." (Doc. No. 149 at PageID# 2473.)

The Court finds that there is strong evidence that the specific Corrosion Allowance Document slide that was circulated by Guidry belongs to Exxon. Guidry appears to acknowledge as much in an email sent to a Dow individual, Shan Thigpen on June 14, 2021. (Ex. N.2, "Attached were questions from ExxonMobil when discussing 1/8" corrosion allowance.") Further, the Corrosion Allowance Document itself contains the title, "Lokring Corrosion Test – 1/8" Corrosion Allowance – *ExxonMobil Comments*." (Ex. N.4) (emphasis added.)  The document originated from Jerard Smith of Exxon and the MSA between Lokring and Exxon creates a strong inference that this Corrosion Allowance Document is Exxon's property, albeit having been utilized by Lokring to conduct proprietary tests.

Lokring argues, however, that the Corrosion Allowance Document qualifies as a trade secret "even though Exxon may have originally created the Corrosion Allowance Document albeit at Lokring's substantial expense and with Lokring's integral involvement." (Doc. No. 155 at PageID# 3229.)  For example, Sindelar testified that Lokring expended around $10,000 to perform the test that was the subject of Test Report 14-016 and that Lokring engaged a company called Stress Engineering to work on the corrosion allowance issue, for which Lokring paid approximately $80,000. (Doc. No. 152 at PageID# 3120-23.) Citing *Sovereign Chem. Co. v. Condren*, Nos. 18285, 18465, 1998 WL 195876, at *6 (Ohio Ct. App. Apr. 22, 1998), Lokring argues that under OUTSA, "two companies that have independently 'discovered' the same valuable information are entitled to the Act's protection."

The Court finds *Sovereign Chem. Co.*, *supra*, to be distinguishable.  In that case, appellant asserted that because a third party had already discovered information regarding the identity of a "Chemical X" as being the same as a "Chemical Y," his former employer's marketing of Chemical

X for a unique application could not be a trade secret. The court held that "[t]he fact that a third company has acquired the same information does not render the information 'readily ascertainable by proper means' and does not defeat its status as a trade secret." *Id.*

In the instant case, however, Lokring and Exxon had entered into a services agreement governing their relationship and services provided thereunder. The actual Corrosion Allowance Document at issue sent by Guidry (Doc. No. 98-2 at PageID# 1415) is a slide that came from Jerard Smith of Exxon and qualifies as Exxon's property under Section 12.1 of the MSA. (Ex. HH.23.) Moreover, Clause 11.3 of the MSA specifies the following:

> **11.3 Contractor's Information.** Neither Company nor Buyer shall have any obligation of confidence with respect to any information disclosed to Company or Buyer by Contractor, and **Company and Buyer shall be free to use or disclose any or all of the information contained in any drawing, record or other document to third parties without accounting to Contractor therefor; unless, however, information is specifically covered by a separate, written confidentiality agreement between Company or Buyer**, as applicable, and Contractor. In the absence of any such separate confidentiality agreement, Contractor shall not place any restrictive notices on any information, no matter the form of its recording that Contractor provides to Company or Buyer hereunder. If Contractor places any such restrictive notices on any drawing, record or other document, Company and Buyer are hereby authorized to nullify, remove, or disregard those notices.

(Ex. HH.23 at § 11.3) (emphasis added.) Sindelar testified that the corrosion report's intended audience was Exxon for the intended purpose of answering Exxon's questions and ultimately to sell them more Lokring products. (Doc. No. 152 at PageID# 3156.) In the absence of another "separate, written confidentiality agreement" between Lokring and Exxon, the language of the MSA indicates that the Corrosion Allowance Document belongs to Exxon.

As the Corrosion Allowance Document is Exxon's property, the Court finds that as to that document, Lokring has failed to demonstrate a substantial likelihood of success in demonstrating that

that Document constitutes a trade secret for purposes of its federal and state misappropriation of trade secrets claims.[16]

### ii. Acquisition of a Trade Secret as a Result of a Confidential Relationship

Lokring must also demonstrate a substantial likelihood of success in demonstrating that Plaintiffs acquired its trade secrets as a result of a confidential relationship. "A confidential relationship may be inferred from the circumstances surrounding the relationship between the owner of the trade secret and the defendant." *Dayton Superior Corp.*, 2013 WL 1694838 at *15 (citing *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.*, 673 N.E.2d 182, 185–86 (Ohio Ct. App. 10th Dist. 1996)). Further, where an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets through a confidential relationship. *MEMC Elec. Materials v. Balakrishnan*, 2012 WL 3962905, at *7 (S.D. Ohio Sept. 11, 2012).

Lokring argues that, although Shepard and Guidry testified that information contained in the Big Contacts List is also available through sources online, if that were the case, then they would not have taken the steps they did with regard to the Big Contacts List. (Doc. No. 155 at PageID# 3231, ¶ 51.) Lokring asserts that "Plaintiffs acknowledged the customer information was owned by Lokring, was to [be] returned to Lokring upon termination of the EDA and no copies were to be retained by Plaintiffs or any employees." (*Id.*)

In response, Plaintiffs argue that Brad Shepard, "being aware that Lokring would know he had done so, forwarded the [E]xcel spreadsheet of Big Contacts from his Lokring email to his

---

[16] Although the Court finds that the Corrosion Allowance Document does not constitute Lokring's trade secret, it nonetheless constitutes "confidential information" under the NDA signed by Shepard, which the Court will address *infra* in the context of Lokring's breach of contract claims.

personal Hotmail account." (Doc. No. 157 at PageID# 3265, ¶ 54.) Plaintiffs maintain that "Shepard's transfer of the [Excel] spreadsheet to his personal Hotmail account was done . . . from the Lokring server, completely above-board so that Lokring would know he had done so. . . . Shepard downloaded it to preserve it for his father, who was entitled to retain a copy." (Doc. No. 157 at PageID# 3265, n.4; Doc. No. 150 at PageID# 2747.) Plaintiffs also argue that "Lokring did not inquire or pursue the Big Contacts data after terminating Brad's distributorship." (Doc. No. 157 at PageID# 3265, ¶ 55.)

For the following reasons, the Court finds Lokring has demonstrated a substantial likelihood of success in showing that Plaintiffs acquired Lokring's trade secrets as a result of a confidential relationship. Plaintiffs obtained access to Lokring's confidential information (including the Big Contacts List) by virtue of their positions at Southwest. (Doc. No. 98-1 at PageID# 1314; Lennon Aff. (Doc. No. 98-1) at ¶¶ 20, 21.) Plaintiffs were certainly aware of Lokring's confidentiality and non-competition requirements, as Plaintiffs, in fact, executed both the 2016 Distributor Agreement and NDA. (Doc. No. 98-2 at PageID# 1378-1381, 1383; Exs. H, I.) On October 20, 2020, just before the termination of the Southwest distributorship, Shepard forwarded the Big Contacts List from his Lokring email address to his personal Hotmail account. (Ex. JJJJ; Doc. No. 150 at PageID#s 2779-80.) Shepard acknowledged during the hearing that the written agreements between Plaintiffs and Lokring did not permit him to retain any copies of this List. Based on the above, and despite any surrounding circumstances regarding efforts to migrate the material into Pipeliner or secure a copy of the Big Contacts List for Joe Shepard, the Court finds there is a substantial likelihood that Lokring will demonstrate that Plaintiffs acquired Lokring's trade secrets as a result of a confidential relationship.

48

### iii.      Unauthorized Use of a Trade Secret

Lastly, Lokring must demonstrate a substantial likelihood of success in demonstrating Plaintiffs' unauthorized use (or misappropriation) of a trade secret. The OUTSA defines misappropriation as follows:

(B) "Misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B). Similarly, the DTSA defines misappropriation as requiring the acquisition or disclosure of an improperly acquired trade secret. *See* 18 U.S.C. § 1839(5).

Here, Plaintiffs improperly obtained the Big Contacts List and, further, failed to return it after the termination of the 2016 Distributor Agreement. As noted above, Shepard forwarded the Big Contacts List from his Lokring account to his Hotmail account just before the Southwest distributorship was to be terminated. (*See* Ex. JJJJ; Doc. No. 150 at PageID#s 2779-80.) On the first day of the hearing, Plaintiffs handed over a paper copy of the Big Contacts List to Lokring. (Doc. No. 152 at PageID#s 3183-85.)   On day four of the hearing, however, Plaintiffs acknowledged that

49

Shepard still had a copy of the Big Contacts List in his Hotmail account but asserted that, due to allegations of spoliation, they did not want to delete it without prior authorization. (Doc. No. 149 at PageID#s 2564-67.) Counsel for Lokring expressed that, "a representation to the Court that it's deleted is sufficient for Lokring's counsel, and if we find out otherwise, we'll bring that to the Court's attention at that time. So I think just deleting it." (*Id.* at PageID# 2567.) Shepard testified during the hearing that he deleted the Hotmail file of the Big Contacts List and had not logged into the Big Contacts database since Lokring told him to cease and desist in July 2020.  See Doc. No. 150 at PageID#s 2747-48. Despite Shepard's deletion of the Big Contacts List from his Hotmail account, Lokring expressed concern that Plaintiffs had possessed the Big Contacts List for the past year, during which they could have used it to prepare to compete against Lokring.[17] (Doc. No. 149 at PageID# 2567.)

Based on the above, the Court finds there is a substantial likelihood that Lokring will be able to demonstrate Plaintiffs' unauthorized use of Lokring's trade secret. The OUTSA defines "misappropriation" in part as "[d]isclosure or use of a trade secret," where "[a]t the time of the disclosure or use, [it] was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Ohio Rev. Code § 1333.61(B)(2)(b). Shepard had knowledge of his NDA with Lokring and its provision that upon termination of employment with Lokring, he was to return all tangible items of confidential information and not retain copies of any item or document included

---

[17] Specifically, Lokring's counsel stated as follows: "But with respect to the tolling, I think, as I understand the tolling provision, the mere having that for 12 months past the time he was supposed to have it during this whole time, he could be developing business plans and make -- putting these plans in place to be off to the races, the day the noncompete ends. So we didn't really get the value of the noncompete period because he had all the information during the entire time. And part of running a successful business is having information to plan." *Id.*

within such category of information.  (Ex. H.5 at § B.3.) Lokring has demonstrated a substantial likelihood of success on its claim that Plaintiffs misappropriated Lokring's trade secrets when Shepard sent the Big Contacts List to his personal email on the eve of the distributorship's termination, and retention of that List thereafter.

Accordingly, and for all the reasons set forth above, the Court finds that Lokring has shown a substantial likelihood of success on the merits of its DTSA and OUTSA claims against Plaintiffs with regard to the Big Contacts List.

### b. Breach of Contract

The Court also finds that Lokring has demonstrated a substantial likelihood of success on the merits with respect to its breach of contract claims against Plaintiffs.  "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 F. App'x 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

Lokring argues that Plaintiffs breached the 2016 Distributor Agreement and NDA. (*See* Doc. No. 61 at PageID#s 905-08; Doc. No. 155 at PageID# 3221.)  Prior to reaching the specific breaches alleged by Lokring, the Court notes that there is no dispute that the EDA and the NDA are binding agreements between Plaintiffs and Lokring, signed by the parties. (Doc. No. 155 at PageID# 3221, ¶ 2; Ex. I.18-19; Ex. H.7.) As a preliminary matter, Plaintiffs argue that the 2016 Distributor Agreement is distinct from the NDA and that the 2016 Distributor Agreement does not incorporate the provisions of the NDA. (Doc. No. 157 at PageID# 3272, ¶¶ 29-30.) Further, Plaintiffs argue that the 2016 Distributor Agreement does not provide for injunctive relief. (*Id.* at ¶ 31.) The 2016 Distributor

Agreement was executed by Brad Shepard on July 1, 2016 (Ex. I.19) and Section 12.1 provides that the Agreement shall continue for one (1) year and automatically renew for consecutive one-year terms unless either party terminated the Agreement with thirty (30) days' prior notice. (Ex. I.14 at § 12.1.) Section 12.7 provides that "[t]he provisions of Sections 8, 9, 10, 11, 12, and 13 shall survive the termination of this Agreement for any reason." (Ex. I.16 at § 12.7.) The NDA provides that "the covenants set forth in Sections A and B above shall be deemed to be independent of all other agreements between Recipient [Brad Shepard] and Lokring." (Ex. H.5 at § C.2.) The Court finds that these are separate agreements and will proceed with analyzing the various provisions that Lokring argues Plaintiffs breached. The Court will address each of the alleged breaches separately, below.

### 1. Sections 5.1(q) and 13.1 of the Distributor Agreement

Lokring first argues that Plaintiffs breached Section 5.1(q) and Section 13.1 of the 2016 Distributor Agreement (Ex. I) by failing to obtain a signed ENDA from Guidry. (Doc. No. 155 at PageID# 3221, ¶ 3.) Section 5.1(q) provides in relevant part as follows: "Distributor further agrees: . . . (q) Distributor shall enter into and cause each employee of Distributor to enter into the Lokring Confidentiality Agreements as more specifically defined in Section 13.1 herein." (Ex. I.8 at § 5.1(q).) Section 13.1 provides:

> **Lokring Confidentiality Agreements:** Distributor agrees to comply with, execute, and cause to be executed, the following confidentiality agreements below (collectively, known as the "Lokring Confidentiality Agreements"):
>
> (a)  the Distributor Confidentiality and Non-Competition Agreement attached in [sic] as <u>Appendix G</u>; and
> (b)  the Distributor Employee Confidentiality and Non-Competition Agreement attached herein as <u>Appendix H</u>.

(Ex. I.16 at § 13.1.)

Plaintiffs concede that they "breached the EDA by not obtaining ENDAs from Guidry and Maywald," but argue that this breach "is not a material breach." (Doc. No. 157 at PageID# 3272, ¶¶ 32, 33.) "[A] material breach of contract is a party's failure to perform an element of the contract that is so fundamental to the contract that the single failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Kehoe Component Sales, Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 1005 (S.D. Ohio 2013) (quoting *Creative Concrete v. D & G Pools*, No. 07 MA 163, 2008 WL 2609504, at *3 (Ohio Ct. App. June 26, 2008)). Ohio courts generally consider five factors in determining whether a breach is material:

> [T]he extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*Id.* (quoting *Software Clearing House, Inc. v. Intrak, Inc.*, 583 N.E.2d 1056, 1060 (Ohio Ct. App. 1990) (citing Restatement of the Law 2d, Contracts). "The determination of whether a party's breach of a contract was a 'material breach' is generally a question of fact." *O'Brien v. Ohio State Univ.*, 2007 WL 2729077 (Ohio Ct. App. Sept. 20, 2007) (citing *Kersh v. Montgomery Developmental Ctr.*, 519 N.E.2d 665 (Ohio Ct. App. 1987).

Plaintiffs argue that Lokring did not have an expectation of a benefit from obtaining ENDAs because it did not take action to obtain ENDAs from Plaintiffs or other distributors. (Doc. No. 157 at PageID# 3273, ¶ 34.)  Specifically, Plaintiffs maintain that Lokring took no action to ensure that the ENDAs for Guidry and Maywald had been signed, citing evidence that Lokring did not always secure signed ENDAs from distributorship employees. (Doc. No. 149 at PageID# 2525.) Plaintiffs further argue that the ENDA was not essential to the 2016 Distributor Agreement, because the parties

53

performed the 2016 Distributor Agreement after the breach was known in January 2019 and that Lokring suffered no damages as a consequence of Plaintiffs' breach. (*Id.* at ¶¶ 35, 38.)

The Court finds that there is evidence that Lokring took steps to secure such signed agreements. For example, Shepard emailed Bill Lennon in January 2019 inquiring about non-compete and confidentiality agreements for employees to sign (Ex. MM.3) and Bill Lennon acknowledged the importance of these documents, responding that "I will have [counsel] forward the standard sales agreements and we're encouraging all distributors to use them. This is a smart practice to maintain a disciplined way, which could save you major legal headaches down the road and even threaten your business viability to a competitor." (Doc. No. 149 at PageID#s 2432-33.) Although there is also evidence that Lokring did not always secure signed agreements from its distributors for their employees, this is a highly fact-specific inquiry.

On balance, the Court finds that Lokring has shown a substantial likelihood of success in demonstrating that Plaintiffs materially breached Sections 5.1(q) and 13.1. *See Kehoe Component Sales, Inc.*, 933 F. Supp. 2d at 1005. Lokring was shown that it was deprived of its expected benefit from the 2016 Distributorship Agreement's requirement that distributors secure ENDA's from their employees. In addition, the Court agrees that Lokring may not be adequately compensated for this lost benefit, particularly in light of the subsequent activities of Guidry, from whom Shepard failed to secure a signed ENDA. Other factors (such as the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party) also counsel in favor of Plaintiffs' breach of Sections 5.1(q) and 13.1 being material.

Accordingly, the Court finds that Lokring has shown a substantial likelihood of success on the merits of its breach of contract claims with respect to Sections 5.1(q) and 13.1 of the 2016 Distributor Agreement.

### 2. Section A.1 of the NDA

Lokring next argues that Plaintiffs breached Section A.1.c. and other subsections of Section A.1 of the NDA, when they disclosed protected Information as defined in the NDA to Guidry without obtaining a confidentiality agreement from Guidry on the same terms and with the same obligations as set forth in the NDA. (Doc. No. 155 at PageID# 3221, ¶ 4.) Section A.1.c. provides:

> Recipient hereby undertakes and agrees . . . (c) not to disclose the Information to any third party except as provided in paragraph 1(b) above or as may be expressly authorized in writing by Lokring. All employees and third parties to whom the Recipient discloses Information as permitted under this Agreement shall: (i) have a need to know the Information; (ii) be bound to the Recipient by written confidentiality agreements or otherwise to maintain the Information in confidence on terms at least as restrictive as this Agreement; and (iii) be informed of the confidential nature of the Information to be disclosed to them and their obligations with respect to its use and disclosure; . . .

(Ex. H.1 at § A.1.c.) Lokring argues that the Big Contacts List and the Corrosion Allowance Document are "Information" under the NDA. (Doc. No. 155 at PageID# 3221, ¶¶ 5-6.) Section A.2 of the NDA broadly defines "Information" to include, in part:

> [A]ll technical and non-technical information disclosed to the Recipient by or on behalf of Lokring, including but not limited to, trade secrets, *customer lists* . . . industrial designs, copyrights, inventions, ideas, processes, formulas, source and object codes, data, programs, works of authorship, know-how, improvements, discoveries, developments, designs, facility lay-out and equipment, materials, recipes of manufacture, techniques, and test results . . . c. all information concerning current and prospective research, experimental work, development, products, marketing and selling, business plans, budgets, unpublished financial statements, licenses, prices and costs . . .

(Ex. H.2 at § A.2.) (emphasis added).

55

Although the Court has found that it is not a Lokring trade secret because it is owned by Exxon, the Court concludes that the Corrosion Allowance Document constitutes "Information" under the NDA.  Mr. Sindelar testified regarding Lokring's significant efforts and expense in working with Exxon, on the corrosion allowance testing.  (Doc. No. 152 at PageID#s 3113-20; Ex. DD.) The Court agrees with Lokring's argument that the Corrosion Allowance Document was technical and/or non-technical information disclosed to the Plaintiffs by or on behalf of Lokring, and it is information concerning current or prospective research, experimental work, and development under Section A.2 of the NDA.  (Doc. No. 155 at PageID# 3221, ¶ 5.)

Lokring argues that Plaintiffs violated Section A.1 of the NDA based on Guidry's unauthorized disclosure of the Corrosion Allowance Document to employees of Dow Chemical through emails Guidry sent in June 2021.  (Doc. No. 155 at PageID# 3222, ¶ 9.) Similarly, Lokring asserts that Plaintiffs violated Section A.1 based on Guidry's unauthorized retention of Information following the termination of the distributorship, including Guidry's retention of the Big Contacts List and the Corrosion Allowance Document.  (*Id.* at ¶ 10.)

In response, Plaintiffs argue that the disclosure of the Big Contacts List to Guidry and Maywald was essential to selling Lokring's product, and therefore was authorized per the terms of Paragraph A.1.a. of the NDA.  (Doc. No. 157 at PageID# 3267, ¶ 6.) Plaintiffs also maintain that Maywald's creation of the Excel spreadsheet copy of the Big Contacts List in June 2020 was authorized because, at that time, the Southwest distributorship was seeking to integrate the Big Contacts information into Pipeliner.  (*Id.* at PageID# 3268, ¶ 7.)  Plaintiffs assert that, by maintaining Big Contacts on the Lokring email server and the Corrosion Allowance Document on the shared drive where only authorized personnel had access, Shepard exercised reasonable care in protecting the

56

Information. (*Id.* at ¶¶ 8-9.) Plaintiffs also argue that the provisions of Paragraph A of Shepard's NDA do not extend beyond termination of the distributorship agreement. (*Id.* at ¶ 11.)

The Court finds that Lokring has demonstrated a likelihood of success on the merits of its claims that Plaintiffs breached Section A.1.c. and other subsections of Section A.1 of the NDA. Under these Sections, Plaintiffs were required to ensure that any employee or third party to whom Information was disclosed were bound by written confidentiality agreements to maintain the Information in confidence. (Ex. H.1 at § A.1.c.) Plaintiffs were also required to "protect the Information from inadvertent or unauthorized disclosure, access, or use in the same manner as the Recipient protects its own confidential information of a similar nature, provided that the Recipient shall exercise no less than reasonable care." (Ex. H.2 at § A.1.d.) The Court finds that Lokring has demonstrated a substantial likelihood of success on its claims that Plaintiffs breached these obligations with respect to Guidry.

Plaintiffs, however, maintain that Lokring's claim for injunctive relief is "moot" because any copies of the Corrosion Allowance Document in their possession were destroyed "when [Southwest's] computers were sold and the hard drives wiped clean" after the termination of the distributorship. (Doc. No. 157 at PageID#s 3268, 3276; Doc. No. 152 at PageID# 3184; Doc. No. 149 at PageID# 2566.) The Court rejects this argument. On the first day of the hearing, Plaintiffs represented to the Court that they did not possess the Corrosion Allowance Document. (Doc. No. 152 at PageID# 3184.) The Court reiterated the contents of its prior TRO and indicated that if there was any evidence as time progressed that Shepard had the Corrosion Allowance Document and did not return it, there would be consequences associated therewith. The Court also indicated that Lokring could file a motion to show cause why the Plaintiffs should not be held in contempt of the

Order if there was evidence that Shepard had that document and did not return it. (*Id.* at PageID# 3185.) Despite Shepard's claims that he never retained the Corrosion Allowance Document, Guidry was, apparently unbeknownst to Shepard, able to retain a copy of this document when he had access to it as a Southwest employee, as evidenced by his later attaching the document to his sales emails to Dow personnel in 2021. (Doc. No. 151 at PageID# 2869; *see, e.g.*, Ex. N.) Although Plaintiffs maintain that Shepard "had no knowledge that Guidry had obtained the corrosion allowance information," (Doc. No. 157 at PageID# 3267, ¶ 70), there is a likelihood that Shepard breached Section A.1 under the NDA, by failing to ensure that all such Information under the NDA that had been disclosed to employees was returned or destroyed upon the termination of the distributorship.

Moreover, Section A.1.h. of the NDA provides for liability for the confidentiality obligations being fulfilled on the part of Recipient's employees. Section A.1.h. sets forth:

> Recipient hereby undertakes and agrees: . . . h. to be fully liable for and responsible for the fulfillment of the above obligations on the part of the Recipient's employees, and any other third party that the Recipient provides or makes Information available to.

(Ex. H.2 at § A.1.h.) Guidry sent a copy of the Big Contacts List from his Lokring email to his personal email on September 7, 2020, during his employment with Southwest. (Ex. S.) Guidry subsequently used this List in his efforts to send emails to Dow personnel. (Doc. No. 151 at PageID# 2921.) Although many of Guidry's actions using the Big Contacts List and Corrosion Allowance Document were subsequent to the termination of the Southwest distributorship, it was because of Guidry's access to these materials that he was able to undertake these actions. Under Section A.1.h., Plaintiffs were liable for Guidry's sending the Big Contacts List to his personal email and unauthorized retention of the Corrosion Allowance Document.

58

Accordingly, the Court finds that Lokring has shown a substantial likelihood of success on the merits of its breach of contract claims with respect to Section A.1 of the NDA.

### 3.     Section 12.5 of the Distributorship Agreement

Lokring next alleges that Plaintiffs breached Section 12.5 of the 2016 Distributorship Agreement. (Doc. No. 155 at PageID# 3222, ¶ 7.) Section 12.5 governs the return of information upon termination of the Agreement. This Section provides:

> In the event that this Agreement is terminated by either party . . . Company and Distributor agree: (a) Distributor shall immediately return all Intellectual Property (as defined in this Agreement) and all Information (as more fully described in the 'Lokring Confidentiality Agreements' attached herein as Appendix G and H respectively, and further defined below in Section 13.1 herein). To the extent certain of the Information or Intellectual Property is incapable of being returned in tangible form then Distributor warrants, and will affirm by affidavit immediately delivered to Company, that Distributor has destroyed all records of such Information or Intellectual Property.

(Ex. I.15 at § 12.5(a).)

Lokring argues that Plaintiffs breached this Section when they failed to return any and all copies of the Information, including the Big Contacts List, the Corrosion Allowance Document, and emails and other documents containing Information to Lokring upon termination of the 2016 Distributorship Agreement on October 21, 2020.  (Doc. No. 155 at PageID# 3222, ¶ 7.) In response, Plaintiffs maintain that they have not had access to the Corrosion Allowance Document since the termination of the distributorship. (Doc. No. 157 at PageID# 3268, ¶ 14; Doc. No. 152 at PageID# 3184.)

As discussed *supra*, Plaintiffs relinquished a paper copy of the Big Contacts List during the hearing but maintained an electronic copy in Shepard's Hotmail account until the first day of the hearing.  (Doc. No. 149 at PageID#s 2566-67.)  In light of these facts, the Court finds that Lokring

59

has demonstrated a substantial likelihood of success on the merits of its claim that Plaintiffs breached Section 12.5 of the 2016 Distributorship Agreement due to their failure to return all copies of the Big Contacts List to Lokring upon the termination of the distributorship.[18]

### 4.    Section B of the NDA

Lokring argues that Plaintiffs breached Section B.3 of the Non-Compete Provisions of the NDA, "by failing to return Lokring's protected Information and by failing to return any Information retained by [Guidry]." (Doc. No. 155 at PageID# 3223, ¶ 13.) Plaintiffs concede that they "breached the provisions of [P]aragraph B.3 of the NDA by not returning the [E]xcel spreadsheet for BigContacts to Lokring." (Doc. No. 157 at PageID# 3268, ¶ 13.) For the same reasons above, the Court finds that Lokring has demonstrated a substantial likelihood of success on the merits of the claim that Plaintiffs breached Section B.3 of the NDA through retention of these materials.

Lokring also asserts that Plaintiffs breached Section B.1 of the Non-Compete provisions of the NDA "when Shepard attended the Offshore Trade Conference in Houston, Texas as a badged guest of Tube-Mac, in order to meet with the Tube-Mac representatives." (Doc. No. 155 at PageID# 3223, ¶ 14; Doc. No. 150 at PageID# 2772.) Moreover, Lokring argues that Section B.1 was breached when Shepard "encouraged Jared Guidry to contact Mike Fadalla in October, 2020, and additionally breached Section B.1 when [Shepard] facilitated Mr. Guidry's connection with Tube-Mac." (Doc. No. 155 at PageID# 3223, ¶ 15.) Section B.1 of the NDA and Non-Competition Agreement provides:

---

[18] The Court also notes that there is evidence Shepard forwarded an email chain from his Lokring account to his personal Hotmail account on October 9, 2020 between Guidry and Gary Hoffmeister of Sekisui, in which Mr. Hoffmeister stated that he had "a new application for the Lokring system." (Ex. B.) In addition, on September 20, 2020, Shepard forwarded emails from his Lokring account to his personal account which included a "Sales Plan Week of 9/14/20" and "Sales Plan Week of 9/21/20." (Exs. D, E.) Shepard testified that he emailed these sales plans to himself "because I knew I would be cut off from the Lokring website. . . . I forwarded myself certain documents, and it related to my business, and I still cared and care about these customers, and I wanted to make sure everything was wrapped up correctly." (Doc. No. 151 at PageID# 2821.)

60

**B.**    **Non-Competition:**

1.    During the term of the Recipient's employment, except as authorized by the Lokring Exclusive Distributor Agreement, and for a period of one year following a separation of employment with Lokring or one of its subsidiaries, affiliates, successors or assigns, for any reason, Recipient shall not, directly or indirectly, on behalf of himself or any other person/entity:

a.    render services to any person or entity (whether as an employee, consultant, independent contractor, or otherwise, whether directly or indirectly) where such services in any way relate to or concern, directly or indirectly, any project or contract on which Recipient worked while employed by Lokring or in any State in the United State[s] or any  countries outside the United States where Lokring then has done business or is actively contemplating doing business;

b.    solicit, encourage, or induce any employee, contractor, agent, client/customer, prospective client/customer, supplier, affiliate, or the like to terminate its/his relationship with Lokring (in whole or in part) or otherwise solicit, induce, or encourage any person/entity to terminate      (in whole or in part) any contractual relationship with  Lokring or to refrain from entering into a contractual relationship with Lokring;

c.    sell or solicit the sale (to any person or entity) of any good or service produced or provided by Lokring; or

d.    otherwise interfere with the business of the [sic] Lokring.

(Ex. H.4 at § B.1.)  Plaintiffs argue that Lokring has failed to produce any evidence that they used Big Contacts to contact customers or compete with Lokring and that Shepard's communications with Tube-Mac were preliminary discussions and, therefore, do not constitute competition.  (Doc. No. 157 at PageID# 3269.)

The Court finds that Lokring has shown a substantial likelihood of success on the merits of its breach of contract claims with respect to Section B.1 of Plaintiffs' Non-Compete Agreement. Shepard testified that he attended the Offshore Technology Conference in Houston, Texas as a registered exhibitor on behalf of Pyplok. (Doc. No. 150 at PageID# 2772.) Although the parties

dispute whether Tube-Mac's product was truly a competing product to Lokring's, the Court finds that Lokring has demonstrated a substantial likelihood of succeeding in its claim that Shepard's actions breached Section B.1.a. of the Non-Compete Agreement, as he was arguably rendering a service to an entity that related to his projects or contracts on which he worked while employed by Southwest.

Lokring also argues that Plaintiffs breached this provision when Shepard encouraged Guidry to reach out to Michael Fadalla[19] in August 2021 about coming to work for them.  Shepard testified that he does not recall whether he told Guidry to reach out to Fadalla and that the first time he met Fadalla was during the course of the hearing. (Doc. No. 151 at PageID# 2817.)   In an October 22, 2020 email, Shepard told Guidry that he had not talked directly to Fadalla, but had gone through Andy Voda, who was then a former Lokring distributor and Fadalla's former employer.  Shepard further stated that Guidry had termination paperwork and free will and could contact whomever he wished. (Ex. WWW; Doc. No. 151 at PageID# 2819.)  Fadalla stated that, shortly after the termination of Voda's Lokring distributorship in July 2021, Shepard contacted him via text message stating, "Let me know if you have a few minutes to talk today." (Doc. No. 98-4 at PageID#s 1451-52.) Fadalla also received communications from Guidry and spoke with him by phone on August 5th, 2021. During that call, Fadalla avers that Guidry indicated that "he believed that I would be a valuable addition to what Brad Shepard and he were seeking to develop at Tube-Mac." (*Id.*) Following the call, Guidry texted that everything discussed was "completely confidential and 110% guarantee no unfavorable parties are aware." (*Id.*; Ex. SS)

---

[19] Mr. Fadalla is a former employee of Andy Voda, who was an exclusive distributor for Lokring.  Mr. Fadalla's employment with Mr. Voda terminated upon the termination of Voda's Lokring Gulf Coast distributorship in July 2021. (Doc. No. 98-4.)

In emails dated August 3-4, 2021, Shepard asked Guidry how his call with Fadalla went. (Ex. HHHH; Doc. No. 151 at PageID# 2828-29.) Fadalla stated that, near the end of August, Guidry "further indicated to me that when Brad Shepard's non-compete with Lokring expires in November [2021], Mr. Guidry was planning to quit working for Tube-Mac and would go back to work as an employee at Shepard and Associates, Inc." (Doc. No. 98-4 at PageID# 1452.) During the hearing, Lokring elicited testimony from Shepard that on September 14, 2021 he was booking an airline ticket for one person to meet with Tube-Mac in Toronto, Canada, which he ultimately cancelled. (Doc. No. 150 at PageID# 2792.)

Lokring has also introduced phone records indicating that Shepard spoke with representatives from Tube-Mac a total of thirty-six (36) times between February and July 2021. (Doc. No. 151 at PageID# 2829.) Though the contents of those communications are unknown, this circumstantial evidence lends support to Lokring's argument that Shepard was breaching his Non-Compete Agreement within the yearlong restrictive period after the distributorship was terminated in October 2020.  Further, during the Texas freeze in February 2021, Shepard acknowledged that he probably had 100-plus calls from former customers who were trying to find product.  (Doc. No. 150 at PageID# 2789.) There is some evidence that Shepard had contact with at least one of these customers.  (Ex. AA; Doc. No. 147 at PageID# 2232-2235; Doc. No. 150 at PageID# 2789.) In addition, in December 2020, Shepard emailed an engineer at ExxonMobil who was involved in a large project known as the NAG Project, for which there were a lot of utility applications for the Lokring fitting. (Ex. CCCC; Doc. No. 150 at PageID# 2770-71.) Shepard asked if they considered using the Pyplok fitting, though Shepard explained, "I asked him if he's heard of Pyplok as well as other compression fittings. It wasn't just Pyplok." (*Id.* at PageID# 2772.) Shepard later followed up in September of 2021, but

Shepard maintains that this email was simply to follow up with Hagberg as a friend and see how they weathered a hurricane that had struck the area. (*Id.*)

Lastly, there is also evidence that Shepard began securing computer services and a Microsoft 365 domain for a new company called Dynamic Seal Solutions during his noncompete period. Shepard testified that he still had "Shepard and Associates and I needed to get that dba off of Lokring Southwest. I still don't know what I want to do with the business. I would rather keep the business and try to sell something, but I -- at that point, I don't know what that is." (Doc. No. 150 at PageID#s 2798-99.) Shepard testified that he got a new "dba" name and the email "brad@dynamic.com" from his computer services contractor, Rod Harmon. (*Id.* at PageID# 2799.) Harmon submitted an invoice in May 2021 for "[d]omain acquisition and DNS configuration for Office 365 business hosting and applications[,] SharePoint customization and configuration for cloud based document storage[,] and [l]ogo consult and design." (Doc. No. 98-2 at PageID# 1443.) Shepard testified that they got the email and website but they have not put anything on it. (Doc. No. 150 at PageID# 2799.)

Based on the above, the Court finds that Lokring has demonstrated a substantial likelihood of succeeding in its claim that Shepard's actions breached Section B.1 of the Non-Compete Agreement. Having so found, the Court must inquire as to its enforceability. In *RECO Equip., Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *2-3 (6th Cir. Oct. 28, 2021), the Sixth Circuit recently found that the plaintiff failed to carry its burden to establish that the non-compete agreement was reasonable, and therefore, enforceable. The court explained that, "[u]nder Ohio law, a non-compete clause will only be enforced if 'the employer can show by clear and convincing evidence that the restrictions imposed ... (1) are no greater than necessary for the protection of the employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public.'"

64

*Union Home Mortgage Corp. v. Cromer*, No. 21-cv-0385, 2021 WL 1601193, at *6 (N.D. Ohio Apr. 23, 2021) (quoting *Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640, 645-46, 752 N.E.2d 994 (2001). *See also Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975).[20] "Each of these elements must be established by clear and convincing evidence." *Handel's Enters., Inc. v. Schulenberg*, 765 F. App'x 117, 123-24 (6th Cir. 2019).

As to the first factor, Lokring introduced a line of questioning during the hearing going to the international scope of Lokring's business. (Doc. No. 151 at PageID#s 2833-34.) Shepard indicated that he was aware that Lokring and Tube-Mac have distributorships worldwide and admitted that it had been his goal while at Southwest to make Exxon more international, but that it never really happened. Shepard testified, "I tried to help the other distributors with worldwide projects but it was really hard to link that stuff up. And so [sic] but I wasn't in charge of that. Lokring never said oh, you need to fly over to Singapore to help with this project, so." (*Id.*) Lokring argues that the injunction would provide Lokring with the benefit of its bargain, which was freely entered into by all parties. (Doc. No. 98 at PageID# 1306.)  Lokring argues that Plaintiffs would not sustain substantial harm if they are enjoined from engaging in business activities competitive to Lokring. Lokring also argues that Ohio courts have ruled in favor of tolling periods of non-competition where the formerly

---

[20] In *Raimonde*, the Ohio Supreme Court also set forth nine reasonable factors to consider. They are: "1. Whether the restriction is temporally and spatially limited; 2. Whether the employee represents the sole contact with the customer; 3. Whether the employee is possessed with confidential information or trade secrets; 4. Whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; 5. Whether the covenant seeks to stifle the inherent skill and experience of the employee; 6. Whether the benefit to the employer is disproportional to the detriment to the employee; 7. Whether the covenant operates as a bar to the employee's sole means of support; 8. Whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and 9. Whether the forbidden employment is merely incidental to the main employment." *Union Home Mortgage Corp. v. Payne*, No. 1:20CV0026, 2020 WL 4282309, at *7 (N.D. Ohio March 9, 2020) (Gaughan, C.J.). The Sixth Circuit indicated in *Patio Enclosures, Inc. v. Herbst*, that in *Raimonde*, the Supreme Court of Ohio "compressed this lengthy list into the three factors quoted above." 39 F. App'x 964, 968 n. 1 (6th Cir. 2002).

affiliated party has violated. (*Id.*) Plaintiffs argue that Lokring has failed to present evidence that extending the non-compete provisions of the NDA is necessary for its protection, since Shepard returned the Excel copy of the Big Contacts List and deleted the Hotmail file to Lokring's satisfaction. (Doc. No. 157 at PageID# 3271.)

As to the second factor, Lokring elicited the following testimony from Shepard:

Q. So it's not too big a hardship on you, is it?

A. I disagree. I would -- I've been very -- you can probably see from my phone records, I've probably been bored and need to get back to work but I have an agreement. Whether I agreed with it or not, Lokring chose to terminate me. I would have liked to be back out there working right away, but in lieu of that, I've made the best of it.

(Doc. No. 151 at PageID# 2831.) Lokring also points to the fact that Shepard had begun building a pool at his house, but Shepard maintained that was before his termination from the distributorship. Lokring also questioned Shepard about the purchase of a lot of baseball cards, to which Shepard responded that he has also sold them. (Doc. No. 151 at PageID# 2832.)

Third, as to the public interest factor, Lokring argues that the requested injunction would promote fair competition and business practices and that businesses such as Lokring should be able to rely on agreements with affiliates and maintain the secrecy of information. (Doc. No. 98 at PageID# 1307.)  Lokring maintains that allowing Plaintiffs "to continue in a similar manner as the evidence to date reflects could cause great harm to the public based on Lokring's longstanding relationship as a defense contractor." (*Id.*)

In response, Plaintiffs argue that Lokring failed to show how tolling the non-compete would not create a hardship on Shepard due to his having already been without a job for one year and needing income to support his family.  (Doc. No. 157 at PageID# 3271.) Plaintiffs argue that Lokring has failed to present evidence that extending the non-compete provisions of the NDA is necessary for its

protection, since Shepard returned the Excel copy of the Big Contacts List and deleted the Hotmail file to Lokring's satisfaction. (Doc. No. 157 at PageID# 3271.)

"In Ohio, noncompete and nonsolicitation agreements that are reasonable are enforced, and those that are unreasonable are 'enforced to the extent necessary to protect an employer's legitimate interests.'" *MetroHealth Sys. v. Khandelwal*, 2022 WL 121336, at *2 (Ohio Ct. App. 8th Dist. Jan. 13, 2022) (quoting *Century Business Servs., Inc. v. Urban*, 900 N.E.2d 1048, ¶ 12 (Ohio Ct. App. 2008). "Courts are empowered to modify or amend employment agreements to achieve such results." *Id.* (citation omitted). The Ohio Supreme Court has indicated, "[I]n *Raimonde*, we acknowledged that courts are empowered to fashion a reasonable covenant between the parties and, in so doing, they should consider the following factors:

> [1] '[T]he absence or presence of limitations as to time and space, [2] whether the employee represents the sole contact with the customer; [3] whether the employee is possessed with confidential information or trade secrets; [4] whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; [5] whether the covenant seeks to stifle the inherent skill and experience of the employee; [6] whether the benefit to the employer is disproportional to the detriment to the employee; [7] whether the covenant operates as a bar to the employee's sole means of support; [8] whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and [9] whether the forbidden employment is merely incidental to the main employment.'

*Rogers v. Runfola & Associates, Inc.*, 565 N.E.2d 540, 543 (Ohio 1991) (quoting *Raimonde*, 325 N.E.2d at 547).

As to factor (1) (i.e., the absence or presence of limitations as to time and space), the Court finds that the one-year non-compete period following separation of employment (Ex. H.4 at § B.1) and its associated tolling provision is reasonable. *See, e.g.*, *Matco Tools Corp. v. Urquhart*, 435 F. Supp. 3d 802, 810 (N.D. Ohio 2020) ("[C]ourts routinely approve as reasonable non-compete

covenants of one year or longer."). However, the Court finds the geographical scope to be overbroad. Section B.1.a provides that Plaintiffs are enjoined from rendering services to any person or entity . . . "where such services in any way relate to or concern, directly or indirectly, any project or contract on which Recipient worked while employed by Lokring *or in any State in the United State[s] or any countries outside of the United States where Lokring then has done business or is actively contemplating doing business.*" Courts have found that non-competes with similarly broad geographic reach are overbroad and unreasonable. *See, e.g.*, *MP Total Care Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 964 (N.D. Ohio 2009) ("The non-compete's geographic reach—the entire United States—is also unreasonably broad, as MP does not purport to work with clinics in every county on a nationwide basis. There is no justification for preventing [Defendant] from working in the same business in areas distant from where plaintiff has a presence. The geographic scope of this contract is overbroad and unreasonable.").

While Shepard may have acknowledged the global scope of Lokring's business, the Southwest distributorship which he ran and which was the subject of the 2016 Distributor Agreement, had a regional scope. Bill Lennon testified that the Southwest distributorship was "located primarily in Texas but surrounding states around Texas" with "multiple states that were covered." (Doc. No. 148 at PageID# 2323.) Moreover, the 2016 Distributorship Agreement provided that the Distributor was appointed "as an exclusive, authorized distributor to promote the sale of [the "Products"] . . . within the territory consisting of the geographical, industry, and/or customer market area identified as the Primary Sales and Service Area and described in Appendix A." (Ex. I.1 at § 1.1.) The parties do not appear to have provided this Court with a copy of Appendix A. However, the Court finds that the geographical scope of this non-competition provision should be narrowed to reflect the

68

geographical sales territory over which the Southwest distributorship had responsibility, as apparently described in that Appendix.

As to the second, third, and fourth factors, the Court finds that factor (2) (i.e., whether the employee represents the sole contact with the customer) weighs in favor of enforcing the non-compete provision against Shepard.  Although not the sole salesperson in the Southwest distributorship, there is evidence that during the Texas freeze when customers needed product, Shepard received communications from former customers. Factor (3) (i.e., whether the employee is possessed with confidential information or trade secrets) clearly indicates enforcement of the non-compete as reasonable due to Shepard's retention of the Big Contacts List after the termination of the distributorship until returning it during the hearing.  Factor (4) also counsels in favor of holding the remainder of the non-compete provisions reasonable in that the terms seek to eliminate competition which would be unfair to Lokring and do not merely seek to eliminate ordinary competition. Indeed, the four provisions in Section B.1. reference Lokring specifically. For example, the non-competition provision in Section B.1.a. indicates that Recipient shall not render services which relate to "any project or contract on which Recipient worked while employed by Lokring."

Lastly, the Court finds that the remaining factors weigh in favor of holding the non-competition agreement, as amended by the Court as to its geographical scope, as reasonable.  The Court finds that the covenant does not seek to stifle the inherent skill and experience of Shepard (factor (5)) or that the benefit to Lokring is disproportional to the detriment to Shepard (factor (6)). As to factor (7) (i.e., whether the covenant operates as a bar to the employee's sole means of support), the Court notes that Shepard testified that he has a BBA from Stephen F. Austin State University in Texas and a credential as a certified financial planner, which he received from Rice University around

2004. (Doc. No. 150 at PageID# 2736.) Shepard indicated that he worked as a financial planner from 2001 to 2009, and at the time just before he began working for his father in 2009, he was working for Bank of America. (*Id.*) Therefore, the restrictive covenant regarding the scope of services related to Shepard's projects or contracts likely does not bar Shepard's sole means of support.

Factor (8) (i.e., whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment) does weigh slightly in Shepard's favor, as he likely developed his sales skills throughout his time at Lokring, both by working with Joe Shepard when he ran the distributorship and when subsequently running the Southwest distributorship himself. Factor (9) (i.e., whether the forbidden employment is merely incidental to the main employment) weighs in favor of holding the remainder of the non-compete provisions reasonable, as they are targeted to the subject of Shepard's main employment and knowledge gained as an exclusive Lokring distributor.

After balancing all of the above factors, the Court finds the terms of the non-compete agreement are reasonable, with the exception of the geographical scope, which is modified to extend only to the former sales territory over which Shepard's distributorship operated.

### 5.    Conclusion

Accordingly, and for all the reasons set forth above, the Court finds that Lokring has demonstrated a substantial likelihood of succeeding in its claim that Plaintiffs breached various sections of the 2016 Distributor Agreement and NDA relating to the treatment and return of confidential information and the non-competition provisions.  The factual background surrounding Plaintiffs' potential breaches of the agreements is quite complex, and "it is ordinarily sufficient if the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to

make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp.*, 119 F.3d at 402. Accordingly, the Court finds that there is a strong likelihood of success on the merits as to Lokring's breach of contract claims.

### c. Unfair Competition and Deceptive Trade Practices

The Court also finds that Lokring has demonstrated a substantial likelihood of success on the merits with respect to its unfair competition and deceptive trade practices claim against Plaintiffs. (*See* Doc. No. 98 at PageID# 1304; Doc. No. 61 at PageID#s 914-16.) In Count 9 of the Third-Party Complaint, Lokring alleges violations of the Lanham Act, 15 U.S.C. § 1125, *et seq.* and the Ohio Deceptive Trade Practices Act, R.C. § 4165.01, *et seq.* The Sixth Circuit has explained that "[b]oth Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n.2 (6th Cir. 2002); *see also Barrio Bros., LLC v. Revolucion, LLC*, No. 18-cv-2052, 2021 WL 2895509, at *7, n.5 (N.D. Ohio July 9, 2021) ("Ohio Courts look to the Lanham Act when interpreting the Ohio Deceptive Trade Practices Act." (citation omitted)). 15 U.S.C. § 1125 provides in part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. . . . The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Water Mgmt., Inc. v. Stayanchi*, 472 N.E.2d 715, 717 (Ohio 1984). "[T]o successfully establish an unfair competition claim based upon legal action, a party must show that the legal action is objectively baseless and that the opposing party had the subjective intent to injure the party's ability to be competitive." *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 843 (Ohio 2012).

Although Shepard does not appear to have sent emails to Lokring customers containing misrepresentations regarding the availability of the Lokring product, it was Shepard's likely breaches of the 2016 Distributorship Agreement and NDA that made Guidry's unfairly competitive and deceptive emails possible. Lokring argues that "Plaintiffs and Guidry, as evidenced by the numerous emails and contacts with Lokring's customers, demonstrate their circulation of false rumors and publication of statements designed to harm Lokring's competitive standing." (Doc. No. 98 at PageID# 1304.) Lokring asserts that "Guidry's emails are rife with such statements. He falsely represented that Lokring no longer serviced Dow's geographic area; misrepresented a confidential report created by ExxonMobil over three years prior to his employment; and falsely stated to other customers that Lokring's products were no longer available." (*Id.*) Moreover, Lokring points to the fact that Plaintiffs were holding a large quantity of Lokring product at a time when such inventory was needed by Lokring customers. (Doc. No. 151 at PageID# 2869.) Plaintiffs argue that "Lokring has failed to

produce any evidence that Plaintiffs have used Big Contacts to contact customers or compete with Lokring." (Doc. No. 157 at PageID# 3269, ¶ 18.)

The Court finds that Lokring has demonstrated a substantial likelihood of success on the merits of its unfair competition claim and deceptive trade practices claims against Plaintiffs. As discussed above, under Section A.1.h. of the NDA, Shepard is fully liable and responsible for the fulfillment of the confidentiality provisions on behalf of Guidry. By failing to secure the Corrosion Allowance Document and Big Contacts List from Guidry and return the same to Lokring upon the termination of the distributorship, Guidry was able to solicit Lokring customers and cause confusion between Pyplok and the Lokring product. (*See* Doc. No. 98-2.) A Dow individual stated as much, writing to Guidry, "I would kindly ask that you refrain from contacting the various Dow personnel, as you have been, as it is creating significant confusion with the Lokring technology we are currently using." (Doc. No. 98-2 at PageID# 1425.) Guidry's emails also misrepresented the availability of Lokring products, indicating "[t]he freeze also showed major delays in procuring Lokring fittings. The Lokring factory in Ohio does not keep inventory and most lead times are now at 8 weeks or more for basic fittings." (Doc. No. 98-2 at PageID# 1412.) Maywald testified that there were no supply chain issues during the freeze, nor was there any backlog or lag time in delivery of Lokring product during that time. (Doc. No. 147 at PageID#s 2285-86.)

For his part, Shepard acknowledged that he was contacted by customers during the time of the supply chain issues but does not recall whether he advised them of his holding a large inventory of Lokring products. Yet Shepard did acknowledge that he received payments from former customers that should have been routed to Alba Pipework, Lokring's distributor that took the place of Southwest.

> Q.     With respect to supply chain issues, you said you were contacted by customers during that time period, right?

73

A.      I was.

Q.      Did you advise them that you were holding a large inventory of Lokring products?

A.      Not that I recall.

Q.      You were holding a large quantity of Lokring product at that time, correct?

A.      I had Lokring fittings that I was waiting for Lokring Technology to pay me for, yes.

Q.      And also during that time, starting in November, I believe you started receiving payments from customers related to -- that were payable to the successor distributor Alba Pipeworks, correct?

A.      I don't know if it started in November, but Alba was using my vendor number, and I started getting payments because they took over my vendor number without my knowledge. Yes.

(Doc. No. 151 at PageID#s 2869-70.) Shepard also testified that during the supply chain issues he got a lot of calls and texts from customers but "really didn't answer back.  If I did, I led them to a Lokring website to find the new distributor because I was never given that information." (*Id.* at PageID# 2855.)

With regard to the litigation instituted by Plaintiffs as unfair competition, the Court declines to analyze at this time whether Plaintiffs' suit against Lokring is "objectively baseless" or if Plaintiffs "had the subjective intent to injure [Lokring's] ability to be competitive." *Am. Chem. Soc.*, 978 N.E.2d at 843. However, the circumstantial evidence surrounding Shepard's communications during the lawsuit lends credibility to Lokring's claim of unfair competition.  As detailed in Lokring's filings, there were a flurry of calls involving Shepard and Guidry around the time that Lokring filed its

Emergency Motion for TRO.[21] Indeed, Lokring argues that during this entire time, "AT&T records reflect[] over 703 phone calls between [Shepard and Guidry], including communications of and concerning Guidry's work for Tube-Mac." (Doc. No. 155 at PageID# 3244, ¶ 111.) Though Guidry testified that, in a large portion of these calls, Shepard was assisting him with a substance abuse problem (*see* Doc. No. 151 at PageID# 2951-52), the surrounding circumstances provide circumstantial evidence supporting Lokring's unfair competition and deceptive trade practices claim.

For all the reasons set forth above, the Court finds that Lokring has demonstrated a substantial likelihood of success on the merits as to its unfair competition claims.

### 2. Irreparable Injury

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550. Lokring asserts that without a preliminary injunction, it will suffer irreparable injury from the loss of fair competition, the loss of its goodwill, and the misuse of its confidential information. (Doc. No. 98 at PageID#s 1304-06.)

Plaintiffs argue that Lokring has failed to produce evidence that it will suffer irreparable harm absent an injunction and that Shepard's communications with Tube-Mac were preliminary discussions that do not constitute competition. (Doc. No. 157 at PageID# 3269.) Plaintiffs also argue

---

[21] For example, on March 31, 2021, the day that Lokring filed an Emergency Motion for TRO to enjoin Plaintiffs from using, selling, or renting Lokring's inventory and preventing Lokring's recovery thereof, (Doc. No. 18), Tube-Mac distributor Steve Burke called Shepard; Guidry called Shepard; and then Shepard returned Guidry's call, speaking at length, before Shepard called Burke. (Doc. No. 110 at PageID# 1690.) Around the time that the parties reached an agreement on Lokring's Motion for TRO regarding the inventory, Mike Shook of Tube-Mac called Shepard and Shepard and Guidry spoke later in the evening and into the early morning of April 6, 2021. (*Id.*) As Lokring notes, "Brad and Mike Shook speak again, Brad calls Andy Voda, then Brad and Mike Shook speak a number of times. Thereafter Joe Shepard and Brad speak before Brad and Mike Shook speak again." (*Id.* at ¶ 10.) Other circumstantial calls exist where Plaintiffs, Guidry, and others are involved. (*See* Doc. No. 110 at PageID# 1690; Ex. AA.)

that the evidence demonstrates that "any other cold weld product such as Pyplok would take years to gain any traction" in the market of the oil and gas industry, where Lokring's products are the only cold weld product used. (*Id.*) Plaintiffs maintain that the "possibility that some of the customers named on Big Contacts might stop using Lokring's products at some indefinite point in the future does not constitute irreparable harm." (*Id.* at PageID#s 3269-70.) Plaintiffs also argue that Lokring was aware that in February 2021, Guidry had contacted former Southwest customers, but failed to take action for seven months, which belies its claim of irreparable harm.[22] (*Id.* at ¶ 3270.) In addition, Plaintiffs argue that they no longer have possession of either the Corrosion Allowance Document or the Big Contacts List and there is no evidence that Shepard used the Big Contacts List. (*Id.* at PageID# 3270.) Plaintiffs maintain that Lokring has not demonstrated any actual financial or reputational loss by reason of Shepard's use of the Big Contacts List or the corrosion allowance information. (*Id.* at PageID# 3276.)

For the following reasons, the Court concludes that Lokring has established that a preliminary injunction is necessary to prevent irreparable harm. A plaintiff's injury is considered "irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). According to the Sixth Circuit, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512. *See also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (holding that "[i]t is appropriate to use a

---

[22] Lokring's counsel represented during the hearing that it was only after the filing of its Amended Counterclaim and Third-Party Complaint in July 2021 that it was able to obtain third-party evidence in support of its motion for injunctive relief. (Doc. No. 149 at PageID#s 2461-64.)

preliminary injunction to avoid harms to goodwill and competitive position" where there is a "realistic prospect of lost sales and market share.")

Among other things, Lokring has demonstrated a strong likelihood of success on the merits on its claims that Plaintiffs breached the NDA by failing to secure the Big Contacts List and Corrosion Allowance Document, and are fully liable for and responsible for the fulfillment of the confidentiality obligations on the part of his employees, such as Guidry.  It was through this breach that Guidry was able to obtain Lokring's confidential Information, which he subsequently used to send sales emails on behalf of Tube-Mac.  Evidence was introduced that Guidry's emails disparaged Lokring, misrepresented its products, and led to customer confusion among Dow personnel.

Although Shepard maintains that he never had access to the Corrosion Allowance Document after the termination of the distributorship, and has deleted the Big Contacts List, Shepard retained the Big Contacts List from the time he emailed it to his Hotmail account in October 2020 until the hearing in October 2021. During this year-long period of time, it is unknown what kind of use Shepard may have had of the Big Contacts List for potential preparations to compete upon the expiration of his non-competition period.  While Guidry testified that it would be a minimum of three to five years before Tube-Mac's Pyplok was accepted into the petrochemical industry, (Doc. No. 151 at PageID# 2893), Lokring indicates that Tube-Mac acquired a company called Deutsch Lock, which has a metal-to-metal design similar to Lokring's. (Doc. No. 151 at PageID# 2931-32.) Irreparable harm would result to Lokring, as the resulting damages from the loss of Lokring's goodwill and the loss of fair competition from Plaintiffs' unauthorized retention of the Big Contacts List and his likely breaches of the non-competition provisions in his NDA would be difficult to calculate. "According to the Sixth Circuit, '[t]he loss of customer goodwill often amounts to irreparable injury because the damages

77

flowing from such losses are difficult to compute.' . . . In addition, 'the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Union Home Mortgage Corp. v. Jenkins*, No. 20-cv-2690, 2021 WL 1979517, at *12 (N.D. Ohio May 18, 2021) (citations omitted). Thus, this factor also favors the issuance of a preliminary injunction.

### 3.    Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017).  Lokring asserts that a preliminary injunction would not affect third parties and that it would only prevent Plaintiffs from benefitting through the improper use of Lokring's confidential information and goodwill.  (Doc. No. 98 at PageID#s 1306-07.) Plaintiffs respond that the equities favor Shepard, "in that he acted in good faith throughout the distributorship and termination process and has not disclosed Big Contacts or the corrosion allowance to anyone or used it to compete with Lokring." (Doc. No. 157 at PageID# 3277, ¶ 57.)  Plaintiffs further argue that Lokring has failed to produce any evidence that tolling the noncompete provisions of the NDA would not impose a hardship on Brad Shepard, asserting that he "has been without a job for one year and testified that he requires income to support his family." (*Id.* at PageID# 3271, ¶ 26.)

 "In assessing a motion for a preliminary injunction, this Court must consider whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction." *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003).  "[M]any courts . . . have found that ex-employees 'willingly entered into the Agreement in order to work at [employer]' so

'any harm is of [their] own making.'" *Total Quality Logistics, LLC v. Traffic Tech, Inc.*, 2021 WL 5834299, at *9 (S.D. Ohio Dec. 8, 2021) (citation omitted).

Here, the Court concludes that this factor weighs in favor of granting a preliminary injunction. Plaintiffs would not be harmed by the issuance of the preliminary injunction, as limited and recrafted below. Any harm that would result from tolling Shepard's non-compete provisions or ensuring that he returns all Lokring confidential information would be enforcing the agreements that he entered into in order to become a Lokring distributor. Accordingly, the Court finds that this factor weighs in favor of granting the preliminary injunction.

### 4. Public Interest

The fourth and final factor courts must consider when granting a temporary restraining order is "whether the public interest will be served by an injunction." *Flight Options*, 863 F.3d at 540. Lokring asserts that the public interest in preventing unfair competition supports the issuance of a preliminary injunction. (Doc. No. 98 at PageID# 1307.) Plaintiffs argue that Lokring has failed to produce any evidence that tolling the noncompete provisions of the NDA would not be injurious to the public. (Doc. No. 157 at PageID# 3271, ¶ 27.) The Court agrees with Lokring that the public interest would be served by enforcing the terms of the non-compete agreement that Shepard entered into and finds that this factor weighs in favor of injunctive relief. *See, e.g.*, *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) ("The public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts."); *Certified Restoration*, 511 F.3d at 551 ("Enforcement of contractual duties is in the public interest.").

### C. Tolling of the Non-Compete Agreement

The Court next considers whether to toll the non-compete agreement.  The tolling provision of the non-competition agreement provides as follows:

4.      Recipient acknowledges and agrees:

a.      that the time period and geographic areas for the restrictions set forth in this Section B shall be tolled during the period between the first violation of any such restrictions and the entry of an order restraining the violation; and

b.      that the restrictions set forth above shall remain in full force and effect upon the termination of Recipient's employment with the [sic] Lokring, for any reason, whether voluntary or involuntary, whether with cause or without cause.

(Ex. H.5 at § B.4.) Citing this provision, Lokring argues that "by retaining and not returning the Confidential Information when the distributorship was terminated, the period of non-competition has tolled since October 22, 2020." (Doc. No. 98 at PageID# 1303.)

In response, Plaintiffs argue that the provisions of Paragraph A of the NDA do not extend beyond termination of the 2016 Distributorship Agreement and that "[t]olling the noncompete provisions of the NDA would render its terms unreasonable, because it effectively would extend the non-compete provision for an indefinite term." (Doc. No. 157 at PageID#s 3268, 3271-72.) Plaintiffs further argue that Lokring's claim that Plaintiffs' breach of Paragraph B should toll the non-compete provisions of the NDA requires examination of the reasonableness of the non-compete provisions. (*Id.* at PageID# 3271.)

The Court finds that, regardless of the terms of confidentiality provisions in Paragraph A of the confidentiality and non-competition agreement, Paragraph B.3. governs the return of confidential information upon the termination of employment, and Shepard violated this provision when he improperly retained the Big Contacts List.  The Court further finds that, although the NDA's one-year non-competition period expired one year from the termination of the distributorship on October

80

21, 2020, this does not prevent the equitable tolling of the non-compete period. In *Total Quality Logistics, LLC v. OTC Logistics LLC*, 2019 WL 1300223 (S.D. Ohio Mar. 21, 2019), the court discussed *Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d 5 (1991) in which the Ohio Supreme Court found that the trial court had erred, in part, in denying injunctive relief.  *Id*.  In *Rogers*, the parties' non-compete agreement had expired by the time the Ohio Supreme Court issued its order. The Ohio Supreme Court found, however, that the appellee should be enjoined from competing for a period as of the date of the court's decision in order to balance the competing interests. *Id.*

In *Total Quality Logistics*, *supra*, the Southern District of Ohio likewise found that "[b]ecause the parties bargained for a one-year limitation on the non-compete agreement and TQL should be afforded the benefit of its bargain, [Defendant's] one-year prohibition is equitably tolled, and the one-year non-compete provision is calculated from the date of this Order." *Id. See also Basicomputer Corp. v. Scott*, 973 F.3d 507, 513 (6th Cir. 1992) ("In *Runfola*, the [Ohio Supreme] [C]ourt modified the trial court's injunction so as to enforce a non-competition covenant for one year from the date of the court's order even though that period extended beyond the expiration of the covenant.")

Although Plaintiffs herein argue that their retention of the Big Contacts information after termination of the distributorship does not entitle Lokring to injunctive relief because Plaintiffs delivered copies of the Big Contacts List to Lokring, the fact remains that Plaintiffs retained that material for approximately a year after the termination of the distributorship, during which time Plaintiffs had access to the information that could be used to prepare to compete against Lokring. (*See* Doc. No. 149 at PageID# 2567.) The Court finds that Plaintiffs' retention of the Big Contacts List as set forth above violates Section B.3. of the NDA.  Therefore, and in accordance with Section

4.A. of the Shepard's NDA, the time period of the non-compete "shall be tolled during the period between the first violation of any such restrictions and the entry of an order restraining the violation." (Ex. H.5 at § 4.A.)

Accordingly, the Court will toll Shepard's non-compete agreement for the length of time between October 22, 2020 (the first day after the termination of the Southwest distributorship, on which Shepard retained the Big Contacts List) until October 14, 2021 (the first day of the hearing on Lokring's Motion for TRO, when Shepard returned the Big Contacts List and deleted it from this Hotmail account). Therefore, Plaintiffs' non-compete agreement shall be tolled for 357 days, which shall begin running from the date of this Order.

### D. Conclusion

For all the reasons set forth above, the Court finds that each of the Rule 65 factors weighs in favor of granting Lokring's request for a preliminary injunction. Accordingly, the Court grants Lokring's Motion for Preliminary Injunction as follows:  (1) Plaintiffs are enjoined from further unauthorized use and disclosure of Lokring's trade secrets and confidential information; (2) Plaintiffs are ordered to provide a complete inventory of Lokring's trade secret and confidential information currently in their possession or to which they have access; (3) Plaintiffs are ordered to return all such trade secret and confidential information to Lokring; and (4) Plaintiffs are enjoined from engaging in any business activities competitive with Lokring, consistent with the non-competition provisions of the NDA and subject to the tolling provisions set forth therein, as reformed herein by the Court.

### V. Bond

Because all of the factors favor the issuance of a preliminary injunction, the Court will grant in part and deny in part Lokring's Motion for Preliminary Injunction as set forth below. Pursuant to

Fed. R. Civ. P. 65(c), courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Lokring argues that no bond should be required because it already has a $402,000 cash bond in place in connection with the parties' stipulation entered on April 16, 2021. (Doc. Nos. 98, 28.) In addition, the Court notes that it required Lokring to post a bond of $25,000 when it granted its Emergency Motion for TRO.  (Doc. No. 103 at PageID# 1551.) The docket reflects that Lokring posted this bond on October 12, 2021.  Plaintiffs do not request that any additional bond be required at this time.

Here, and in light of the fact that Plaintiffs have not requested an additional bond, the Court finds that no additional bond will be required at this time.

## VII.   Conclusion

For all the reasons set forth above, Third-Party Defendant Jared Guidry's Motion to Dismiss (Doc. No. 111) is GRANTED. Third-Party Defendant Jared Guidry is dismissed and Guidry's Motion to Quash Subpoena (Doc. No. 90) is DENIED AS MOOT.  Finally, Defendant/Third-Party Plaintiff Lokring Technology, LLC's Motion for Preliminary Injunction (Doc. Nos. 98, 99) is GRANTED IN PART and DENIED IN PART, as follows.

**IT IS HEREBY ORDERED** that:

A.  Plaintiffs are enjoined from further unauthorized use and disclosure of Lokring's trade secrets and confidential information;

B.  Plaintiffs are ordered to provide a complete inventory of Lokring's trade secret and confidential information currently in their possession or to which they have access;

83

C.    Plaintiffs are ordered to return all such trade secret and confidential information to Lokring;

D.    For a tolled period of 357 days from the date of this Order, Plaintiffs shall not, directly or indirectly, on behalf of himself or any other person/entity:

a.    render services to any person or entity (whether as an employee, consultant, independent contractor, or otherwise, whether directly or indirectly) where such services in any way relate to or concern, directly or indirectly, any project or contract on which Plaintiffs worked while employed by Lokring or in any portion of the sales territory that Plaintiffs previously had responsibility over during Plaintiffs' tenure as an exclusive Lokring distributor;

b.    solicit, encourage, or induce any employee, contractor, agent, client/customer, prospective client/customer, supplier, affiliate, or the like to terminate its/his relationship with Lokring (in whole or in part) or otherwise solicit, induce, or encourage any person/entity to terminate (in whole or in part) any contractual relationship with Lokring or to refrain from entering into a contractual relationship with Lokring;

c.    sell or solicit the sale (to any person or entity) of any good or service produced or provided by Lokring; or

d.    otherwise interfere with the business of the [sic] Lokring.

**IT IS SO ORDERED.**


_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  February 2, 2022                    U.S. DISTRICT JUDGE

84