UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHEPARD AND ASSOCIATES,　　　　)　　CASE NO.  1:20-cv-02488
INC., *et al.*,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　)　　JUDGE BRIDGET MEEHAN BRENNAN
　　　　v.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
LOKRING TECHNOLOGY, LLC,　　　　)
　　　　　　　　　　　　　　　　　)　　**MEMORANDUM OPINION**
　　　　Defendant/Third-Party Plaintiff,　)　　**AND ORDER (Amended)**
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
TUBE-MAC INDUSTRIES, INC.,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Third-Party Defendant.　　　)

This Order addresses the third-party claims Lokring Technology, LLC ("Lokring") brought against Tube-Mac Industries, Inc. ("Tube-Mac") in *Lokring's First Amended Counterclaims and Third-Party Complaint* (Doc. No. 61).  Those claims were the subject of cross-motions for summary judgment filed by Lokring (Doc. No. 310)[1] and Tube-Mac (Doc. No. 309).  For the reasons below, Tube-Mac's motion for summary judgment is GRANTED, and Lokring's motion is DENIED.

## I.　　**Undisputed Facts**

The Court finds that the following facts were not genuinely disputed.  Facts to which the parties jointly stipulated (Doc. No. 362) are cited as "SOF.

---

[1] Lokring's motion also addresses certain of its claims against Plaintiffs.  That portion of Lokring's motion will be addressed in a forthcoming Order.

Located in Willoughby, Ohio, Lokring designs, develops, manufactures, and markets mechanically attached fittings for connecting pipes and other transfer systems for fluids and gases.  (SOF at ¶ 1.)  Lokring also manufactures and sells tools used to install Lokring's fittings. (*Id.* at ¶ 3.)

Lokring sells its products through independent, exclusive distributors in various geographic areas within the United States and worldwide.  (*Id.* at ¶ 2.)  Lokring's independent, exclusive distributors sell the fittings and tools to customers, many of which are large companies with facilities around the world.  (*Id.* at ¶ 4.)  Distributors can also lease tools to customers.  (*Id.*) Lokring's independent, exclusive distributors did not sell any other products besides Lokring's products.  (*Id.*)  Distributors sell Lockring's products to customers within their exclusive territories.  (*Id.* at ¶ 11.)

In 2003, Joe Shepard became an exclusive distributor for the Southwest territory, including Texas, Oklahoma, Colorado, Kansas, Wyoming, and parts of Nebraska.  (*Id.* at ¶ 5.) He formed Shepard and Associates, Inc. to operate the distributorship.  (*Id.*)  Joe Shepard hired his son, Brad, as a Shepard and Associates salesperson in 2009 or 2010.  (*Id.* at ¶ 6.)

On September 29, 2015, Lokring and Joe Shepard signed a distributor agreement, which took effect on July 1, 2016.  (*Id.* at ¶ 7.)  In April 2016, Lokring, Shepard and Associates, Brad, and Joe entered into two agreements for the Southwest distributorship: the Lokring Amended and Restated Exclusive Distributor Agreement ("EDA") and a Confidentiality and Non-Competition Agreement ("NDA").  (*Id.* at ¶ 8.)  The NDA is listed as Appendix G to the EDA. (*Id.*)[2]

Effective July 1, 2016, Joe Shepard was released from the Southwest EDA – leaving

---

[2] Brad Shepard and Shepard and Associates are referred to collectively herein as "Plaintiffs."

Shepard and Associates and Brad Shepard subject to the EDA and NDA.  (*See id.* at ¶ 10.)

On January 25, 2019, Shepard and Associates hired Zach Maywald.  (*Id.* at ¶ 13.)  In February 2019, Shepard and Associates hired Jared Guidry.  (*Id.* at ¶ 14.)  Guidry signed an offer letter.  (*Id.*)  Lokring does not have an executed copy of any non-disclosure or noncompete agreement between Guidry and Shepard and Associates.  (*Id.*)  Nor does Lokring have an executed copy of any non-disclosure agreement or noncompete agreement involving Guidry that names Lokring as a third-party beneficiary to the agreement.  (*Id.*)

From 2010 to June 30, 2020, Shepard and Associates used the Big Contacts software platform.  (*Id.* at ¶ 23.)  Shepard and Associates and Joe Shepard entered information into this platform from 2010 to June 2020.  (*Id.*)  On June 29, 2020, Maywald, while still employed by Shepard and Associates, sent an email to Guidry and Brad Shepard.  (*Id.* at ¶¶ 18-19.)  This email included a BP GOM.xlsx file and an ALLACOUNTS.xlsx file downloaded from the Big Contacts platform that contained customer lists with personnel contact information.  (*Id.*)  The BP GOM.xlsx file and the ALLACOUNTS.xlsx file each contain rows of information that identify a site, a name, an email address, a phone number, and a position for the identified person.  (*Id.* at ¶ 26.)  In some cases, the rows do not include all this contact information (*e.g.*, some contacts include only a company name or a phone number.).  (*Id.*)

On September 7, 2020, Guidry sent the BP GOM.xlsx file and the ALLACOUNTS.xlsx file from his Lokring email address to his personal email account.  (*Id.* at ¶ 21.)

On October 20, 2020, Brad Shepard sent the BP GOM.xlsx file and the ALLACOUNTS.xlsx file from his Lokring email address to his personal email account.  (*Id.* at ¶ 22.)  On June 3, 2020, Brad Shepard obtained a backup of the Big Contacts CRM included in a .zip file.  (*Id.* at ¶ 27.)  On July 30, 2020, Brad Shepard sent the .zip file from his Lokring email

address to his personal email account.  (*Id.* at ¶¶ 27-28.)

On September 20, 2020, Lokring advised Brad Shepard and Shepard and Associates that Lokring was terminating the EDA within 30 days as either party had the right to do under the EDA.  (*Id.* at ¶ 24.)  On September 21, 2020, Brad Shepard met with and terminated all Shepard and Associates' employees effective immediately.  (*Id.* at ¶ 25.)

While employed with Tube-Mac, Guidry sent emails soliciting the sale of Pyplok products using a Tube-Mac email address.  (*Id.* at ¶ 29.)  The emails Guidry sent are stored on Tube-Mac's email server.  (*Id.*)  Guidry stopped providing services to Tube-Mac by March 1, 2023.  (*Id.*)

## II.    Law and Analysis

Lokring's three claims against Tube-Mac have been thoroughly briefed in the parties' cross-motions for summary judgment, supported by citations to evidence in the record. Lokring's Count Seven asserts trade secret misappropriation under federal law.  Count Eight asserts trade secret misappropriation under Ohio law.  Count Nine asserts unfair competition under both federal and Ohio law.

### A.    Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears

the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

 "Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Id*.; *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

 A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) and (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp*., 767 F.3d

526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

### B. Choice of Law

The distributor agreement between Lokring and Shepard and Associates provides that its construction and enforcement – as well as any documents incorporated in and executed in connection with that agreement – are governed by federal and Ohio law (without regard to conflict of laws principles). (Doc. No. 9-1 at 2779, § 13.5.)[3] Lokring and Tube-Mac both argue that Ohio is the pertinent body of state law governing the claims against Tube-Mac. (*See* Doc. No. 309 at 6935; Doc. No. 310 at 7200, 7214, 7218, 7226; Doc. No. 331 at 11793.) To the extent there is a basis for either party to argue that Texas law should govern the issues discussed below, such arguments have been waived. *See generally Meridia Prod. Liab. Litig. v. Abbott Lab's*, 447 F.3d 861, 865 (6th Cir. 2006).

Accordingly, where state law controls or informs the resolution of claims against Tube-Mac, this Court applies Ohio law. *See generally Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993); *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006); *Sirlouis v. Four Winds Int'l Corp.*, No. 1:10-cv-00469, 2012 WL 1068709, at *4 (N.D. Ohio Mar. 29, 2012); *Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004).

### C. Claims for Misappropriation of Trade Secrets

Lokring contends in Count Seven that Tube-Mac is liable under the Defend Trade Secrets

---

[3] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

Act, 18 U.S.C. § 1836, *et seq*. ("DTSA").  (Doc. No. 61 at 912-13.)  "The DTSA requires a plaintiff to demonstrate (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' *id*. § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id*. § 1839(5)."  *Oakwood Labs LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021).

Count Eight asserts essentially the same claim under the Ohio Revised Code § 1333.61, *et seq*.  Under Ohio law, "the elements are: (1) the existence of a trade secret; (2) acquisition of the trade secret as the result of a confidential relationship or through improper means; and (3) an unauthorized use of the trade secret."  *Novus Grp., LLC v. Prudential Fin., Inc*., 74 F.4th 424, 427-48 (6th Cir. 2023) (applying Ohio law); *see also Tilr Corp. v. TalentNow, LLC*, 2023-Ohio-1345, 2023 WL 3083168, at *5 (Ohio Ct. App. Apr. 26, 2023); *Hanneman Family Funeral Home and Crematorium v. Orians*, 2022-Ohio-984, 2022 WL 893806, at *6 (Ohio Ct. App. Mar. 28, 2022); *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 82 N.E.3d 1180, 1184-85 (Ohio Ct. App. 2017).

Misappropriation is defined nearly identically in the federal and state statutes. Under the DTSA, misappropriation means:

> (A)  acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;[4] or
>
> (B)  disclosure or use of a trade secret of another without express or implied consent by a person who —

---

[4] An improper means under the DTSA "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition . . . ."  18 U.S.C. § 1839(6).

(i)  used improper means to acquire knowledge of the trade secret;

(ii)  at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was —

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii)  before a material change of the position of the person, knew or had reason to know that —

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).  Similarly, under Ohio law, trade secret misappropriation means either:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;[5] [or]

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B).

---

[5] "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Ohio Rev. Code § 1333.61(A).

### 1.    Protectible Information

"A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge."  *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021). Here, Lokring identifies two species of trade secrets: customer lists and narrative notes regarding customer dealings.  Both categories of information were kept on a customer relationship management software platform operated by Shepard and Associates called "Big Contacts." (Doc. No. 309 at 6938-40; Doc. No. 310 at 7206-07; Doc. No. 333 at 11881, 11883-84.)

The Big Contracts platform contains the identities of commercial customers, including contact information for personnel at those customer-companies.  "Big Contacts" is not the customer list.  "Big Contacts" is a company that sells a license to use a web-based CRM platform called Big Contacts.  The customer list itself was contained on the Big Contacts platform, and the list is not the same as the platform.  (Doc. No. 333 at 11901.)  The platform allows for entry of "notes" regarding a customer or its personnel.  Notes might include anything from basic data points (such as dates of telephone calls) to robust narrative details (such as who had lunch with whom and what was said during the meal).  (*See* Doc. No. 298-01 at 5464-6458.)

"Customer lists . . . and sales strategies can be trade secrets."  *SKF USA Inc v. Zarwasch-Weiss*, No. 1:10-cv-1548, 2011 WL 13362617, at *16 (N.D. Ohio Feb. 3, 2011) (citing *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848 (S.D. Ohio 2000) and *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999)).  The Court therefore deems the customer lists and notes in question as eligible for trade secret protection under the DTSA and Ohio law.

But deeming these two categories of information protectible is not sufficient for liability under state or federal law.  While the customer lists and notes are eligible for trade secret protection, Lokring still must show that those were obtained from within a confidential relationship or by improper means – despite reasonable efforts made to maintain secrecy.

## 2.    Confidential Relationship

Lokring argues that Tube-Mac (*i.e.*, via the actions of Guidry) misappropriated trade secrets in the form of customer lists and notes data – both taken from the Big Contacts platform. (Doc. No. 61 at 912-14.)[6]  Tube-Mac counters that Lokring cannot show acquisition of a trade secret as the result of a confidential relationship.  (Doc. No. 309 at 6948.)  It argues that "the facts are clear no improper means or duty to maintain secrecy existed (*e.g.*, no acquisition occurred via a confidential relationship with Lokring)."  (*Id.* at 6949 n.4; *see also* Doc. No. 331 at 11772, 11786.)

Lokring acknowledges that "the question of whether a trade secret was misappropriated depends on whether there was a duty to maintain secrecy or whether the trade secret was obtained through improper means."  (Doc. No. 333 at 11892.)  It relies on the argument that the information at issue was subject to contracts and confidentiality rules between Lokring and Plaintiffs.  (Doc. No. 310 at 7205-06; Doc. No. 333 at 11888-93.)  Those obligated Plaintiffs to require Guidry to sign an identical confidentiality agreement, Lokring contends.  (*See id.*)

But Lokring disputes that showing a "confidential relationship" is required:

Tube-Mac focuses a great deal of attention on the need for a "confidential relationship," but nowhere in its briefing does it provide the Court with a definition of a "confidential relationship," and Tube-Mac cites no authority establishing what exactly a "confidential relationship" is for purposes of a misappropriation claim.  While some case law uses the term "confidential relationship," those words are not contained in either the OUTSA or the DTSA and are not a requirement.  Instead, both statutes define the nature of the circumstances under which a trade secret is "misappropriated."

(Doc. No. 333 at 11890-91.)

The Ohio Supreme Court has explained that "trade secret laws are not those of property

---

[6] Lokring's trade secret claims against Plaintiffs are factually and legally distinct.  Nothing in this Opinion should be construed as resolving the merits of Counts Seven or Eight as against Plaintiffs.

but the equitable principles of good faith applicable to confidential relationships." *Consumer Direct, Inc. v. Limbach*, 580 N.E.2d 1073, 1075 (Ohio 1991) (quoting *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 817-18 (Ohio 1986)).  Moreover, this Court is bound to follow the Sixth Circuit's opinion in *Novus Group*, which held that plaintiffs must show "acquisition of the trade secret as the result of a confidential relationship or through improper means."  74 F.4th at 428 (applying Ohio law); *see also B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449, 2021 WL 3732313, at *6 (6th Cir. Aug. 24, 2021); *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 Fed. App'x 860, 861 (6th Cir. 2008); *Hoover Transp. Servs., Inc. v. Frye*, 77 Fed. App'x 776, 782 (6th Cir. 2003).

a)  **Contractual Basis**

"In analyzing whether information is disclosed within a confidential relationship, Ohio courts have generally considered the facts of each case, looking for an agreement or understanding of confidentiality."  *R & R Plastics, Inc. v. F.E. Myers Co.*, 637 N.E.2d 332, 341 (Ohio Ct. App. 1993).  In *R & R Plastics,* the information was shown to others who were neither asked to sign confidentiality agreements nor were exposed to information that was conditioned on their agreement to confidentiality.  *See id.* at 341-42.  From those facts, the court found "no evidence to support [the] assertion that an agreement or understanding of confidentiality, expressed or implied, ever existed between the parties."  *Id.* at 341.

Similarly in *Novus Group,* the Sixth Circuit recognized the need for a confidential relationship but cast doubt that such a relationship exists for trade secret purposes unless spelled out in contract.  "To assess whether a confidential relationship exists," the Sixth Circuit asked whether the plaintiff and defendants had "formed a relationship in which the pair had a duty to 'maintain the information received . . . in the utmost secrecy.'"  74 F.4th at 428 (quoting

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003)).[7]  The Sixth Circuit rejected the suggestion that confidentiality arrangements among certain business affiliates will create a duty on the part of other parties.  *Id*.  As for reliance on supposed understandings regarding confidentiality, "[t]he problem here is that what allegedly was in the mind was not on the paper[.]"  *Id.* at 429.  The Sixth Circuit rejected the premise that non-disclosure duties arise by implication in the absence of a contract to that effect.  *See id.*

### b)      Plaintiffs' Contractual Duties

The EDA between Lokring and Plaintiffs provides that Plaintiffs "shall . . . cause each employee of Distributor to enter into the Lokring Confidentiality Agreements as more specifically defined in Section 13.1[.]"  (Doc. No. 9-1 at 270 § 5.1(q).)  Plaintiffs agreed to cause their employees to execute the confidentiality agreement in Appendix H to the EDA.  (*Id.* at 278 § 13.1(b).)

Under the terms of the EDA, Plaintiffs were treated as independent contractors and nothing was to be construed as giving Lokring "the power to direct and control the day-to-day activities of [Plaintiffs] or any personnel employed by [Plaintiffs]."  (*Id.* at 279 § 13.3(a).)  Under the Confidentiality and Non-Competition Agreement (or NDA) found at Appendix G to the EDA, Plaintiffs were "fully liable for and responsible for the fulfillment of [confidentiality] obligations on the part of [Plaintiffs'] employees, and any other party that [Plaintiffs] provides or makes information available to."  (Doc. No. 9-1 at 283 § A.1.h.)

---

[7] The Sixth Circuit affirmed the district court's holding that whether an alleged defendant received information via a confidential relationship is an inquiry distinct from Plaintiff's efforts to maintain secrecy.  *See* 74 F.4th at 428.  In the present discussion, the Court focuses on the relationship between Guidry and his prior employer Shepard and Associates.  Later in this Order, the Court will address efforts by Lokring and Shepard and Associates to maintain the secrecy of the information at issue.

Lokring argues and offers examples to show that "Plaintiffs had a long history of not adhering to the EDA[.]"  (Doc. No. 306 at 6592.)  Pertinent to the present motions, Lokring contends that "Plaintiffs breached . . . the NDA when they disclosed protected Information as defined in the NDA to Guidry without obtaining a confidentiality agreement from Guidry on the same terms and with the same obligations as set forth in the NDA."  (Doc. No. 310 at 7216.) Elsewhere, Lokring takes a different tack, arguing that Guidry signed such an agreement – but that he and Brad Shepard later destroyed it.  (*Id.* at 7218-22.)  Whatever the explanation, the absence of a signed contract with Guidry precludes any claim predicated on such an alleged agreement.

### c)      The Statute of Frauds

Lokring contends that Guidry was subject to non-disclosure and non-competition restrictive covenant agreements between Guidry and Plaintiffs – to which Lokring was a third-party beneficiary.  (Doc. No. 310 at 7218-19; Doc. No. 333 at 11880, 11897.)  No such contracts signed by Plaintiffs or Guidry are in the record.  Lokring accuses Guidry and Plaintiffs of hiding, destroying, and falsely denying the existence of those contracts.  (*Id.*)  Lokring has a pending tort claim for spoliation against Brad Shepard regarding those alleged contracts and other documents. (*See id.*; Doc. No. 61 at ¶¶ 97-104, 167-81.)

Aside from one stray, ambiguous allegation (Doc. 61 at ¶ 199), Lokring does not attempt to show that Tube-Mac engaged in spoliation.  Lokring's pleading is precise that Plaintiffs and Giudry spoliated the alleged contracts between them.  The spoliation claim does not allege that Tube-Mac did so.  (*See id.* at ¶¶ 167-81.)  Nor does Lokring allege that Tube-Mac ever possessed the purportedly missing contracts.  (*Id.*)

Though Lokring did not claim Tube-Mac concealed or destroyed the contracts in

question, Lokring's summary judgment papers invoke and rely on spoliation.  (Doc. No. 310 at 7218-20; Doc. No. 333 at 11880, 11897.)  It characterizes Tube-Mac as turning a blind-eye to spoliation, while opportunistically taking advantage of the resulting void in Guidry's confidentiality duties. (*E.g.*, Doc. No. 310 at 7205 (describing Tube-Mac as knowingly benefitting and "willfully blind" to the conduct of Plaintiffs and Guidry), 7218 n.12 (indicating that Tube-Mac did not ask to review Brad Shepard's NDA or follow up regarding a possible NDA for Guidry).)[8]  In response to Lokring's reliance on alleged "missing" contracts, Tube-Mac points to the statute of frauds, which would require the sort of restrictive covenant agreements for Guidry to be in writing and signed.  (Doc. No. 309 at 6952; Doc. No. 331 at 11793.)

"The rules that apply to spoliation of evidence are defined by state law." *Jaro Transp. Servs., Inc. v. Grandy*, No. 4:03-cv-01227, 2006 WL 2553424, at *10 (N.D. Ohio Sept. 5, 2006) (citing *Beck v. Heik*, 377 F.3d 624, 641 (6th Cir. 2004)).  "The statute of frauds applies to agreements that cannot be performed within a year.  When parties to an alleged agreement did *not* intend the agreement to be performed in less than a year, the statute of frauds renders that agreement unenforceable." *Olympic Holding Co. v. ACE Ltd.*, 909 N.E.2d 93, 102 (Ohio 2009) (citing Ohio Rev. Code § 1335.05).

> The purpose of the statute of frauds is to prevent frauds and perjuries.  The statute does so by informing the public and judges of what is needed to form a contract and by encouraging parties to follow these requirements by nullifying those agreements that do not comply.  [T]he statute of frauds is supposed to make people take notice of the legal consequences of a writing and to reduce the occasions on which judges enforce non-existent contracts because of perjured evidence.  In every case, the formality means that unless the parties adopt the prescribed mode of manifesting their wishes, they will be ignored.  The reason for

---

[8] The Sixth Circuit, applying Ohio law, has held that "a plaintiff may not raise a claim for spoliation of evidence for the first time in opposition to a defendant's motion for summary judgment." *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 451 (6th Cir. 2007) (citing *Matyok v. Moore*, No. L-00-1077, 2000 WL 1232417, at *3 (Ohio Ct. App. Sept. 1, 2000)).  As noted, Lokring did not plead a claim against Tube-Mac for spoliation.

ignoring them, for applying the sanction of nullity, is to force them to be self conscious and to express themselves clearly.

*Id*. at 99 (quotations and citations omitted).

Lokring neither pleads nor shows in its summary judgment papers that Tube-Mac had control of the "missing" contracts in question yet failed to produce them. Accordingly, Lokring is not entitled to the benefit of adverse inferences against Tube-Mac arising from purportedly spoliated contracts. *See Davison*, 231 F. App'x at 451-52; *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 878, 888 (N.D. Ohio 2009), *aff'd*, 606 F.3d 262 (6th Cir. 2010); *Brokamp v. Mercy Hosp. Anderson*, 726 N.E.2d 594, 608 (Ohio Ct. App. 1999).

In light of this body of law, the Court may not indulge an assumption that the alleged contracts in question existed. Guidry's employment lasted more than a year, and the sort of contracts hypothesized by Lokring would come within Ohio's statute of frauds. *See generally* Ohio Rev. Code § 1335.05. Even assuming Brad Shepard and Guidry had discussed a future confidentiality or non-competition agreement, "it is well-settled that a verbal contract within the condemnation of the statute of frauds cannot be enforced in any way, either directly or indirectly, and cannot be made either the ground of a demand or the ground of a defense." *Ma v. Gomez*, 209 N.E.3d 178, 198 (Ohio Ct. App. 2023) (quotations and emphasis omitted).

In support, Lokring submits the initial offer letter Plaintiffs sent to Guidry mentioning that future restrictive covenant agreements were contemplated. But that is all the offer letter contains – mere mentions in the form of two bullet points referencing a future noncompetition agreement and confidentiality agreement. (*See* Doc. No. 123-5 at §§ 12-13.) The offer letter is bereft of details, terms, or conditions. There is no specific scope on either topic that a court could enforce.

Guidry testified that those bullet points never materialized into contracts:

Q.     Did you have an NDA or a confidentiality agreement from your employment with Shepard and Associates dba Lokring Southwest?

A.     No.

Q.     In looking at Exhibit SSS, can you tell me whether or not Lokring Technology, LLC is specifically referenced anywhere in your offer letter?

A.     Lokring Technology, LLC is never mentioned in this offer letter.

Q.     Paragraphs 12 and 13 [of the offer] reference confidentiality and noncompetition agreements. Were any such documents ever presented to you by anybody?

A.     Those documents were never presented to me by anybody, nor were they ever spoke of after signing this.

(Doc. No. 151 at 2876-77.)

Brad Shepard concurred:

Q.     All right.  In looking at Exhibit SSS [the Guidry offer letter], who drafted this document?

A.     This was drafted by me.

Q.     All right.  Can you tell me anywhere in this offer letter, the Pages 3 and 4 and 5 of Exhibit SSS, that Lokring Technology, LLC is mentioned anywhere in that agreement?

A.     Nowhere, to my knowledge.

Q.     Turning to Page 4 of Exhibit SSS, there's a statement, Paragraph 12, "You will agree to a confidentiality agreement."  Did you ever present a confidentiality agreement to Jared Guidry?

A.     No, sir.

Q.     Is there any reference that Lokring Technology, LLC would be the beneficiary of any proposed confidentiality agreement?

A.     No, sir.

Q.     Paragraph 13, "You will agree to a noncompete agreement"  Did you ever present a noncompete agreement to Jared Guidry?

A.     No, sir.

> Q.      Did you ever tell Jared Guidry that a noncompete agreement would be required for which Lokring Technology, LLC would be a beneficiary?
>
> A.      No, sir.

(*Id.* at 2843-44.)

Lokring does not supply the Court with a legal argument supported by persuasive authorities tailored to the unusual circumstance here.  Not only is the alleged written contract missing from the record, both putative contracting parties *deny* the very existence of such a contract.  Even assuming the strong version of Lokring's theory – *e.g.*, that Guidry promised to sign restrictive covenants in the future – that promise does not overcome the statute of frauds.  *See Olympic Holding,* 909 N.E.2d at 96 ("We decline to recognize an exception to the statute of frauds even when the promise to execute an agreement is fraudulent or misleading.").

Based on the evidence, authorities, and arguments in the record, this Court follows the instruction of the Ohio Supreme Court.  For purposes of resolving the competing summary judgment motions on claims against Tube-Mac, the alleged restrictive covenant contracts between Plaintiffs and Guidry are "ignored" or treated as a "nullity."  *Id.* at 95 ("Agreements that do not comply with the statute of frauds are unenforceable.").[9]

### d)      Third-Party Beneficiary

Without a contract binding Guidry, there is no basis for Lokring to claim third-party beneficiary status.  "[O]nly a party to a contract or *an intended* third-party beneficiary may bring

---

[9] Relatedly, the Ohio Supreme Court in *Olympic Holding* further held that an oral agreement to conduct a joint business venture was unenforceable because the nature and scope of the agreement brought it within the statute of frauds.  909 N.E. 2d at 102 ("In *Garg v. Venkataraman*, the court stated that while joint venture agreements may be oral, they are, nonetheless, still contracts, and thus subject to all of the applicable requirements of contract law, including the Statute of Frauds.  Thus, *Garg* held that if a joint-venture agreement does not comply with the statute of frauds, it is unenforceable and cannot impose any fiduciary duties upon the parties.  We agree with *Garg* and therefore hold that an unenforceable joint-venture agreement cannot impose any fiduciary duties on the parties." (cleaned up)).

an action on the contract . . . . For [Lokring] to be an intended beneficiary, the contracting parties *had to enter into the agreements* with the intent to benefit [Lokring]." *LHPT Columbus, L.L.C. v. Capitol City Cardiology, Inc*., 24 N.E.3d 712, 720 (Ohio Ct. App. 2014) (citations omitted; emphases added). "[I]f the promisee . . . intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary', who has no enforceable rights under the contract." *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980) (holding that a third-party was not an intended beneficiary and therefore had no enforceable rights) (cited with approval by *Hill v. Sonitrol of Sw. Ohio, Inc*., 521 N.E.2d 780, 784-85 (Ohio 1988)). "Courts generally presume that a contract's intent resides in the language the parties chose to use in the agreement." *Huff v. FirstEnergy Corp*., 957 N.E.2d 3, 7 (Ohio 2011). "For an injured third party to qualify as an intended third-party beneficiary under a written contract, the contract must indicate an intention to benefit that third party." *Id.* (court syllabus).

Here, Lokring has a cogent theory that Plaintiffs intended for Lokring to be a third-party beneficiary when Shepard and Associates employees executed NDAs. But Lokring supplies neither evidence to support nor a legal theory to sustain the notion that somehow *Guidry* intended to benefit Lokring through confidentiality or non-competition restrictions. To the contrary, Guidry maintains that he did not sign a contract. He did not agree to be bound by restrictive covenants in favor of his employer Shepard and Associates – much less in favor of his employer's supplier, Lokring.[10] In the absence of a written contract with Guidry's signature

---

[10] Confronted with a similar situation (albeit under Kentucky law), another district court reviewed contracts with signature blocks indicating which parties would be bound or benefit from draft contracts *if* they had been signed. But because those contracts were not signed, the

demonstrating his intent and agreement to benefit Lokring, Lokring has no enforceable third-party beneficiary rights.

### e)        No Genuine Dispute of Material Facts

Tube-Mac put forward the following undisputed facts.  Brad Shepard and Guidry both testified that Plaintiffs never presented either non-disclosure agreement or non-competition agreement to Guidry for signature.  (Doc. No. 309 at 6937 ¶¶ 5-6.)  Guidry did not sign – and Lokring did not produce an executed copy to show – such an agreement.  (*Id.* at ¶¶ 7, 9.)

Lokring asks the Court to deem Brad Shepard's and Guidry's testimony not credible.  That argument is misplaced.  On summary judgment, "credibility judgments and weighing of the evidence are prohibited."  *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010)).  And the Court does not disregard the testimony of Brad Shepard or Guidry simply because it serves their or Tube-Mac's interests.  *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 314-15 (6th Cir. 2023) (citing *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010)).

Lokring relies on a patchwork of circumstantial evidence in an effort to show that Guidry verbally acknowledged being subject to a non-disclosure agreement (referred to in the testimony as an "NDA").  Lokring cites testimony and affidavits from Maywald as well as another affidavit from Bea Ochoa – *i.e.*, both former employees of Shepard and Associates.  (Doc. No. 333 at 11879-80.)  There are significant limitations in the oral and written testimony of Maywald and Ochoa, neither of whom pins down a specific articulated admission from Guidry.  (*See generally* Doc. No. 334 at 11912-16.)  But even assuming Guidry made such a statement, statements alone

---

court held that they were ineffectual under the statute of frauds.  *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 889 (E.D. Ky. 2003), *aff'd,* 124 F. App'x 329 (6th Cir.), *cert. denied*, 126 S.Ct. 384 (2005).

do not overcome the statute of frauds. Lokring cannot rely on Maywald's and Ochoa's testimony. *See Olympic Holding*, 909 N.E.2d at 99 ("The purpose of the statute of frauds is to prevent 'frauds and perjuries.'").

Accordingly, even if Lokring's evidence could be construed to indicate the presence of a genuine fact dispute, it is not a *material* dispute. Lokring's evidence would not render Guidry and Shepard and Associates bound contractually, nor would it render Lokring an intended third-party beneficiary with enforceable contract rights. *See Liberty Lobby, Inc.,* 477 U.S. at 248 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

In sum, Lokring has not shown the information at issue was procured by Guidry from within a confidential relationship. Lokring therefore must show that Guidry obtained the information through improper means.

### 3. Improper Means

"Improper means" under Ohio trade secret law "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ohio Rev. Code § 1333.61(A); *see also id.* § 2913.02 (defining theft); 2921.02 (defining bribery).[11]

Lokring's motion argues:

There is no question that both Shepard and Tube-Mac obtained Lokring's customer list through improper means. *See*, R.C. § 1333.61(B). On October 20, 2020, just one day prior to termination of the EDA, Brad Shepard forwarded Lokring's

---

[11] The federal DTSA includes this same definition, 18 U.S.C. § 1839(6)(A), but further adds that "improper means . . . does not include reverse engineering, independent derivation, or any other lawful means of acquisition." *See* 18 U.S.C. § 1839(6)(B).

customer list to his personal email address and on September 7, 2020, Guidry forwarded the customer list to his personal email.

> The record further establishes that Plaintiffs and Tube-Mac engaged in the unauthorized use of a trade secret.  *Id*.  Guidry testified that he used Lokring's customer list to solicit sales, and there is no question his use of the list was unauthorized.  The record establishes beyond a doubt that Guidry sent hundreds of emails to specific individuals on Lokring's customer list.  And Guidry certainly had reason to know that this list was acquired by improper means.

(Doc. No. 310 at 7225-26.)[12]  In response to Tube-Mac's motion, Lokring argues:

> [W]hether a trade secret was misappropriated depends on whether there was a duty to maintain secrecy or whether the trade secret was obtained through improper means.  Here, there is ample record evidence to establish circumstances where Guidry and Tube-Mac had a duty to maintain the secrecy of Lokring's customer lists.

(Doc. No. 333 at 11892 (quoting the footer disclaimer from the bottom of emails sent using Lokring servers).)

In its reply, Lokring reiterated its position regarding improper means:

> The record establishes that Guidry used improper means to acquire Lokring's customer list, then further disclosed and used the trade secrets – in a manner completely authorized by TM [Tube-Mac] – as TM's employee; Guidry admitted this under oath during the PI hearing.  (Guidry Dep. 157:12-25; 158:3; Dep. Ex. 76; Hearing Exhibit S.1).

(Doc. No. 352 at 14569.)

Lokring argues that the notice appearing in the footer or signature file of emails sent over Lokring email servers renders Guidry's conduct an "improper means."  Guidry received an email at his lokring.com address from Maywald's lokring.com address on June 29, 2020.  Attached were the customer contact list spreadsheet files titled BP GOM.xlsx and ALLACOUNTS.xlsx. (Lokring TRO Hearing Exs. S.1-S.2; *see also id.* Exs. T & U.)  The notice Lokring relies upon provides:

---

[12] Lokring does not attempt to meet any definition for theft, bribery, misrepresentation, or espionage.

> This communication and any information drawn from it are the confidential property of Lokring Technology, LLC and are provided to you for a specific purpose.  The information may not be copied, exhibited, or provided in any form to others without the written consent of Lokring Technology, LLC.  If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately and delete this message from your system.  Thank you.

(Doc. No. 341 at 12297-98 (citing Lokring TRO Hearing Exs. S.1-S.2).)

To begin, the head of Shepard and Associates, Brad Shepard, was copied on the email. The email was sent *on* Lokring's server.  Thus, Guidry did not improperly receive the customer spreadsheets.  These actions were visible to Lokring and to Guidry's employer.

Assuming without deciding that the notice from the email signature's fine print would impose a legal duty upon Guidry, the undisputed facts here do not amount to a breach of that notice.  First, the "specific purpose" was made plain in the body of the email.  The spreadsheet attachments were in a form to be downloaded to a computer device.  The email instructed to "[d]ownload to excel format" and then "[s]ave to folder."  (*Id.*)  Second, the prohibition on exhibiting or providing the information was "to others."  Although there is evidence that Guidry used content from within these email attachment lists, there is no evidence that he made other copies of the lists.  Third, dissemination, distribution, copying or other use of the email or its attachments was only prohibited if the reader was not the intended recipient.  But here, Guidry was an intended recipient of the email.  Finally, Guidry was not obligated to notify anyone of his receipt of this email inasmuch as it was not sent to him in error.  Even if such a duty existed, the obligation would only have been to notify the sender, Maywald, who was an employee of Shepard and Associates, not Lokring.

For the reasons discussed above, Lokring has not shown that Guidry procured the information at issue by improper means.  Because the information also was not procured from

within a confidential relationship (as previously discussed), the Court concludes as a matter of

law that Lokring has not satisfied the second element of a claim for trade secret misappropriation

under Ohio law.  Summary judgment is entered in favor of Tube-Mac and against Lokring on

Count Eight.

### 4.        Reasonable Efforts to Maintain Secrecy

"Because of the intangible nature of a trade secret, the extent of the property right therein

is defined by the extent to which the owner of the secret protects his interest from disclosure to

others."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).  "Ohio law recognizes that a

party claiming trade secret status has the burden of demonstrating that it took reasonable steps to

maintain the secrecy of the protected information."  *Niemi v. NHK Spring Co*., 543 F.3d 294, 302

(6th Cir. 2008).  "[A] trade secret cannot be acknowledged as such unless the manufacturer has

initiated measures designed to ensure the security of those things considered trade secrets."

*Valco Cincinnati, Inc.*, 492 N.E.2d at 819.  "There is no presumption that any particular idea

imparted to or acquired by an employee is a trade secret unless the possessor takes active steps to

maintain the secrecy."  *Water Mgmt., Inc. v. Stayanchi*, 472 N.E.2d 715, 718 (Ohio 1984).

"It stands to reason, therefore, that disclosure can extinguish a trade secret and the

owner's rights therein."  *Houser v. Feldman*, 569 F. Supp. 3d 216, 226-27 (E.D. Pa. 2021)

(quotations and citations omitted).  "A failure to require a third party to enter a confidentiality

agreement to protect alleged trade secrets is one clear way to waive any trade secret protection

that might exist."  *BDT Prods.*, 274 F. Supp. 2d at 891.

In *BDT Products*, the court noted that the parties had other contracts that contemplated

confidentiality and trade secret protection.  But because those parties did not have a

confidentiality agreement that covered the particular discloser and recipient at issue, any trade

secret protection was "forfeited." *Id.* at 892 (applying Kentucky Uniform Trade Secrets Act) ("BDT's execution of numerous agreements that protected information disclosed by Hewlett Packard and Tektronix, but that did not afford any protection for information disclosed by BDT, is the antithesis of 'reasonable efforts' to maintain secrecy.").  Moreover, the court refused to recognize some implied duty of confidentiality where the parties could have contracted to address the situation where the information was disclosed but did not do so.  *See id.* at 893-94.

The Eleventh Circuit has likewise rejected a trade secret claim where an employer failed to require and obtain a confidentiality agreement to protect the information at issue.

> [W]e affirm the District Court's rejection of Yellowfin's Customer Information trade secret claim because Yellowfin failed to reasonably protect the information. Yellowfin limiting employee access to the information and password-protecting the computer network on which the information resided were positive steps in securing the alleged trade secret.  But Yellowfin compromised the efficacy of these measures by encouraging [its employee] to keep the Customer Information on his cellphone and personal laptop.  Indeed, [that employee] refused to sign an employment agreement which stated that he would, among other things, keep all Yellowfin trade secrets in confidence.  Further, Yellowfin neither marked the Customer Information as confidential nor instructed [the employee] to secure the information on his personal devices.  And when [he] left Yellowfin, the company did not request that [this employee] return or delete any of the information.
>
> Thus, at bottom, Yellowfin's efforts to secure the Customer Information rest upon a purported 'implicit understanding' between Yellowfin and [the former employee] that the information was to be kept confidential.  Although Florida law recognizes implied confidential relationships sufficient to trigger trade secret liability, this Court is wary of any trade secret claim predicated on the existence of such a relationship.

*Yellowfin Yachts, Inc. v. Barker Boatworks*, *LLC*, 898 F.3d 1279, 1300 (11th Cir. 2018) (quotations and citations omitted).

The Eighth Circuit recently treated the failure to obtain a confidentiality agreement as sufficient to deny trade secret protection.

> The district court concluded Crop Ventures did not take reasonable efforts to maintain the secrecy of the information it alleges was a trade secret.  Crop Ventures shared the information with a third-party contractor without a confidentiality

agreement and without other policies or practices for safeguarding secrets.  The district court concluded this information was therefore not protected under the [state statute] or DTSA.

On appeal, [Crop Ventures' successor-in-interest] has not challenged the finding that it shared the relevant information with a third-party who had no obligation to keep it confidential.  As a result, we agree with the district court that Crop Ventures did not take reasonable steps to safeguard its trade secrets. Without such reasonable efforts or measures, there is no secret to protect, and [the successor] cannot maintain a claim under the [state statute] or DTSA.

*Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020).

An employer's failure to advise employees that information was considered a trade secret and failure to have them sign a confidentiality agreement recently led a district court to grant summary against a trade secret plaintiff.  *RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119, at *27 (D. Colo. Nov. 13, 2020).  Notwithstanding general practices like password-protected accounts or limiting the number of persons with access to information, the court held that the failure to take the straightforward and direct approach of obtaining a confidentiality agreement sufficed for judgment as a matter of law.  The court concluded "that no reasonable jury could find that the Trade Secret Plaintiffs employed reasonable efforts to secure the information."  *Id.*

The reasonableness or efficacy of a trade secret plaintiff's efforts to maintain secrecy are typically left for a jury.  *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 459-60 (6th Cir. 2013) (collecting authorities).  But not always.  "While it is true that the existence of a trade secret would normally constitute a factual question, . . . some types of information may not be a trade secret as a matter of law, and [ ] summary judgment may be appropriate in cases where a party has failed to meet its burden of proof for the purposes of a summary judgment motion by generating through evidentiary submissions a *genuine* issue of material fact."  *Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034, 1043 (N.D. Cal. 1990)

(citation omitted).  If a trade secret plaintiff fails to meet the rigors of Rule 56, the Sixth Circuit

has affirmed a district court's entry of summary judgment on the grounds that there was no

evidence to show that the plaintiff maintained the secrecy of the information.  *See R.C.*

*Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 276-77 (6th Cir. 2010).

Lokring's arguments to show that measures were taken to maintain the secrecy of the

purported trade secrets focus on (i) its general practices with all distributors and (ii) the terms of

Lokring's distributor agreement and NDA with Brad Shepard.  Lokring leans heavily on the

Court's Preliminary Injunction Order.  But, "[b]ecause of the lesser burden of proof required to

support a motion for preliminary injunction as contrasted with a motion for summary judgment,

a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is

not dispositive of those substantive issues on the merits."  *William G. Wilcox, D.O., P.C.*

*Employees' Defined Ben. Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989).

"Findings made in the course of deciding whether to issue a preliminary injunction . . . generally

do not establish the law of the case . . . ."  *Grudzinski v. Staren*, 87 F. App'x 508, 512 (6th Cir.

2004); *see also Harris v. Fitchville Twp. Trustees*, 154 F. Supp. 2d 1182, 1186-87 (N.D. Ohio

2001) ("The Sixth Circuit has held that determinations made in the process of deciding a motion

for preliminary injunction are not binding in a resolution on the merits.").  "[A] court's findings

and conclusions at the preliminary injunction stage are by nature *preliminary*.  They are typically

based on an incomplete record, using a different standard (likelihood of success on the merits),

and therefore are not binding at summary judgment.  Accordingly, [Plaintiff] was not entitled to

rely on these findings . . . ."  *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524,

528 n.4 (7th Cir. 2000) (internal citation omitted) (emphasis in original); *accord*, *Wilcox*, 888

F.2d at 1114.

Based on the evidentiary record now before the Court, Lokring does not show (or create a triable issue) that reasonable measures were taken in relation to Guidry to keep the information at issue secret.  The First Circuit has persuasively indicated that evidence of reasonable measures must address how those measures were directed to or affected the person accused of misappropriation.

> After a careful review of the record, we have not found any evidence to support Incase's argument that it took reasonable steps to preserve the secrecy of the price flag design.  Although [an Incase manager] testified, for example, that when Incase works on a project, it is treated as confidential between Incase and the company, that the design is proprietary and our property, and that he believed that the price flag designs were secret, he admitted under cross-examination that *this policy was never articulated to Timex*.  The fact that Incase kept its work for Timex private from the world is not sufficient; discretion is a normal feature of a business relationship.  Instead, there must be affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made.  Here, there is no evidence that any such steps were taken.  Therefore, we affirm the district court's judgment as a matter of law on the misappropriation of trade secrets claim.

*Incase Inc. v. Timex Corp*., 488 F.3d 46, 53 (1st Cir. 2007) (citations omitted; emphasis added); *see also J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc*., 260 N.E.2d 723, 730–31 (Mass. 1970) (holding that protecting a trade secret "calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it").  Lokring is in a situation similar to Incase while Guidry stands in a posture akin to Timex.  Whatever general policies Lokring required, none of those was applied to Guidry in particular.

Lokring's basis to show that it took reasonable precautions to maintain the secrecy of the information is limited to the contractual duties of Shepard and Associates and its principal Brad Shepard.  But Lokring does not show that a reasonable jury could conclude that Shepard and Associates employed reasonable measures to maintain the secrecy of the information on the Big Contacts database in relation to Guidry.  He had access to the database during a year of

employment.  He was not made to sign a confidentiality agreement.  Two customer contact lists exported from Big Contracts were emailed to Guidry by Shepard and Associates personnel along with instructions on how to download those lists to a computer.  The owner of the company Brad Shepard was copied on the email.  That information was provided voluntarily to Guidry on June 29, 2020.  During the remaining three months of his employment, Shepard and Associates did not attempt to claw back the information or to restrict Guidry's access to it.

Moreover, Lokring knew or should have known that Plaintiffs failed to take reasonable precautions with respect to Guidry.  No reasonable jury could find otherwise on this record. Guidry worked at Shepard and Associates for approximately one year.  The standard form employee agreement that Lokring required (Appendix H to the distributor agreement) had a signature block for Lokring as third-party beneficiary.  So for a year, Lokring did not demand that its distributor and Guidry immediately sign that agreement and present it for Lokring's own execution.  Further, for most of Guidry's tenure, Shepard and Associates used its own customer database housed on Big Contacts, over which Lokring did not exercise monitoring capability or control (*i.e.*, at least until July 2020).  (*See* Doc. No. 309 at 6940 ¶ 24.)

During that time, Lokring could have and should have known that an employee of Shepard and Associates with no confidentiality contract on record had access to customer lists and notes in the Big Contacts platform.  Given these facts, a reasonable jury could not find that Lokring took reasonable precautions to maintain the secrecy of the information at issue with respect to Guidry.

The failure to take reasonable precautions to maintain secrecy is distinct from the confidential relationship issue.  *See Novus Grp.*, 74 F.4th at 428.  For the reasons above, the Court concludes as a matter of law that Lokring cannot satisfy either 18 U.S.C. § 1839(3)(A) or

Ohio Rev. Code § 1333.61(D)(2).  Summary judgment is entered in favor of Tube-Mac and against Lokring on Counts Seven and Eight on this basis as well.

### D.    Unfair Competition Claims

In Count Nine, Lokring alleges that Tube-Mac engaged in unfair competition under federal law (the "Lanham Act") and state law.  (Doc. No. 61 at 914-15.)  Both parties move for summary judgment on this claim.  (Doc. 309 at 6960-61; Doc. No. 310 at 7226, *et seq*.)

### 1.    Legal Doctrine

The Lanham Act provides a cause of action where "[a]ny person, who on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities[ ] . . . of his or her or another person's goods, services, or commercial activities[.]"  15 U.S.C. § 1125(a)(1)(B). This provision affords a remedy to businesses that complain about an injury to a commercial interest in reputation or sales resulting from a competitor's false advertising.  *See generally Lewis v. Acuity Real Est. Servs., LLC*, 63 F.4th 1114, 1118 (6th Cir. 2023); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014).

Likewise, under the Ohio Deceptive Trade Practices Act ("ODTPA"), a civil action may be filed when "[a] person, . . . in the course of the person's business, vocation, or occupation, . . . [d]isparages the goods, services, or business of another by false representation of fact[.]"  Ohio Rev. Code § 4165.02(A)(10).  Courts "evaluate an Ohio deceptive trade practices claim under the same analysis as that used for Lanham Act claims."  *Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x. 53, 55 (6th Cir. 2012) (citing *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003)).

To prevail, a plaintiff must prove that the defendant (a) made false or misleading statements of fact about their product, (b) which actually deceived or had a tendency to deceive a substantial portion of the intended audience, and (c) likely influenced the deceived consumers' purchasing decisions.  *Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 270 (6th Cir. 2018); *see also Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019); *cf. Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 796 F.3d 576, 590 (6th Cir. 2015) ("Absent a false statement about geographic origin, a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the 'characteristics of the good itself' – such as its properties or capabilities.").

"Liability arises if the commercial message or statement is either literally false or literally true or ambiguous, but has the tendency to deceive consumers."  *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735 (6th Cir. 2012) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 290 F.3d 578, 586 (3d Cir. 2002)).[13] "[W]here statements are literally false, a violation may be established without evidence that the statements actually misled consumers."  *Id.* at 694 F.3d at 735.

> A 'literally false' message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.  The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported.

---

[13] "Literally false statements actionable under the Lanham Act fall into two subcategories: explicit false statements and falsehoods conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."  57 Causes of Action 2d 665 (2013) (citing *Innovation Ventures*, 694 F.3d at 735).

*Id.* at 735-36 (quotations and citations omitted).[14]  "[O]nly an unambiguous message can be literally false," *Novartis*, 290 F.3d at 587, and "courts presume that consumers were actually deceived upon a showing of literal falsity," *Wysong*, 889 F.3d at 270-71.

### 2.  Proof of Literal Falsity

"Product disparagement involves more than a simple negative statement about a competitor's product.  . . . The relevant question . . . is whether [the defendant] has made false . . . representations of fact, about [the plaintiff's] products, and not merely negative representations about those products."  *Gillette Co. v. Norelco Consumer Prod. Co.*, 946 F. Supp. 115, 128 (D. Mass. 1996).  "[P]laintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe."  5 McCarthy on Trademarks and Unfair Competition § 27:56 (5th ed.) (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999), *as amended on reh'g*, (Sept. 29, 1999)).

"The Court may determine, based on its own review of an advertisement, that a literally true or a literally false message is conveyed or not conveyed.  The Court may rely on its own common sense and logic in interpreting the message of the advertisement."  *Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994).  "The method of proof varies . . . depending on whether the charge is that a statement is false on the one hand, or that it is misleading, on the other.  If the assertion is made that a statement is literally false, then there is no need for the court

---

[14] "Liability . . .  may arise if the commercial message or statement is literally true or ambiguous but has the tendency to deceive consumers.  Such statements are sometimes called impliedly false claims.  A plaintiff alleging an implied falsehood is claiming that a statement, whatever its literal truth, has left an impression on the listener or viewer that conflicts with reality – a claim that invites a comparison of the impression, rather than the statement, with the truth."  57 Causes of Action 2d 665 (2013) (citations omitted).

to consider consumer survey evidence."  *Gillette*, 946 F. Supp. at 127-28.  "[A] court may grant relief on the basis of its own findings without reference to consumer reaction to the product when the defendant's representations are actually false."  *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 15 (1st Cir. 1986).

Nonetheless, courts still look for evidence from a plaintiff to demonstrate or substantiate the falsity of challenged statements.  In *Gillette,* for example, a shaving device company sued regarding a competitor's reference to wet shaving as painful or dangerous.  946 F. Supp. at 129. The plaintiff submitted evidence showing remarkable customer satisfaction with its products. The court held that such evidence did not disprove any potential painful or dangerous outcome from shaving.  The court also cited the defendant's anecdotal evidence of cuts and skin irritation, which could not be denied – notwithstanding widespread customer satisfaction with the plaintiff's products.  *Id.*  Thus, the court held that plaintiff's evidence did not show literal falsity of the challenged statements.  *Id.*

A "Lanham Act claim must be based upon a statement of fact, not of opinion."  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999).  And "only an unambiguous message can be literally false." *Novartis*, 290 F.3d at 587.  With those points in mind, the Court reviews the challenged emails.

### 3.    Communications at Issue

Lokring moves for summary judgment identifying two sentences from the body of near-identical solicitation emails Guidry sent *en masse* to personnel at several companies.  (Doc. No. 310-1.)  The emails in question all contained the text below along with certain attachment(s), with Guidry adding or revising some recipient-specific details in some of the emails.  The text used in the emails contained the following:

I previously worked for Brad Shepard at Lokring Southwest, you may know Lokring Technology closed that office late last year without cause. Now I work for Tube-Mac selling a product called Pyplok. Pyplok is an ASME B31 code qualified connection (documentation attached). Pyplok was first developed by McDonnell Douglas for the F4 Fighter Jet and has been utilized primarily in aerospace and high-pressure hydraulic applications since.

Would your group be interested in evaluating Pyplok fittings for use in Category D services?

With the history [recipient company name] has had with Lokring what advantage would a second compression fitting bring?

**PRICE** - Lokring released another sizeable price increase 5/14/2021 which was effective immediately. Pyplok couplings are significantly more cost effective and in most cases can save over 60% over Lokring. If you would like to see a more comprehensive price comparison let me know.

**AVAILABILITY** - The freeze also showed major delays in procuring Lokring fittings. The Lokring factory in Ohio does not keep inventory and most lead times are now at 8 weeks or more for basic fittings. Tube-Mac keeps a sizeable inventory on hand and will have a large local stock in Texas by end of the year. Most lead times would be 1 week or less if it is not in stock. Having a second sourcing option during the freeze could have prevented major delays on applications like potable water, air, low pressure steam, ect...[*sic*]

**FITTING DESIGN** - The major flaw in the Lokring design is the thin cross section in the middle of the fitting where the two pipes meet. Attached were questions from ExxonMobil when discussing 1/8" corrosion allowance. Pyplok fittings have over 1/8" of material throughout the fitting with no thin cross section in the middle of the fitting. Over time there is a tendency for the Lokring fittings to shear at that thin cross section as shown in the attached picture. Within ExxonMobil this has happened at the Baytown Refinery, Beaumont O/A Plant, and Beaumont P/E Plant.

**FORGED SHAPES** - Pyplok shapes like 90 degree elbows and flanges come fully forged with no welds. Lokring shapes are welded and have caused issues with inspection at multiple sites since those welds are not xrayed. There were instances when those welds were then x-rayed by the inspection company and failed causing further delays.

**TOOLING** - There have been multiple Lokring tooling failures at Nucor Steel and ExxonMobil. In comparison Pyplok tooling is made of Aermet, an extremely high quality alloy, and has a long history of no field failures.

(Doc. No. 310-41 (inclusive of the attachments); *see also* Doc. No. 310-1.)[15]

The two individual sentences Lokring contends are literally false and misleading are in the "FITTING DESIGN" portion of the emails. The first sentence reads: "The major flaw in the Lokring design is the thin cross section in the middle of the fitting where the two pipes meet." (Doc. Nos. 310-1, 310-41.) The second sentence provides: "Over time there is a tendency for the Lokring fittings to shear at that thin cross section as shown in the attached picture." (*Id.*)

### 4. The 'Major Flaw' Statement

Lokring explains that when asked the basis for writing a "major flaw," Guidry referred to "feedback from customers, they didn't like the thin cross section of repaired couplings in stainless steel fittings." (Doc. No. 310 at 7228.) This statement is false, Lokring reasons, because "Guidry had no reasonable basis for making this wildly inaccurate statement, and this is made clear through Guidry's own deposition testimony. When asked what basis he had for claiming the thin cross section was a 'major design flaw,' he glibly explained that some customers said 'they didn't like the thin cross section.'" (Doc. No. 333 at 11905-06.) Lokring goes on to argue:

---

[15] The body of the emails contained in Doc. No. 310-1 are identical to the email in Doc. No. 310-41. The introduction paragraphs, however, are different in some of the Doc. No. 310-1 emails.

> I wanted to give you an update on Pyplok progression at LYB and discuss some pricing and availability issues with Lokring that were highlighted during the winter storm recovery. You may know that Corpus Christi plant installed almost 200 Pyplok couplings to help repair water lines, Jennifer Suarez has been overseeing that work if you would like feedback. To my knowledge everything has been good. Mike Liles approved the initial deviation for Pyplok use. Additionally, see the items below to further consider Pyplok an option[.]

(Doc. No. 310-1 at 7234-84.) Attached to the Doc. No. 310-41 email and most of the Doc. No. 310-1 emails were a Pyplock Technical Information Package, a picture of a Lokring product installed at a customer's facility that had sheared, and a document containing a third-party's comments on the shearing issue.

> There is gigantic difference between a 'major design flaw' and a few customers not liking something.  This brazen response demonstrates the recklessness of Guidry's false statement and displays an utter disregard for the truth.  On the other hand, Mark Sindelar, head of product development and technology at Lokring, testified that the thin cross section is not a flaw, that's how the product is designed and its 'been proven to work in application and has been acceptable for over 25 years.'

(Doc. No. 310 at 7228.)  "This testimony is the equivalent of admitting that [Guidry] had no basis for his false assertion, as he further indicated that he 'did no independent engineering investigation other than hearing from several customers.'"  (Doc. No. 352 at 14572 (quoting Guidry Dep. 236:7-8).)

Tube-Mac interprets this same deposition testimony differently, arguing that it "shows that Mr. Guidry's statements were supported by his personal experience, actual tooling failures, and actual customer feedback."  (Doc. No. 331 at 11789.)

Lokring relies on a brief portion of deposition testimony from its head of product design Mark Sindelar.  But Sindelar's deposition testimony is limited and does not go as far as Lokring's arguments suggest.  Taking Sindelar's testimony as true does not establish the literal falsity of Guidry's email statements.

Sindelar confirms that the Lokring product has "various different sections; some thicker, some thinner."  (Doc. No. 331-5 at 11830.)  He acknowledges that certain Lokring products have a cross-section that may be thinner.  (*Id.* at 11829-30.)  He also acknowledges that for some Lokring designs, the section where two pipes meet is thinner.  (*Id.* at 11830.)  Sindelar's testimony thus indicates the basic accuracy of Guidry's product description in the first challenged sentence.  Sindelar confirms that "the Lokring design" does indeed have a "thin cross section in the middle of the fitting where the two pipes meet."

The most that could be deemed false in the first sentence, then, would be Guidry's characterization of that design as a "major flaw."  Lokring bears the burden to show actual

falsity. For two reasons, Lokring does not meet that burden.

First, Lokring does not develop a legal argument or cite caselaw for the proposition that Guidry's "major flaw" characterization could render the rest of his sentence literally false, notwithstanding the undisputed fact that the remainder of the sentence *accurately* describes a facet of the Lokring product design.

Second, when Sindelar was asked whether the thin cross-section was a flaw or was the design, he responded that it was the design. (*Id.* at 11830.) When asked about Guidry's "reference to a "major flaw," Sindelar responded: "That is not factual." (*Id.*)

Sindelar's testimony is confined by virtue of the specific, limited questions he was asked (*i.e.*, in the portions of the deposition transcript the parties cited). *Street*, 886 F.2d at 1479-80 (trial court need only consider portions of record cited by parties). When asked to choose between flaw or design, Sindelar confirms that the thin cross-section is by design. But he does not explicitly testify that there is no flaw whatsoever in Lokring's thinner cross-section design.

The difficulty in relying on this deposition colloquy is that "flaw" and "design" are not mutually exclusive. A product could be made precisely to design specifications yet have a "flaw" due to some problem or shortcoming in the design itself. On the other hand, a product could be manufactured erroneously, where its "flaw" results from a failure to conform to the design. Sindelar's "design" response confirms that Lokring's thin cross-section was intentional. But the cited testimony does not rule out the possibility that this design choice might have drawbacks. It is not inherently false to say that a thinner pipe connector may be more susceptible to corrosion or breakage than it otherwise would be if it were made thicker.

In sum, the product description in the first sentence is accurate. Labeling the product features as a "major flaw" may be overstated and misleading, but the underlying product

description is not false.  The Court therefore concludes that the first challenged sentence cannot be deemed literally false, even if the characterization of a "major flaw" is misleading.

### 5.    The "Tendency to Shear" Statement

Guidry wrote that "[o]ver time there is a tendency for the Lokring fittings to shear at that thin cross section as shown in the attached picture."  (Doc. No. 310-41.)  This second challenged sentence includes specific facts more susceptible to empirical testing and truth, and so – on its face and as compared to the first sentence – this presents a statement that susceptible to being proved true or false.

Lokring asserts definitively that this second sentence "is proved false."  (Doc. No. 352 at 14572.)

> First, there is absolutely no data to support it.  Second, Mr. Sindelar's testimony proved this was not true.  In addition, Guidry's use of the photograph was intentionally false statement, as the evidence has demonstrated that the fitting in the photo sheared because of installation error. (Ex. OO).

(*Id.* at 14572-73.)

"[T]he burden is upon [Lokring] to establish the falsity of the claim, not upon [Tube-Mac] to prove the truth of the claim."  *Gillette*, 946 F. Supp. at 135.  Lokring did not submit expert or other technical evidence to demonstrate the literal falsity of Guidry's statements.

Lokring relies again on Sindelar's deposition testimony.  Sindelar recounts that in his fifteen years working at Lokring, he knew of two instances where a Lokring fitting sheared at its thinner cross-section.  (Doc. No. 331-5 at 11831.)  To be precise, Sindelar was asked about "the history with shearing in Lokring's products *properly installed*," and he responded: "I only know of two."  (*See id.* (emphasis added).)  Sindelar did not definitively testify that there were only two instances of Lokring product shearing; he only testified that *he knew of* two instances of properly installed products shearing.  Here, Sindelar's testimony was not as sweeping or as

definitive as Lokring's argues.

Moreover, the portion of Sindelar's testimony on which Lokring relies contains an inconsistency.  When asked about the photograph attached to Guidry's emails, Sindelar confirmed that the picture was from one of the two shearing instances that Sindelar remembered.  (*Id.*)  Later in his deposition testimony, Sindelar recounted that the true cause of the shearing captured in the photo had not been Lokring's product design; rather, the problem was how the customer's pipes were installed and aligned.  (*Id.*)  On the one hand, Sindelar referred to the instance depicted in the photograph Guidry sent as being one of only two times he knew of product shearing for a *properly installed* Lokring product.  But later, Sindelar referred to that same instance as having been caused by *improper* installation or pipe alignment.  Given that the testimony was succinct, only partially developed, and contains a facial inconsistency, the Court cannot read this testimony as establishing the outright falsity of Guidry's email.

### 6.      Evidence of Actual Deception

Another way "to prevail on a false-advertising claim is to show that the defendant's messaging was 'misleading,' even if not literally false.  To prevail on this theory, however, the claimant must prove that a 'significant portion' of reasonable consumers were actually deceived by the defendant's messaging.  Lanham Act claimants usually do so with consumer surveys." *Wysong*, 889 F.3d at 271.

Lokring has not met its Rule 56 burden to show actual deception to sustain a Lanham Act claim based on a misleading communication.  Lokring does not quantify how many customers actually were deceived by Guidry's email.

Lokring chiefly relies on one email as evidence of actual confusion.  On March 24, 2021, Dow Chemical's Discipline Engineer for Piping and Fixed Equipment wrote the following to

Guidry:

> I am going to respectfully ask that you **please stop contacting my peers** in Deer Park I Houston Hub and **misrepresenting the Pyplok fitting as a "LOKRING equivalent".**  The Pyplok fitting has not been evaluated by our Dow piping discipline team and is not approved for use at Dow.

(Doc. No. 310 at 7210 (citing Ex. U at Dow 181) (emphasis in original).)

On its face, the email in question does *not* indicate any deception about the quality or design flaws in Lokring products.  So even if this email could be construed as evidence of confusion, such confusion has nothing to do with the Lokring product design.  Instead, the Dow Discipline Engineer rebuffed Guidry's attempts to sell Tube-Mac products which Dow had not approved.

There is no evidence to show that Dow or other companies believed that Lokring products were defective or stopped buying and using those products.  Lokring does not have evidence that confusion resulted in actual deception about Lokring products.[16]

For all the reasons above, Tube-Mac is entitled to summary judgment against Lokring on Count Nine.

### E.     Trademark Infringement

Lokring's motion referred to trademark infringement.  (Doc. No. 310 at 7231.)  Its complaint raised only an unfair competition claim under the Lanham Act – not a claim for trademark enforcement.  (*See* Doc. No. 61 at 914-15.)

A plaintiff may not use summary judgment as occasion to alter or expand its claims beyond what was pled.  *See Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x

---

[16] Guidry emailed many employees, but they were employed at just a handful of customer companies.  Because the Court has concluded that the content of the evidence presented does not show actual deception regarding Lokring product quality, the Court need not resolve whether the recipients of Guidry's email constitute an audience widespread enough to sustain the claim.

659, 666 (6th Cir. 2012); *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir.
2007).  "Rather, if a plaintiff wishes to expand their claim mid-stream – because, for instance,
they unearthed new evidence of misconduct in discovery – the proper procedure . . .  is to amend
the complaint in accordance with Rule 15(a)."  *Vonderhaar v. Waymire*, 797 F. App'x 981, 990
(6th Cir. 2020) (quoting *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d
784, 788 (6th Cir. 2005)).  Accordingly, the Court disregards any suggestion in Lokring's
summary judgment papers that Tube-Mac infringed upon a trademark.

### III.    Conclusion

For the foregoing reasons, Tube-Mac's motion for summary judgment is GRANTED.
Lokring's motion for summary judgment is DENIED.  Tube-Mac is no longer a party to this
action.  Accordingly, Doc. Nos. 158, 296, 297, 298, 345, 355, 360, 405, and 408 are DENIED as
moot.

**IT IS SO ORDERED.**

Date: August 21, 2023

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE